## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| JOSEPHAT HENRY resident of Harvey, KAY WILLIAMS resident of Harvey, SYLVIA BROWNE resident of Clifton Hill, MAUDE DREW resident of Estate Barren Spot, MARTHA ACOSTA resident of Estate Profit, WILHELMINA GLASGOW as an individual and mother and next friend of SAMANTHA VIERA, a minor, both residents of Estate Profit, MERCEDES ROSA resident of Estate Profit, GEORGE RODRIGUEZ as an individual and as father and next friend of AMANDO and GEORGE E. RODRIGUEZ, Minors, all residents of Estate Profit, SONYA CIRILO resident of Estate Profit, RAQUEL TAVAREZ, resident of Estate Profit, NEFTALI CAMACHO, as an individual and as father and next friend of ANGEL JAVIER CAMACHO, a minor, both residents of Estate Profit, EYAJIE MALAYKHAN resident of Estate Profit, CHEDDIE KELSHALL resident of Estate Profit and other persons too numerous to mention, A CLASS ACTION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 1999/0036 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ST. CROIX ALUMINA, LLC, ALCOA INC., and GLENCORE, LTD, f/k/a CLARENDON, LTD., | ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' JOINT MOTION TO
## DECERTIFY THE CLASS OF PLAINTIFFS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 2

STANDARD .................................................................................................................... 3

ARGUMENT ................................................................................................................... 4

I.   DECERTIFICATION IS REQUIRED BECAUSE THE INDIVIDUALIZED
     NATURE OF PLAINTIFFS' PERSONAL INJURY CLAIMS PRECLUDES
     CLASS TREATMENT ......................................................................................... 6

II.  DECERTIFICATION IS REQUIRED BECAUSE THE INDIVIDUALIZED
     NATURE OF PLAINTIFFS' PROPERTY DAMAGE CLAIMS PRECLUDES
     CLASS TREATMENT ......................................................................................... 14

III. DECERTIFICATION IS REQUIRED BECAUSE THE INDIVIDUALIZED
     NATURE OF PLAINTIFFS' MEDICAL MONITORING CLAIMS
     PRECLUDES CLASS TREATMENT ................................................................. 20

IV.  DECERTIFICATION IS REQUIRED BECAUSE INDIVIDUALIZED
     TREATMENT OF PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES IS
     MANDATED BY THE DUE PROCESS CLAUSE OF THE CONSTITUTION ............ 23

V.   DECERTIFICATION IS REQUIRED BECAUSE CLASS TREATMENT OF
     PLAINTIFFS' CLAIMS WOULD NOT BE SUPERIOR ................................... 28

VI.  TO THE EXTENT THIS COURT RULES THAT A "COMMON ISSUES"
     TRIAL WOULD BE APPROPRIATE, THAT TRIAL SHOULD BE FRAMED
     BY A COMPLETE DETERMINATION OF THE NAMED PLAINTIFFS'
     CLAIMS ............................................................................................................... 29

CONCLUSION ................................................................................................................ 30

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*In re Agent Orange Prod. Liability Litigation*, 818 F.2d 145 (2d Cir. 1987)......................7, 13

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)...............................................11

*Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D. Pa. 1997) ..................................4, 13, 29

*BMW of N. America, Inc. v. Gore*, 517 U.S. 559 (1996) ..............................................24, 25, 27

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ............................................................................3

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) *(Barnes II)*...........................22

*Barnes v. American Tobacco Co.*, 176 F.R.D.  479 (E.D. Pa. 1997) *(Barnes I)* .....................13

*In re Baycol Products Litigation*, 218 F.R.D. 197 (D. Minn. 2003).........................................22

*Beebe v. Pac. Realty Trust*, 99 F.R.D. 60 (D. Or. 1983)............................................................28

*Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179 (E.D. Pa. 2007)..........................4, 13, 28

*Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78 (M.D. Pa. 1974) .................................17

*Bradford v. Union Pacific R.R. Co.*, 2007 U.S. Dist. LEXIS 72951 (W.D. Ark.
   Sept. 28, 2007) ..............................................................................................5, 18, 19, 28

*CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499 F.3d 184 (3d Cir.
   2007) ............................................................................................................................27

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ..............................................11

*Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545 (D.V.I. 2004) ....................6

*Cimino v. Raymark Industrial*, 751 F. Supp. 649 (E.D. Tex. 1990) .........................................28

*Comer v. Nationwide*, 2006 U.S. Dist. LEXIS 33123 (S.D. Miss. Feb. 23, 2006)...................19

*Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004).....................................................18

*In re Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847 (9th Cir. 1982) ...........13

*Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir. 1993)..........................................................................26, 27

*Emig v. American Tobacco Co.*, 184 F.R.D. 379 (D.Kan. 1998) ...........................................13

*In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 194 F.R.D. 484
    (D.N.J. 2000)..............................................................................................................................13

*Gass v. V.I. Telegraph Corp.*, 149 F. Supp. 2d 205 (D.V.I. 2001) .............................................6

*Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996) ......................................4, 12

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D. Ind. 1995)...........................................................12

*Jones v. Allercare, Inc.*, 203 F.R.D. 290 (N.D. Ohio 2001) .........................................................6

*Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667 (N.D. Ohio 1995)....................................................13

*La Bauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005).........................................................15

*Lester v. Percudani*, 217 F.R.D. 345 (M.D. Pa. 2004) .................................................................5

*Maenner v. St. Paul Fire & Marine Insurance Co.*, 127 F.R.D. 488 (W.D. Mich.
    1989).............................................................................................................................................29

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 241 F.R.D.
    435 (S.D.N.Y. 2007)...................................................................................................................7

*Neenan v. Carnival Corp.*, 199 F.R.D. 372 (S.D. Fla. 2001) ....................................................13

*In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) .........................................21

*In re Paxil Litigation*, 212 F.R.D. 539 (C.D. Cal. 2003) ...........................................................13

*Perez v. Metabolife International, Inc.*, 218 F.R.D. 262 (S.D. Fla. 2003) ...............................22

*Perrin v. Expert Oil & Gas, LLC*, 2008 U.S. Dist. LEXIS 8830 (E.D. La. Feb. 6,
    2008) .....................................................................................................................................12, 29

*Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007)..................................................25, 26, 27

*In re Prempro Products Liability Litigation*, 230 F.R.D. 555 (E.D. Ark. 2005).......................13

*Puerto Rico v. M/V Emily S*, 158 F.R.D. 9 (D.P.R. 1994).........................................7, 11, 12, 28

*Purjet v. Hess Oil Virgin Islands Corp.*, 22 V.I. 147, 1986 U.S. Dist. LEXIS 15677
    (D.V.I. 1986)..............................................................................................................................21

*Salvant v. Murphy Oil USA, Inc.*, 2007 U.S. Dist. LEXIS 59317 (E.D. La. Aug. 13, 2007) ...........................................................................................................................................12

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)...............................................................................................24, 25, 27, 28

*Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) ...................10, 11, 12

*Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107 (D.N.J. 2002) ....................................5

*Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400 (W.D. Mo. 1994) .............................12, 19

*Wachtel v. Guardian Life Insurance Co. of America*, 453 F.3d 179 (3d Cir. 2006)........1, 4, 29

*Watson v. Shell Oil Co.*, 979  F.2d 1014 (5th Cir. 1992)............................................................28

*Willow Inn, Inc. v. Public Serv. Mutual Insurance Co.*, 399 F.3d 224 (3d Cir. 2005) ............27

*Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977)............................................17

*Zehel-Miller v. Astrazenaca Pharmaceuticals, LP*, 223 F.R.D. 659 (M.D. Fla. 2004)...........22

## STATE CASES

*City of San Jose v. Super. Ct. of Santa Clara*, 525 P.2d 701 (Cal. 1974)..................................14

*Lockheed Martin Corp. v. The Superior Court of San Bernardino*, 63 P.3d 913 (Cal. 2003) .........................................................................................................................................22

*Nickeo v. Atlantic Tele-Network Co.*, 45 V.I. 149 (V.I. Terr. Ct. 2003).....................................6

## DOCKETED CASES

*Barnes v. Virgin Islands Alumina Corp.*, Civil No. 112/1995......................................................23

## FEDERAL RULES

Fed. R. Civ. P. 23.............................................................................................................*passim*

## MISCELLANEOUS

Restatement (Second) of Torts § 7...................................................................................................21

Restatement (Second) of Torts § 908.................................................................................................26

Sutherland, Lewis, *Class Certification for Environmental and Toxic Torts*, Envtl. &
   Toxic Tort Matters: Advanced Civil Litig., Am. Law Inst.-Am. Bar Assoc.
   Course of Study (Jan. 24-25, 2002) .............................................................................................19

COME NOW Defendants St. Croix Alumina, Inc. ("SCA"), Alcoa Inc. ("Alcoa") and Glencore Ltd. ("Glencore") (collectively, "Defendants"), and file this Motion to Decertify the Class certified pursuant to the Court's August 7, 2000 and January 26, 2001 Orders. In support of their Motion, Defendants state as follows:

**INTRODUCTION**

This is a case where individual issues predominate and where any attempt to handle the case as a class action is not superior to other available case management tools. Plaintiffs seek medical monitoring (necessarily tailored to the circumstances of each individual plaintiff), punitive damages and compensatory damages for alleged personal injuries and property damage, which they allege was caused by exposure to material carried into their homes by Hurricane George in 1998 from an alumina refinery site on St. Croix.[1] Early in the litigation the Court certified a class and four subclasses (for personal injury, property damage, medical monitoring and punitive damages). More recently, the Court, recognizing the individual nature of Plaintiffs' alleged exposure and injuries, decertified all subclasses and held that after a class trial on "liability" issues, the class would be decertified and causation and damages issues would be determined in individual trials.

Because "class actions often present extraordinarily complex factual and legal scenarios. . . a certification order may be 'altered or amended' at any time 'before final judgment.'" *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 n.8 (3d Cir. 2006) (quoting Rule 23(c)(1)(C)). The class here should be decertified, primarily because the current record demonstrates that common issues do not predominate over the numerous individual issues that

---

[1] Plaintiffs also seek injunctive relief as to an alleged ongoing nuisance – the continued release of material from the alumina refinery site, which is no longer owned, operated or controlled by any of the defendants. However, as discussed below, no class has ever been certified as to this injunctive relief.

1

all parties agree exist and that can only be addressed in individual trials and that a class action is therefore not the superior device to resolve this controversy. As Plaintiffs concede, "[o]f course, Defendants are not actually 'liable' until causation and damage to particular claimants has been determined through the individual proceedings." (Pl. Resp. to Def. Objections to Pl. Second Am. Class Action Litig. Plan at 3.) Indeed, even if the class is not decertified, thousands of individual trials will be required on causation and damages issues to resolve the claims of the currently certified class.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed this action in February 1999. In August 2000, the Court certified the following class under Rule 23(b)(3):

> All individuals who, as of September 21, 1998 [the date of Hurricane Georges], resided, worked, and/or owned property located in the following six communities adjacent to and downwind from the St. Croix Alumina Refinery Plant – the projects of Harvey and Clifton Hill and the estates of Barren Spot, Profit, Clifton Hill and La Reine – who, due to Defendants' conduct with regard to the containment and storage of red dust containing bauxite and red mud, suffered damages and/or injuries as a result of exposure during and after Hurricane Georges to red dust and red mud blown during Hurricane Georges.

(August 7, 2000 Opinion at 19-25 (as clarified by January 26, 2001 Order at 1-2).) Within this class, the Court certified four subclasses: (1) a property damage subclass; (2) a medical monitoring subclass; (3) a personal injury subclass; and (4) a punitive damages subclass. (*Id.*)

In light of their recognition that "[o]f course, Defendants are not actually 'liable' until causation and damage to particular claimants has been determined through the individual proceedings," Plaintiffs proposed a two phase proceeding. Phase I would be a trial of "common issues," while Phase II would be a series of individual trials in which issues unique to individual class members would be decided. (Pl. Second Am. Class Action Litig. Plan at 3.) In August

2005, Defendants filed their objections to Plaintiffs' Class Action Litigation Plan, and simultaneously sought decertification of the class and subclasses.

On January 19 and 20, 2006, Magistrate Judge Cannon held an evidentiary hearing at which he heard arguments from the parties and testimony from Defendants' expert Dr. Philip Guzelian. Thereafter, Magistrate Judge Cannon recommended that the Court (1) permit the previously defined class to remain certified through a "liability-only" trial, after which it would be decertified; (2) decertify the subclasses; and (3) order Plaintiffs to submit a revised trial plan. (Proposed Findings and Recommendations at 8-9.) In particular, Magistrate Judge Cannon recognized that the causation and damages aspects of Plaintiffs' claims, as well as issues related to medical monitoring, required individualized treatment. The Court adopted these findings and recommendations from Magistrate Judge Cannon. (*See* April 24, 2006 and June 1, 2006 Orders.)

Thus the current class does not cover Plaintiffs' claims for injunctive relief; nor do any subclasses remain. Defendants now seek decertification of the class in its entirety so that the Court can proceed with the individual trials of the seventeen named plaintiffs.

## STANDARD

To qualify for class treatment, Plaintiffs bear the burden of proving that the proposed class action satisfies the requirements of both Rule 23(a) and Rule 23(b). *See Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). Under Rule 23(a), a party seeking class certification must show (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a).

The Court certified Plaintiffs' class pursuant to Rule 23(b)(3). Rule 23(b)(3) provides for certification of a class only if "the court finds that the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and

3

that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." Fed. Rule Civ. P. 23(b)(3) (emphasis added). Rule "23(b)(3)'s predominance requirement incorporates the commonality requirement," enabling the Court to consider them simultaneously. *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996). Although Defendants believe that the named plaintiffs cannot satisfy the Rule 23(a) requirements, Defendants' arguments below focus on the exacting Rule 23(b)(3) predominance and superiority requirements.

## ARGUMENT

Defendants do not dispute that there are a handful of issues common to all class members. For instance, in its original certification order, the common issue identified by the Court was whether "Defendants failed to secure red bauxite dust and whether that failure resulted in a hazardous substance permeating Plaintiff class' neighborhoods."[2] (August 7, 2000 Opinion at 18.) And certain of Defendants' defenses – such as Act of God – would be common to all class members.

However, while these are important issues, as this case has developed it has become clear that these few issues do not predominate over a plethora of individual issues in this litigation.[3]

___

[2] In fact, this was the *only* common issue identified by the Court in the August 7, 2000 Opinion. Rule 23(c)(1)(B), adopted in 2003, requires that a class certification order "define the class and the class claims, issues, or defenses." The Third Circuit has stated that this rule "requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment." *Wachtel* 453 F.3d at 184. To that end, the Third Circuit reversed the certification order in *Wachtel* because the district court did not "explicitly define which claims, issues, or defenses are to be treated on a class basis for the remainder of the litigation." *Id.* at 189.

[3] The predominance requirement of Rule 23(b)(3) cannot be avoided by reliance on Rule 23(c)(4). "The better view is that issue certification under 23(c)(4)(A) does not obviate the need to evaluate predominance. In other words, a predominance determination is a prerequisite to certification under Rule 23(b)(3). Indeed, the 1966 Advisory Committee Notes so instruct, stating that only where predominance exists can the class action device be used." *Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 190 (E.D. Pa. 2007). *See also Arch v. American Tobacco Co.*, 175 F.R.D. 469, 496 (E.D. Pa. 1997)

4

The predominant issues – those that will occupy the most time and effort of the Court and the jury – will be the highly individualized injury, causation and damages issues. *See Lester v. Percudani*, 217 F.R.D. 345, 351 (M.D. Pa. 2004) (the predominance inquiry "measures the number and relative importance of these common issues against the remaining individual issues not susceptible to class-wide proof") (citing *Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107, 120 (D.N.J. 2002)). Those same individual issues render class treatment of Plaintiffs' claims unmanageable, and therefore not a superior method of adjudication. *Bradford v. Union Pacific R.R. Co.*, 2007 U.S. Dist. LEXIS 72951, *25-26 (W.D. Ark. Sept. 28, 2007) ("Here, the difficulties in class management overwhelm any efficiencies that could be secured through class-wide adjudication. Each class member will be required to present highly individualized evidence regarding specific causation and damages. The presentation of this evidence will constitute the majority of the trial. Therefore, any judicial economy that would be achieved by class certification is lost. As such, a class action is not the superior method for adjudicating the Plaintiff's or the proposed class member's personal injury claims.").

As the Plaintiffs and the Court have previously recognized, each individual plaintiff will have to provide individualized evidence on, among other things, exposure, dose, injury, causation (including lack of an alternative cause), risk, and damages for his or her personal injury, property damage and medical monitoring claims. Expert testimony on these subjects is also necessarily individualized and must be specific to each plaintiff and each class member – testimony about one individual will not be relevant to the claims of another individual.

---

("[b]efore a district court may certify common issues pursuant to (c)(4), the court must first find that a cause of action, as a whole, satisfies the predominance requirement of (b)(3)").

**I.      DECERTIFICATION IS REQUIRED BECAUSE THE INDIVIDUALIZED NATURE OF PLAINTIFFS' PERSONAL INJURY CLAIMS PRECLUDES CLASS TREATMENT.**

The very nature of the personal injury claims in this action unquestionably renders a personal injury sub-class, or any other class determination of personal injury issues, inappropriate. *See* Fed. R. Civ. P. 23(b)(3) *Advisory Notes*, 39 F.R.D. 69 (1966) ("A mass accident resulting in injuries to numerous persons is ordinarily not appropriate for a class action.").

There can be little doubt that individual issues predominate. "'The elements of a negligence suit are well established: duty, breach of duty, causation, and damages.'" *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 571 (D.V.I. 2004) (citing *Gass v. V.I. Tel. Corp.*, 149 F. Supp. 2d 205, 209 (D.V.I. 2001)); *accord Nickeo v. Atlantic Tele-Network Co.*, 45 V.I. 149, 2003 V.I. LEXIS 1 (V.I. Terr. Ct. 2003). Here, while some or even most of the duty and breach elements might arguably be decided based on common evidence,[4] Plaintiffs agree that the *causation* and *damages* elements of their negligence claims must be determined individually. (*See* Pl. Resp. to Def. Objections to Pl. Second Am. Class Action Litig. Plan at 3.) In such circumstances, class treatment is unwarranted. *See, e.g., Jones v. Allercare, Inc.*, 203 F.R.D. 290, 300 (N.D. Ohio 2001) ("because the proposed class members' substantive claims depend on individual permutations, the fact that the named plaintiffs have the same general complaint against the defendant does not render their claims typical. . . . Each plaintiff must individually prove that he or she experienced personal injuries and/or property damage which

---

[4] In light of the dispute as to whether red mud or bauxite was the substance dispersed from the refinery during the hurricane, even these duty and breach issues may not be common. For example, although Defendants believe that no red mud left the refinery property, it is conceivable that a jury could find that red mud was released into some areas but not others. This would make a classwide finding of duty and breach impossible.

was proximately caused by the use of defendant's products.  The named plaintiffs' claims are typical only if what is needed to prove them is the same as what is needed to prove the claims of the proposed class."); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 165 (2d Cir. 1987) ("The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom.  That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs . . . and the nature of their exposure to Agent Orange."); *Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 14 (D.P.R. 1994) (denying certification of class action for personal injuries allegedly caused by an oil spill because "any injuries would be dependent upon the numerous variables present, including such matters as personal susceptibility to harm, and degree, nature and duration of exposure."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (in an action alleging personal injuries arising from chemical exposure, "the disparities in the injuries, and the questions of whether the gasoline caused such injuries, are too great to satisfy Rule 23(b)(3)'s predominance requirement.").

There is no dispute that the evidence required to prove causation and damages will be highly individualized in this case.  The medical experts for both plaintiffs and defendants (Dr. Nachman Brautbar and Dr. Guzelian, respectively) agree that the medical or scientific methodology for determining whether an individual's alleged exposure *caused* the alleged ailment requires a number of steps.  *See, e.g.*, Exh. A, Brautbar Deposition at 69:17-70:1; *see also id.* at 47:12-19, 49:12-50:22, 553:8-554:24, 555:16-557:22.  Experts for both sides generally agree that in making such an individual determination, each of these steps must be done on an individual basis.  *See id.*  The following are among the steps involved in making an individual determination of causation:

- An evaluation of each individual plaintiff's exposure.   Exh. B, Guzelian Hearing Testimony at 84:7-23, 85:24-86:1; *see also* Exh. A, Brautbar Deposition at 553:8-20;

- Performance of a separate dose reconstruction for each individual plaintiff. *See* Exh. B, Guzelian Hearing Testimony at 90:16-25 ("dose actually is essential to making any kind of a toxicologic evaluation.");

- Medical testing of each individual plaintiff to reach a differential diagnosis of each individual plaintiff's ailment.   *See id.* at 91:1-23; *see also* Exh. A, Brautbar Deposition at 534:12-535:6;

- An evaluation of the cause of each individual plaintiff's diagnosed ailment, based on (a) whether it is known that there is a general relationship between the chemical and the disease, (b) the individual's dose, and whether it is sufficient to cause the disease, (c) the timing of the individual's symptoms in relation to the individual's exposure, (d) alternative causes for the individual's disease, and (e) whether there is logical coherence and consistency between each of these factors. One must evaluate "all five [factors to] reach at least an objective basis for trying to decide yes or no about causation for that particular person." *See* Exh. B, Guzelian Hearing Testimony at 91:24-93:9 and 96:7-23.  Evaluation of alternative causes for an individual's disease must be done on an individual basis. *See id.* at 96:24 – 97:8; *see also* Exh. A, Brautbar Deposition at 47:12-19, 49:12-50:22, 553:21-24, 555:16-557:22.

As described above, the record establishes – and on this experts for both sides agree – that each named plaintiff had a different and unique exposure to the red material blown from the refinery by Hurricane Georges; "there [were not] common exposures" among the named plaintiffs. *See* Exh. B, Guzelian Hearing Testimony at 114:13-15.   Further, these unique

8

individual exposures cannot be used to extrapolate the exposures of the unnamed class members. The factors that go into the formula for calculating exposure are unique for each individual – *e.g.*, body weight, duration of exposure during the hurricane, and "differences in the amounts of time they had an opportunity for contact in the cleanup phase, one person to another" *Id.* at 145:5-7; *see also id.* at 142:8-143:20; 144:13-145:7 and 145:21-146:10; Exh. A, Brautbar Deposition at 711:17-713:22 and 714:18-715:3.

The record also establishes – and again, experts for both sides agree – that each named plaintiff received a different and unique dose of the red material blown from the refinery during Hurricane Georges. *See, e.g., id.* at 711:17-713:22 and 714:18-715:3. Just among the named plaintiffs "there is at least a tenfold range between" the doses received. *See* Exh. B, Guzelian Hearing Testimony at 145:18-19. Thus the doses of the seventeen named plaintiffs cannot be used to extrapolate the doses of any unnamed class members who claim personal injury. *See id.* at 145:8-146:10.

In addition, the record establishes that among the named plaintiffs there is divergence among health effects claimed as a result of the alleged exposure to the red material blown from the refinery during Hurricane Georges. Their descriptions cover a broad spectrum, including a variety of different skin "conditions," asthmatic conditions, eye, nose and throat "irritation," and headaches. *See id.* at 146:11- 21, 166:25-167:17, and 214:24-215:11. Accordingly, the health effects of the named plaintiffs cannot be used to assess the health effects of absent individuals.

Even among the named plaintiffs who claimed similar ailments apparently fitting into a generic category (such as some variety of skin conditions), the actual symptoms experienced "were quite a bit different one person from another," differing dramatically in kind, in time of onset, in severity, in duration, in treatment, and in alternative causes, from one plaintiff to the

next. *Id.* at 146:16-17. This suggests different diagnoses for the claimed skin conditions among the named plaintiffs. *See id.* at 146:22-147:11. Moreover, the record establishes that "[t]he timing [of the named plaintiffs' claimed health effects] was quite different. . . suggesting these might not necessarily be the same diagnosis, and also suggesting that it's not necessarily true that simply because they occurred at the time of the hurricane that they were necessarily caused by the hurricane." *Id.* at 148:4-8.[5]

The named plaintiffs likewise have different levels of documentation of their claimed ailments. *See id.* at 148:9-149:21. Most of the named plaintiffs did not seek medical attention contemporaneous with Hurricane Georges. In many cases, Plaintiffs' expert opines that the named plaintiffs experienced personal injuries based solely on the individuals' allegations long after the fact and long after the alleged symptoms had disappeared.

From a medical or scientific standpoint, "the alleged cause-and-effect relationship between the exposure and the injury at issue for the few selected and examined individuals [the named plaintiffs] [cannot] be used to accurately determine whether such a causal relationship exists for several thousand unidentified, unexamined individuals [the personal injury subclass members]." *Id.* at 176:22-177:5; *see also id.* at 237:2-238:3.

In cases very similar to this one, courts have recognized that the individualized nature of causation and damages predominate, precluding class treatment. For example, in *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006), the Court of Appeals for the Fifth Circuit affirmed a district court's denial of certification of a class of individuals exposed to smoke from a fire at Exxon Mobil's Baton Rouge chemical plant. The plaintiffs had proposed a

---

[5] Moreover, the Centers for Disease Control reported in the weeks following the hurricane a phenomenon that makes a differential diagnosis attributing plaintiffs' symptoms to refinery materials dispersed by the hurricane impossible: an outbreak of the coxsackie virus, which causes acute hemorrhagic conjunctivitis (pink eye), among other symptoms. *See* Exh. C, Guzelian Report at 51. This epidemic began on St. Croix before the hurricane, and peaked in the succeeding four weeks. *See id.*

class quite similar to that requested by Plaintiffs in the instant matter. *Id.* at 600. Exxon Mobil argued that certification would be inappropriate because, *inter alia*, the common issues – the cause of the fire and "related liability issues" – were straightforward, while the individual issues – causation and damages – were complex, meaning that the common issues did not predominate. *Id.* at 603. The district court agreed, as did the Court of Appeals:

> Based on the evidence presented to the district court regarding the complexity of the medical causation and damages issues, and with little evidence that the liability issues are similarly complex, it was not an abuse of its discretion for the district court to conclude that [the plaintiffs] had failed to demonstrate that the class issue of [Exxon Mobil's] negligence or strict liability predominates over the vastly more complex individual issues of medical causation and damages.

*Id.*[6]

Likewise, in *M/V Emily S*, the court rejected certification of a class of individuals allegedly exposed to fumes from an oil spill. The court found that the

> [A]ction provide[d] a particularly good example of why "mass tort" cases are generally not good candidates for class certification. To establish their entitlement to relief in this case, the plaintiffs must prove, in addition to any negligence or other fault on the part of one or more defendants, the *fact* of each class member's personal injury *and* the *causal link* between that individual's injury and the spill. The evidence presented at the class action hearing, including the evidence the *plaintiffs* presented, demonstrated conclusively that these questions could not be answered meaningfully on a class-wide basis.

158 F.R.D. at 13 (italics in original). According to the court, the putative class representatives could not meet the predominance requirement of 23(b)(3):

> To predominate, "it is not enough that the claims arise out of a common nucleus of operative fact. Instead, the common questions must be central

---

[6] While not reaching the superiority inquiry, the Fifth Circuit Court of Appeals also noted that "the predominance of individual issues relating to the plaintiffs' claims for compensatory and punitive damages detracts from the superiority of the class action device in resolving these claims." *Exxon Mobil Corp.*, 461 F.3d at 604-05 (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998); *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996)).

> to all the claims. . . . Common issues are predominant only if their
> resolution would 'provide a definite signal of the beginning of the end.'"

*Id.* at 19. As the Court has recognized, resolution of the purported common issues in the instant matter would not signal "the beginning of the end" – thousands of individual trials would still loom ahead.[7] Thus, the class here meets neither the predominance nor the superiority requirements of Rule 23(b)(3).

Nor can certification be saved by reliance on general causation as a common issue. At most, general causation will be a minor issue in any trial, and it will be eclipsed many times over by the more important issues of individual exposure, dose, causation, and damages (if any). Judge Finch stated in his December 11, 2007 Order that in class actions, "general causation" is "typically" decided in the first phase of a trial. (December 11, 2007 Order at 1.) But in addition to the numerous courts, like those cited above, that have refused to certify "single incident" or "mass accident" cases like this one, many courts have specifically rejected the argument that a need to prove "general causation" supports class certification and a multi-phase trial structure.

---

[7] *See also, e.g., Georgine*, 83 F.3d at 632-33 (where individual issues predominate, class treatment will not increase efficiency, and thus certification would be inappropriate); *Perrin v. Expert Oil & Gas, LLC*, 2008 U.S. Dist. LEXIS 8830, *14-15 and n.8 (E.D. La. Feb. 6, 2008) (quoting *Exxon Mobil Corp.*, 461 F.3d at 604) (denying certification of class of crabbers and fishermen seeking recovery for damages caused by oil spill, finding that "this, like most 'single incident' or 'mass accident' cases, is not suited for class treatment" because "plaintiffs 'have not demonstrated that this mass tort has any exceptional features that warrant departing from the general rule and treating it as a class action'"); *Salvant v. Murphy Oil USA, Inc.*, 2007 U.S. Dist. LEXIS 59317, *5 (E.D. La. Aug. 13, 2007) ("Courts have repeatedly held that claims for personal and emotional injuries arising from exposure to toxic chemicals are inappropriate for class treatment because individualized factual issues concerning specific causation and damages predominate over any common issues"); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1404 (W.D. Mo. 1994) ("while there are undoubtedly common issues of law and fact, such as whether FAG Bearings released TCE into the groundwater, the individual issues of causation and damage so overshadow those in numerosity and complexity to render a class action unhelpful"); *Hurd v. Monsanto Co.*, 164 F.R.D. 234, 240 (S.D. Ind. 1995) (quoting *M/V Emily S*, 158 F.R.D. at 15) ("[P]laintiff has not shown that common issues will predominate over individual issues. . . . [C]ausation in a personal injury case predicated on exposure to PCBs 'will necessarily be different for every person in the proposed class, based on each person's length of exposure to [PCBs], notice, pre-existing medical conditions and other factors.'").

For example, in *In re Agent Orange*, the Second Circuit was faced with this very question in overturning a class certification order:

> The relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (*e.g.* state of health, lifestyle) and the nature of their exposure to Agent Orange. Although generic causation and individual circumstances concerning each plaintiff and his or her exposure to Agent Orange thus appear to be inextricably intertwined, the class action would have allowed generic causation to be determined without regard to those characteristics and the individual's exposure.

818 F.2d at 165 (italics in original). Indeed, in a recent case, a court within the Third Circuit canvassed the case law and concluded that "[i]n mass tort cases, courts have routinely refused to certify common questions of general causation." *Blain*, 240 F.R.D. at 185 n.19 (citing, in addition to *Agent Orange*, *In re Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982); *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 570 (E.D. Ark. 2005); *In re Paxil Litig.*, 212 F.R.D. 539, 546-47 (C.D. Cal. 2003); *Neenan v. Carnival Corp.*, 199 F.R.D. 372, 376-77 (S.D. Fla. 2001); *Emig v. American Tobacco Co.*, 184 F.R.D. 379, 390 (D.Kan. 1998); *Barnes v. American Tobacco Co.*, 176 F.R.D. 479, 500-01 (E.D. Pa. 1997) (*"Barnes I"*); *Arch*, 175 F.R.D. at 488; *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 677 (N.D. Ohio 1995)); *see also In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 194 F.R.D. 484, 490 (D.N.J. 2000) ("Resolution of the 'general causation' question. . . does not show commonality under Rule 23(a)(2)").

Any benefits of trying "general causation" on a class basis in the instant case are particularly attenuated. Here, just the seventeen named plaintiffs allege a wide variety of ailments · rashes of different types, respiratory ailments, swelling, itching, headaches, etc. – based on different levels of exposure. Neither the parties nor the Court have any idea what

ailments or exposure levels will be claimed by the thousands of absent class members. Thus, any attempt to prove "general causation" in this case will lead to the unanswerable question: "general causation of what?" There is simply no way for a single jury to address all the issues that may arise in the thousands of subsequent individual trials.

## II.   DECERTIFICATION IS REQUIRED BECAUSE THE INDIVIDUALIZED NATURE OF PLAINTIFFS' PROPERTY DAMAGE CLAIMS PRECLUDES CLASS TREATMENT.

Class certification is similarly inappropriate with respect to Plaintiffs' proposed property damages subclass because Plaintiffs have never been able to explain how their alleged real property or personal property damages could be determined on a classwide basis given "the individual nature of causation and damages." (Proposed Findings and Recommendations at 6; *see also* April 24, 2006 Order at 2 (adopting Magistrate Cannon's recommendation to decertify the property damages subclass).)

In support of their argument for class treatment of the real property damage claims, Plaintiffs previously have relied on their expert's unsubstantiated assertions that class members' real properties have suffered a "diminution in value on the order of 30% or more." Exh. D, Mundy Report, pg. 48 (report prepared by Dr. John Kilpatrick). Dr. Kilpatrick has testified that "the diminution in value is *most likely* uniform throughout these affected estates." Exh. E, Kilpatrick Deposition at 210:12-14 (emphasis added). According to Plaintiffs, by applying a statistical formula to determine property damages for all class members' properties, they can circumvent "the fundamental maxim that each parcel of land is unique" due to "the many recognized factors combining to make up the uniqueness of each parcel of land." *City of San Jose v. Super. Ct. of Santa Clara*, 525 P.2d 701, 711 (Cal. 1974).

Dr. Kilpatrick's sweeping assertions cannot be credited because he has performed no analysis of the properties at issue to support his claim that any diminutions are "most likely

uniform." *See* Exh. E, Kilpatrick Deposition at 210:5-78, 210:12-14; *see also id.* at 233-234
(admitting that he has not tested to determine whether some homes were cleaned and never again
showed red mud). This alone is grounds for denying certification. *See La Bauve v. Olin Corp.*,
231 F.R.D. 632, 676-78 (S.D. Ala. 2005) (denying certification because, *inter alia*, plaintiffs'
damages expert had not tested his purposed methodology). Indeed, when asked what factors
might influence diminution, Dr. Kilpatrick conceded that a particular property's value would
likely be affected by between 10 and "greater than 100 factors." Exh. E, Kilpatrick Deposition at
185: 6-15. Nonetheless, he has not explained how any statistical formula would account for even
the most basic property valuation factors (such as location, age, condition, structural makeup and
history), let alone the one hundred or more factors that he concedes may affect property values.

Dr. Kilpatrick has also acknowledged that there are factors unique to St. Croix properties
that would require a property-by-property analysis. First, according to Dr. Kilpatrick, many St.
Croix citizens go "to great expense to put white tile floors in their homes" and "[m]any of the
houses are painted white," because "white is the color of purity [and] there's a great deal of
respect for cleanliness." *Id.* at 224:2-15. But colors vary from house to house and neighborhood
to neighborhood: "[o]ftentimes there are some pastels or beiges, and these tend to vary from
neighborhood to neighborhood." *Id.* at 224:4-6. Property-specific valuations therefore would
have to include a determination of whether floor tiles have been stained and, if so, individual
issues of causation concerning that staining and the cost to repair stained items. At least one
Plaintiff has testified that her floor was stained "all red, red, red," Exh. F, Rosa Deposition at
36:9, but others have testified that their homes received little or no staining. *See, e.g.*, Exh. G,
Drew Deposition at 38-40.

A second significant valuation factor, according to Dr. Kilpatrick, is the condition of a property's cistern. According to Dr. Kilpatrick, "even if the rest of the house gets damaged by a hurricane or something, the cistern needs to be protected because that's the value of the property." Exh. E, Kilpatrick Deposition at 94: 12-14. Consequently, an individualized review of each property will be required to determine whether the property had a cistern at the time of Hurricane Georges, the cistern's condition before and after Hurricane Georges, and – for any damaged cistern – whether those damages were caused by Defendants.

Plaintiffs' testimony varies on the condition of their cisterns, with at least one Plaintiff testifying that his cistern was stained by Hurricane Georges, *see* Exh. H, Henry Deposition at 51:18-52:1, 63:7-8 (cistern stained by Hurricane Georges), but other Plaintiffs testifying to no damage to cisterns. Exh. G, Drew Deposition at 37-38 (no damage to cistern); Exh. I, Rodriguez Deposition at 52:12-15 (no damage to cistern); Exh. J, Cirilo Deposition at 39: 7-8 (no cistern on property). And still other properties with cisterns have access to other fresh water sources, like public water lines, thus lessening the impact of cistern damage on property value. *See* Exh. K, Bolton Deposition at 130-132, 160-161 (Defendants' expert on property valuation and damages). Dr. Kilpatrick's testimony that property damages are "most likely uniform" thus conflicts with Plaintiffs' own testimony and the evidence before this Court.

Any damages calculations also would need to account for variations in property interests, because although some putative class members own, and reside at, properties located within the relevant neighborhoods, *see, e.g.*, Exh. L, Acosta Interrogatory Responses dated Nov. 22, 2000, pg. 10, others are renters, *see, e.g.*, Exh. I, Rodriguez Deposition at 28: 7-19, and still others are landlords, *see, e.g.*, Exh. M, Browne Interrogatory Responses dated Dec. 15, 2000, pg. 13. Thus, even if the various properties could be valued, the Court would need to determine each purported

class members' property interest to assess individual damages.[8]  And here, that task would be further complicated by uncertainties about those interests and how they have changed over time.[9] When determining damages for any particular property, it would also be necessary to determine any set-offs.  *See Windham v. American Brands, Inc.*, 565 F.2d 59, 66-67 (4th Cir. 1977) ("In some cases, the calculation [of damages] might be complicated . . . by the need to allow off-sets against the claims" and the individualized proof necessary to make such determinations).  Here, several Plaintiffs have testified that they have already received compensation from the federal government.[10]  Still others have been compensated or assisted by Defendants or their insurers.[11]

Plaintiffs therefore have not presented – and cannot present – a mathematical formula to assess St. Croix property values that could possibly account for all the individualized issues described above.  Rather, in claiming that Plaintiffs' properties have suffered a "diminution in value on the order of 30% or more," Dr. Kilpatrick relies solely on academic case studies involving residences in other geographic areas that he simply asserts present "Comparable

---

[8] *See Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 84 (M.D. Pa. 1974) ("The physical task of calculating the damage to a lessee's interest in a dwelling as well as the owner's damage therein would be immense, indeed prohibitive. . . .").

[9] For example, as of Plaintiffs' depositions in 2003, one of the relevant properties was in the name of Eyajie Malaykhan's husband, who died in 1996, *see, e.g.*, Transcript of Deposition of Eyajie Malaykhan ("Malaykhan Deposition") at 4-6, cited pages attached as Exhibit N, and Plaintiffs could not identify the owners of at least one other property, *see* Transcript of Deposition of Neftali Camacho ("Camacho Deposition") at 14-16, cited pages attached as Exhibit O.  *See also* Exh. J, Cirilo Deposition at 30: 21-24.

[10] *See, e.g.,* Exh. I, Rodriguez Deposition at 167 ("[W]e did get a grant from FEMA to buy bedding," but "I can't recall if it was Georges or Marilyn."); Exh. II, Henry Deposition at 42-43 ("Because you know FEMA pass and when they assess . . . they give me two thousand something dollars."); Exh. P, Acosta Deposition at 39 ("They was giving checks, and I believe the check was for $1,000."); Exh. Q, Document Bates-stamped CC00004674 (stating that Martha Acosta was paid $2,005.90 for damages to her property).

[11] *See* Exh. M, Browne Interrogatory Responses dated Dec. 15, 2000, pg. 13 (indicating that a contractor cleaned and sealed Ms. Browne's cistern, washed the house and roof, and delivered additional water).

Transactions." Exh. D, Mundy Report, pg. 47. Dr. Kilpatrick has made no effort to compare these "individual transactions" to the relevant properties, or to explain how his "accumulated data" – not discussed in any detail in his report – could be extrapolated on a class wide basis. *See id.* Moreover, Dr. Kilpatrick's attempt to rely on studies of properties in Georgia, Missouri, and Washington is fundamentally at odds with his acknowledgment that there are many factors unique to St. Croix that impact property values. *See* Exh. E, Kilpatrick Deposition at 223.[12]

Furthermore, even Plaintiffs' proposed approach – which is riddled with flaws – would require individual appraisals of class members' properties to establish the value to which any diminution factor would be applied,[13] with each appraisal to be subject to discovery, deposition, and pretrial challenges, as well as competing appraisals by Defendants. Indeed, judicial proceedings concerning the property appraisals – as well as individual issues of causation, set-offs, property ownership, and other matters that could not possibly be determined by an appraiser – inevitably would turn into a series of complex individual trials in which any possible benefit of class treatment would be lost. *See Bradford*, 2007 U.S. Dist. LEXIS 72951 at *11; *see also Corley v. Entergy Corp.*, 220 F.R.D. 478, 485-86 (E.D. Tex.) (denying certification because, *inter alia*, individual mini-trials would be required to establish land values).

Plaintiffs have not proposed a methodology by which damages to their personal property could be calculated on a classwide basis. Rather, they have acknowledged that "claimants will present individualized evidence of damage to their personal property" in the proposed "Phase II" proceedings. (Pl. Second Am. Class Action Litig. Plan at 9.) No formula could capture the wide

---

[12] Indeed, the table listing these "Comparable Transactions" merely demonstrates that they concern "individual transactions" in cities throughout the United States, involving different types of material and causing different levels of average diminution. *Id.*

[13] *See* Pl. Second Am. Class Action Litig. Plan at 8; Exh. E, Kilpatrick Deposition at 210-211.

variety of claims for damages allegedly caused to various types of personal property, ranging from curtains, bed linens, towels, and rugs to clothing, to electronics, to cars.

Decertification of the property damage claims is supported by numerous recent decisions in which courts have rejected similar attempts to certify classes based on claims of property damage resulting from a single incident. For example, in *Bradford*, the district court refused to certify a claim based on alleged diminution in value of various properties caused by a train derailment because "[f]actors such as a property's damage, location, age, condition, structural makeup and history are determinative on the issue of a property's devaluation" and such factors "vary from property to property." 2007 U.S. Dist. LEXIS 72951 at *11. Thus, "the issue of diminished value w[ould] have to be analyzed for each individual property on a case by case basis." *Id.* And the presentation of "[h]ighly individualized evidence . . . on each property" would have required "a series of individual mini-trials that [would] dominate the proceeding." *See also Comer v. Nationwide*, 2006 U.S. Dist. LEXIS 33123, *2 (S.D. Miss. Feb. 23, 2006) (refusing to certify a class seeking property damages arising from Hurricane Katrina, because "[t]he nature and extent of property damage the owners sustained from the common cause, Hurricane Katrina, will vary greatly in its particulars" and "with respect to the issue of damages, each individual claim will require particular evidence to establish the cause of and the extent of the loss"); *Thomas*, 846 F. Supp. at 1404 (refusing to certify a class for damages allegedly caused by groundwater contamination because determining "diminution in property value . . . would [] require individualized proof" and that "would start hundreds or thousands of individual mini-trials on complex causation and damages issues"); Lewis Sutherland, *Class Certification for Environmental and Toxic Torts*, Envtl. & Toxic Tort Matters: Advanced Civil Litig., Am. Law Inst.-Am. Bar. Assoc. Course of Study (Jan. 24-25, 2002), 15-16 ("[P]roperty damage

claims, like personal injury claims[,] involve predominately individual issues focused on each plaintiff's property, and as a result are generally incompatible with class certification").

There can be no short cut around the necessity of individual trials to address the property damage claims, both as to alleged diminution in real property value and alleged damage to personal property. Individualized questions of causation will only further hamper any classwide treatment of Plaintiffs' claims regarding property damage. In no sense would class treatment of some aspects of such claims be superior to individual trials – which will be required regardless.

## III.   DECERTIFICATION IS REQUIRED BECAUSE THE INDIVIDUALIZED NATURE OF PLAINTIFFS' MEDICAL MONITORING CLAIMS PRECLUDES CLASS TREATMENT.

Plaintiffs also claim that their alleged exposure to materials carried from the alumina refinery by Hurricane Georges has increased their risk of cancer. *See, e.g.,* Exh. A, Brautbar Deposition at 720:3-5. Plaintiffs' purported expert Dr. Brautbar has opined that this exposure warrants the imposition of a large-scale, intrusive, experimental medical monitoring program for all class members. *See id.* at 334:22-25, 368:7-13, and 403:16-23. However, "his proposed program for screening for lung cancer is not recognized as effective and safe by any major medical professional organization." Exh. C, Guzelian Expert Report at 4. Dr. Brautbar's claim that medical monitoring would be appropriate for as-yet-unidentified class members "in the absence of information about each affected individual would seriously violate the scientific principles required for objective cause and effect analysis and may lead to invalid scientific conclusions." *Id.* at 6.

The right to medical monitoring damages requires determination of individual issues unique to each plaintiff, and thus cannot be awarded on a class-wide basis. Judge Finch reiterated this finding in his December 11, 2007 Order, stating that even if there were a separate

medical monitoring subclass, each individual claimant would still be required to prove an entitlement to medical monitoring in an individual trial. (December 11, 2007 Order at 2.)

Under Virgin Islands law, a plaintiff may pursue a claim for medical monitoring only upon a threshold showing of demonstrable injury caused by the defendants' conduct. *Purjet v. Hess Oil Virgin Islands Corp.*, 22 V.I. 147, 1986 U.S. Dist. LEXIS 15677, *4 (D.V.I. 1986). As Judge O'Brien explained in *Purjet*, "actual injury or damage is an essential element of a tort cause of action." *Id.* at 147 (citing Restatement (Second) of Torts § 7). Accordingly, relief in the form of medical monitoring "is appropriate only when a demonstrable injury caused by a negligent act increases the probability of developing ailments in the future." *Id.* at 153. Each individual plaintiff thus will have to prove (among other elements) a ***demonstrable injury caused by defendants increasing the probability of developing lung cancer in the future*** to have a claim for medical monitoring. This can only be attempted on an individual basis, and only after sufficient discovery (including expert discovery and exams) had been conducted as to each of thousands of individual plaintiffs. This is not a determination that can be made on a class-wide basis.

Moreover, even if a plaintiff succeeds in proving the requisite injury caused by Defendants' conduct, further individual inquiries are necessary to ascertain whether or not that person can and should be monitored. Among other things, each individual must make a showing that a reasonable physician would prescribe for him or her a monitoring regime different than the one that would have been prescribed for him or her in the absence of the alleged exposure. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 788 (3d Cir. 1994). Unique individual proof on this element is required from each plaintiff, including the plaintiff's medical history, family history, lifestyle and habits. For example, a plaintiff who already has the target disease, who

21

already has a disease in the same target organ, or who has other significant risk factors for the disease (such as a family history or lifestyle factors), may already require some or all of the monitoring requested in the litigation. (For evidence supporting the individualized nature of the medical monitoring determination, *see generally,* Exh. B, Guzelian Hearing Testimony at 109:22–112:24, 110:7-10, 128:17-25, and 138:7-139:14; *see also* Exh. A, Brautbar Deposition at 194:25-195:4, 201:22-204:1, 344:7-346:17, 359:4-18, 420:6-9, 923:11-25.) Accordingly, the medical monitoring claims should not be certified. *See Barnes v. American Tobacco Co.,* 161 F. 3d 127, 146 (3d Cir. 1997) (*"Barnes II"*) (stating that "[i]n order to prove the program he requires, a plaintiff must present evidence about his individual smoking history and subject himself to cross-examination by the defendant about that history. This element of the medical monitoring claim therefore raises many individual issues."); *Perez v. Metabolife Int'l, Inc.,* 218 F.R.D. 262, 274-75 (S.D. Fla. 2003) (denying certification of medical monitoring claims because "various individual factors will likely affect the level of medical monitoring, if any, that is appropriate for each specific individual."); *In re Baycol Prods. Litig.,* 218 F.R.D. 197 (D. Minn. 2003); *Lockheed Martin Corp. v. The Superior Court of San Bernardino,* 63 P.3d 913, 925 (Cal. 2003) (denying class certification for medical monitoring claim because "[a] class member's need for additional monitoring hinges on the particular traits or characteristics of each class member. As plaintiffs' own experts acknowledge, human reaction to environmental and other hazards varies from individual to individual."); *Zehel-Miller v. Astrazenaca Pharms., I.P,* 223 F.R.D. 659, 664 (M.D. Fla. 2004) (denying certification of medical monitoring class under Rule 23(b)(3) on the grounds that, *inter alia,* "individual questions concerning patient characteristics and medical history, [footnote] physician involvement, dosage, causation and comparative or

contributory negligence, eviscerate any notion that common issues predominate in this case.") (footnote omitted).

While the question whether a medical monitoring regime is appropriate for a particular plaintiff will always implicate individualized issues, that is especially true here. Josephat Henry and other named plaintiffs -- in addition to, undoubtedly, a large number of unidentified class members – have in a previous lawsuit recovered funds to be used for medical monitoring. *See Barnes v. Virgin Islands Alumina Corp.*, Civil No. 112/1995, in the Virgin Islands Territorial Court, Division of St. Croix. In that action, individuals who lived in Estate Profit, Bethlehem Village or Estate Harvey between 1989 and 1995 alleged that they were exposed to "black dust" released from the alumina refinery. Those plaintiffs, who demonstrably overlap with Plaintiffs here, entered into a settlement agreement with, *inter alia*, Vialco, on February 24, 1997, under which they received funds to be used for medical monitoring. Because those plaintiffs are already being medically monitored – or have at least recovered funds to be used for medical monitoring -- they may not be entitled to further recovery for medical monitoring here. This is just another layer of complications making class treatment of Plaintiffs' claims inappropriate.

In light of the clear law on medical monitoring classes, class treatment of such claims cannot be said to be superior to individual trials. Further, individual issues clearly predominate over those few issues that would be common to all class members. Plaintiffs' request for medical monitoring militates strongly in favor of decertification.

## IV.   DECERTIFICATION IS REQUIRED BECAUSE INDIVIDUALIZED TREATMENT OF PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES IS MANDATED BY THE DUE PROCESS CLAUSE OF THE CONSTITUTION.

Plaintiffs also seek punitive damages on their personal injury and property damage claims. Of course, because punitive damages do not represent a separate cause of action, but are simply a measure of damages, if the Court determines that the personal injury and property

23

damage claims cannot be maintained on a class basis, then there can be no class trial on punitive damages. Moreover, because of the individual issues that even Plaintiffs concede exist as to their claims (*i.e.* causation and damages), punitive damages can only be assessed in the context of individual trials that adjudicate individual compensatory damage claims. Based on a growing line of Supreme Court decisions, it has become clear that any punitive damage award that is not directly based on the harm to the plaintiff who receives the award violates the Due Process Clause of the United States Constitution. For example, the Plaintiffs have advocated, and the Court's December 11 Order suggested, that a punitive damages multiplier can be established in a single trial involving only the seventeen named plaintiffs. However, as discussed below, that approach would lead to unconstitutional results and demonstrates why punitive damages should be addressed only in the individual trials that would be required even without decertification.

The Supreme Court has held that "the precise award [of punitive damages] in any case, of course, ***must be based upon the facts and circumstances of*** the defendant's conduct and ***the harm to the plaintiff.***" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003) (emphases added). The Supreme Court's holding in *State Farm* was grounded in its previous ruling in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). In *Gore*, the Supreme Court held that a jury's award of punitive damages must be tested against three "guideposts" to determine its constitutionality: (1) "the degree of reprehensibility of the [conduct]"; (2) "the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damages award"; (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 574-75. The Supreme Court held in *State Farm* that the second *Gore* guidepost requires courts to "ensure that the measure of punishment is both

24

reasonable and proportionate to the ***harm to the plaintiff*** and to the general damages recovered."
*State Farm*, 538 U.S. at 423 (emphasis added).

Accordingly, any punitive damages award to any plaintiff must be based on not just
evidence of "the defendant's conduct," but also on the "facts and circumstances" of the harm to
***each plaintiff*** who receives an award of punitive damages. *Id.* Here, the "facts and
circumstances" concerning the harm allegedly suffered by each class member present highly
individualized issues and, as conceded by the Plaintiffs, cannot be decided by a "common issues"
jury. Thus, under *State Farm*, the Court may not constitutionally permit the application of a
single punitive damages multiplier set in the context of a "common issues" trial on certain duty
and breach questions, or set in the context of a trial of the seventeen named plaintiffs' claims, to
claims of individuals whose compensatory damages (if any) have not yet been determined.

The Supreme Court has made clear that the *Gore* guideposts are not only to be used in a
court's review of a jury's punitive damages verdict; rather, the Due Process Clause imposes a
requirement to establish trial procedures that avoid an "unreasonable and unnecessary risk" of a
jury verdict that violates the Due Process Clause. *Philip Morris USA v. Williams*, 127 S. Ct.
1057 (2007) (holding that trial court's refusal to provide a proper jury instruction concerning
punitive damages resulted in Due Process Clause violation). In *Williams*, the Supreme Court
vacated and remanded to the Oregon Supreme Court a jury's punitive damages award that had
been based on evidence of injuries suffered not just by the individual plaintiff whose claims were
before the jury, but also on injuries of "strangers to the litigation." *Id.*

The use of a class-wide punitive damages multiplier would contravene *State Farm* and
*Williams*, because it would require the jury considering the "common issues" to determine
punitive damages for absent class members based on the facts and circumstances of the harms

allegedly suffered by a select few, the named Plaintiffs.[14] As the Supreme Court held, "the Due Process Clause prohibits a State from punishing an individual without first providing that individual with an 'opportunity to present every available defense.'" *Williams*, 127 S. Ct. at 1063.[15] If a multiplier were used, Defendants would be forced to wait until the individual trials to present defenses applicable to class members not present for the class plaintiffs' trial – but by then a punitive damages multiplier will already have been improperly set based on the harm to only the named plaintiffs.[16]

Furthermore, any application of a classwide punitive damages multiplier to individualized claims would pose an "unreasonable and unnecessary risk" that the multiplier would violate the Due Process Clause as applied to actual awards. To date, Plaintiffs have not been able to establish either the "numerator" (*i.e.*, the number of putative class members) or the "denominator" (*i.e.*, the amount of compensatory damages likely to be claimed by putative class members) that would be necessary to determine whether the multiplier is "grossly excessive" as

---

[14] This problem could not be solved by instructing the jury deciding the named Plaintiffs' claims to consider alleged harm to absent class members because those claims – and corresponding defenses and related facts and circumstances – would not be before the jury. In fact, any instruction telling the jury to consider claims of absent class members to determine a punitive damages multiplier would directly convene the Supreme Court's holding in *Williams*.

[15] Defendants' defenses to punitive damages are likely to be based in part on individualized facts and circumstances for each plaintiff, consistent with Virgin Islands law. Courts generally look to the Restatement (Second) of Torts § 908 (1977) for substantive rules governing Virgin Islands diversity cases concerning claims for punitive damages, and the Restatement provides for a multi-factor framework that includes consideration of the "nature and extent of the harm to the plaintiff. . . ." *See, e.g., Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir. 1993) (citing Restatement (Second) of Torts § 908(2)). As described *supra*, the "nature and extent of the harm" allegedly suffered by each plaintiff varies significantly from plaintiff to plaintiff and presents numerous individualized issues.

[16] While a punitive damages multiplier based only on the named plaintiffs' claims would clearly be unfair to Defendants, it would also be unfair to absent class members who may have stronger claims than the named plaintiffs. Indeed, if the Defendants are successful and the jury finds that the named plaintiffs suffered no harm, would the punitive damages multiplier be zero for all absent class members? The Seventh Amendment prohibits solving such problems by permitting subsequent juries to re-examine the multiplier based on individual facts and circumstances.

applied in the aggregate. Without this information, this Court would not be able to undertake a complete post-trial review of the jury's verdict under the second *Gore* guidepost, because there would be no way to know whether the multiplier is to be applied to one hundred class members with compensatory damages claims ranging from $200 to $5,000, or to "thousands" of class members (*see* Plaintiffs' Proposed Findings of Fact and Conclusions of Law Denying Defendants' Motion to Decertify and Overruling Objections to Plaintiffs' Trial Plan ¶ 151) with compensatory damages claims ranging from $200 to $20,000 each.

The Supreme Court has made clear that a one-size-fits-all proportionality analysis does not comport with the Due Process Clause: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. The converse is also true. *Id.* Consistent with these holdings, this Court should implement a trial plan that leaves to individualized proceedings any punitive damages awards, as well as judicial review of whether any awards violate the Due Process Clause or other applicable doctrines.[17] Such an approach would allow this Court to monitor the aggregate effect of any punitive damages awards in individual proceedings and to make any post-trial reductions as appropriate. *See, e.g., Dunn,* 1 F.3d at 1389-91 (permitting submission of post-trial affidavits by defendants seeking remittitur based on aggregate effect from punitive damages verdicts in other cases).

In Plaintiffs' previous briefing in support of the "multiplier" approach, they relied on a handful of cases from the Fifth Circuit, all of which pre-date *State Farm* and *Williams. See, e.g.,*

---

[17]   The Third Circuit has examined several punitive damages awards since *State Farm* and *Williams* were decided, and in each case analyzed the facts and circumstances of harm suffered by the specific plaintiff seeking punitive damages. *See, e.g., CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.,* 499 F.3d 184 (3d Cir. 2007); *Willow Inn, Inc. v. Public Service Mutual Ins. Co.,* 399 F.3d 224, 233-37 (3d Cir. 2005)

Plaintiffs' Response to Defendants' St. Croix Alumina, LLC, and Alcoa, Inc.'s Motion to Decertify and Objections to Plaintiffs' Trial Plan at 40-44 (citing *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1018-1021 (5th Cir. 1992), *reh'g granted*, 990 F.2d 805 (5th Cir. 1993), *appeal dismissed on reh'g*, 53 F.3d 663 (5th Cir. 1994); *Cimino v. Raymark Industries, Inc.*, 751 F. Supp. 649, 657-58 (E.D. Tex. 1990), *aff'd in part, vacated in part*, 151 F.3d 297 (5th Cir. 1998)). As explained above, following *State Farm* and *Williams*, use of a classwide multiplier is not a viable option in cases that involve claims of individualized injuries to each plaintiff. Indeed, Defendants have not found a decision from any Circuit Court of Appeals or District Court that has accepted the use of a classwide punitive damages multiplier after the Supreme Court's decisions in *State Farm* and *Williams*.

Because the Supreme Court has made clear that punitive damages awards must occur in the context of individualized consideration of an individual plaintiff's damages, neither punitive damages nor a punitive damages multiplier can be assessed on a class basis here.

## V.   DECERTIFICATION IS REQUIRED BECAUSE CLASS TREATMENT OF PLAINTIFFS' CLAIMS WOULD NOT BE SUPERIOR.

For many of the same reasons individual issues predominate, class treatment would not be a superior method of adjudicating Plaintiffs' claims. A "class action is 'superior' for purposes of Rule 23(b)(3) when it is clearly better than, 'and not just as good as, other available methods for handling the controversy.'" *M/V Emily S*, 158 F.R.D. at 15-16 (quoting *Beebe v. Pac. Realty Trust*, 99 F.R.D. 60, 73 (D.Or. 1983)).

In a mass tort context, "the most significant portion of the litigation parsing out causation will take place in the context of each individual's claim." *Blain*, 240 F.R.D. at 191. Thus "class treatment will not materially advance the litigation." *Id. See also Bradford*, 2007 U.S. Dist. LEXIS 72951 at *25-26 ("Each class member will be required to present highly individualized

evidence regarding specific causation and damages. . . . As such, a class action is not the
superior method"); *Arch*, 175 F.R.D. at 492 (class treatment not superior where "[t]he reality of
this litigation is that there are simply too many individual issues and class members to try this
case efficiently"); *Perrin*, 2008 U.S. Dist. LEXIS at *17 (class treatment not superior where,
following a trial on the question of "fault" on the part of the defendant, "the Court would be
inevitably confronted with a series of mini-trials addressing the more involved individualized
issues of proximate cause, injury-in-fact, and damages").

As demonstrated above, individual issues clearly predominate. Thus, class treatment of
Plaintiffs' claims are an inferior method of adjudication and the Court should decertify the class.

## VI.    TO THE EXTENT THIS COURT RULES THAT A "COMMON ISSUES" TRIAL WOULD BE APPROPRIATE, THAT TRIAL SHOULD BE FRAMED BY A COMPLETE DETERMINATION OF THE NAMED PLAINTIFFS' CLAIMS.

For all of the foregoing reasons, no class should be certified here. If, however, this Court
concludes that a class should remain certified for a trial on the few issues common to the class,
then the trial plan should include a trial involving a general verdict on the named plaintiffs'
claims, along with specific issue-by-issue determinations by the same jury on "common issues."
Moreover, the common issues should be identified as described in rule 23(c)(1)(B) and the Third
Circuit's decision in *Wachtel*. (*See* n.2, *supra*.) Such a trial could be administered by requiring
the jury to render a general verdict on the named plaintiffs' claims, along with answers to written
questions under Rule 49(b) on the common issues. *See Maenner v. St. Paul Fire & Marine Ins.
Co.*, 127 F.R.D. 488, 492 (W.D. Mich. 1989) (approving a trial plan involving a single trial on all
common liability issues for the certified class, to be determined by jury interrogatories under
Rule 49, as well as a final verdict by the same jury on the named plaintiffs' claims). This would
avoid the need for either two separate juries or a longer two-step trial in which the common
issues and the named plaintiffs' claims are resolved seriatim. Moreover, the trial would result in

an appealable judgment such that any necessary guidance could be obtained in a timely manner. Following this trial, and with it jury determinations of any "common issues" that will apply to all class members, the Court should, consistent with the prior decertification order, decertify the class.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Court decertify the class of plaintiffs.

Dated: April 2, 2008                                       Respectfully submitted,

THE LAW OFFICES OF BERNARD C. PATTIE, PC          MACKAY & HODGE, LLC
s/Bernard C. Pattie                                            s/Derek M. Hodge
Bernard C. Pattie                                              Derek M. Hodge, Esq.
1244 Queen Cross Street, Suite 5                       19A-20 Kongens Gade
Christiansted, VI 00820                                     St. Thomas, VI 00803
 (340) 692-1171 *phone*                                    (340) 774-3971
 (340) 692-7719 *fax*                                        (305) 418-7505
boinie@compuserve.com                                     Derek@mackayhodge.com
paralegal.bcppc@vipowernet.net                        V.I. Bar No. 198
V.I. Bar No. 262

                                                               TATRO TEKOSKY SADWICK LLP
HUNTON & WILLIAMS LLP                                  René P. Tatro*
David Craig Landin*                                        Juliet Markowitz*
Lori Elliott Jarvis*                                           *Admitted *Pro Hac Vice*
Patricia Sulzbach*                                           333 South Grand Ave., Suite 4270
*Admitted *Pro Hac Vice*                                 Los Angeles, California 90071
951 E. Byrd Street
Richmond, VA 23235                                        ***Counsel for Defendant Glencore Ltd.***
(804) 788-8200 *phone*
(804) 788-8214 *fax*

GIBSON, DUNN & CRUTCHER LLP
Christopher H. Buckley, Jr.*
Daniel W. Nelson*
*Admitted *Pro Hac Vice*
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

 ***Counsel for Defendants***
 ***St. Croix Alumina, LLC and Alcoa Inc.***

30

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April, 2008, I electronically filed the foregoing Motion to Decertify the Class of Plaintiffs with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Lee J. Rohn, Esq.
Law Offices of Lee J. Rohn
1101 King Street, Suite 2
Christiansted, St. Croix VI 00820
lee@rohnlaw.com

Gordon C. Rhea, Esq.
Richardson, Patrick, Westbrook & Brickman, LLC
P.O. Box 3111
17 Church Street, Suite 205
St. Croix, VI 00822
grhea@rpwb.com

Scott Summy, Esq.
Renee Melancon, Esq.
Laura Baughman, Esq.
Ellen Presby, Esq.
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
ssummy@baronbudd.com

s/Bernard C. Pattie
1244 Queen Cross Street, Suite 5
Christiansted, VI 00820
(340) 692-1171 *phone*
(340) 692-7719 *fax*
boinie@compuserve.com
paralegal.bcppc@vipowernet.net
V.I. Bar No. 262