## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

JOSEPHAT HENRY resident of Harvey, KAY )
WILLIAMS resident of Harvey, SYLVIA )
BROWNE resident of Clifton Hill, MAUDE )        CIVIL NO. 1999/0036
DREW resident of Estate Barren Spot, MARTHA )
ACOSTA resident of Estate Profit, )
WILHELMINA GLASGOW as an individual and )
mother and next friend of SAMANTHA VIERA, )
a minor, both residents of Estate Profit, )
MERCEDES ROSA resident of Estate Profit, )
GEORGE RODRIGUEZ as an individual and as )
father and next friend of AMADO and GEORGE )
E. RODRIGUEZ, Minors, all residents of Estate )
Profit, SONYA CIRILO resident of Estate Profit, )
RAQUEL TAVAREZ, resident of Estate Profit, )
NEFTALI CAMACHO, as an individual and as )
father and next friend of ANGEL JAVIER )
CAMACHO, a minor, both residents of Estate )
Profit, EYAJIE MALAYKHAN resident of Estate )
Profit, KELSHALL CHEDDIE resident of Estate )
Profit and other persons too numerous to mention, )
A CLASS ACTION, )
                                                 )
Plaintiffs, )
                                                 )
v. )
                                                 )
ST. CROIX ALUMINA, LLC, ALCOA INC., and )
GLENCORE, LTD, f/k/a CLARENDON, LTD., )
                                                 )
Defendants. )
_____ )

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

COME NOW Plaintiffs, through counsel of record, and respectfully file this their Plaintiffs'

Motion for Class Certification:

1.       This case was certified as a Rule 23(b)(3) class action on August 7, 2000.  A medical

monitoring subclass, property damages subclass, personal injury subclass, and punitive

damages subclass were certified as well.

2.       On May 16, 2005, Plaintiffs filed their Plaintiffs' Class Action Litigation Plan. Doc. 800. In the plan, Plaintiffs proposed that the case be tried in two phases.

3.       Defendants objected to the trial plan and moved for decertification. On January 19-20, 2006, the Magistrate Judge conducted a hearing on these objections and recommended that the case proceed as a class certified on liability only and that the subclasses be de-certified. The district court adopted these recommendations. Doc. 949.

4.       On December 11, 2007, the Court issued an Order revisiting certification in the interests of trial efficiency and workability. Doc. 1181, p.1. This third district court certification order states that there is no benefit to post-trial decertification, that the property damage and personal injury subclasses should be reinstated, that a punitive damages multiplier could be adjudicated on a class-wide basis, and that the demand for injunctive relief to protect Plaintiffs against future harm should be considered for Rule 23(b)(2) certification. Doc. 1181, pp. 1-3.

5.       Defendants responded with a brief objecting to these proposals and demanding decertification of the entire class. Doc. 1242. After a status conference, this Court ordered that the Defendants file their decertification brief on April 2, 2008, which Defendants did at Doc. 1248.

6.       Plaintiffs have this day filed their response in opposition to Defendants' motion for decertification. As a formality, and in an abundance of caution, Plaintiffs file this motion to formalize their position on certification at this time and to request that the Court's 2006 certification order be officially vacated and superceded by the December 2007 Order.

THEREFORE, for the foregoing reasons and those more fully outlined in the accompanying brief, exhibits, and materials incorporated by reference, Plaintiffs respectfully request that the Court certify all class claims pursuant to Federal Rule of Civil Procedure 23(b)(3) and certify Plaintiffs' claims for

2

injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2).  Plaintiffs further request

certification of the Property Damages Subclass and the Personal Injury Subclass pursuant to Federal

Rule of Civil Procedure 23(c)(4)(B).

Dated: April 16, 2008                         Respectfully submitted,

                                              ROHN & CAMERON, LLC
                                              1101 King Street
                                              Christiansted, St. Croix
                                              U.S. Virgin Islands  00820-4933
                                              (340) 778-8855 / (340) 773-2954 (FAX)

                                              By:___s/__*Lee J. Rohn*_____(dr)
                                                     LEE J. ROHN

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

JOSEPHAT HENRY resident of Harvey, KAY )
WILLIAMS resident of Harvey, SYLVIA )
BROWNE resident of Clifton Hill, MAUDE )     CIVIL NO. 1999/0036
DREW resident of Estate Barren Spot, )
MARTHA ACOSTA resident of Estate Profit, )
WILHELMINA GLASGOW as an individual )
and mother and next friend of SAMANTHA )
VIERA, a minor, both residents of Estate Profit, )
MERCEDES ROSA resident of Estate Profit, )
GEORGE RODRIGUEZ as an individual and as )
father and next friend of AMADO and )
GEORGE E. RODRIGUEZ, Minors, all )
residents of Estate Profit, SONYA CIRILO )
resident of Estate Profit, RAQUEL TAVAREZ, )
resident of Estate Profit, NEFTALI )
CAMACHO, as an individual and as father and )
next friend of ANGEL JAVIER CAMACHO, a )
minor, both residents of Estate Profit, EYAJIE )
MALAYKHAN resident of Estate Profit, )
KELSHALL CHEDDIE resident of Estate Profit )
and other persons too numerous to mention, A )
CLASS ACTION, )
)
Plaintiffs, )
)
v. )
)
ST. CROIX ALUMINA, LLC, ALCOA INC., )
and GLENCORE, LTD, f/k/a CLARENDON, )
LTD., )
)
Defendants. )
_____

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

PROCEDURAL HISTORY .................................................................................................1

FACTUAL BACKGROUND..............................................................................................1

STANDARD.......................................................................................................................4

ARGUMENT......................................................................................................................5


I.      RULE 23(a)'S PREREQUISITES ARE SATISFIED........................................................6

      A.      Numerosity......................................................................................................6

      B.      Commonality...................................................................................................6

      C.      Typicality........................................................................................................7

      D.      Adequacy.........................................................................................................8


II.      RULE 23(b)'S PREREQUISITES ARE SATISFIED .......................................................9

      A.      Plaintiffs' Demand for Injunctive Relief Should Be Certified
              Pursuant to Rule 23(b)(2)...............................................................................9

      B.      Rule 23(b)(3)'s Requisites are Satisfied and Allow Certification
              of the Case as a Whole...................................................................................17

              1.      Common issues predominate......................................................17
              2.      The efficiencies of class resolution are superior to
                     thousands of individual cases....................................................17

      C.      The Property Damages Subclass and Personal Injury Subclass
              Should Be Reinstated.....................................................................................19


III.      CONCLUSION..............................................................................................................20

## TABLE OF AUTHORITIES

## CASES

Pages

*Air America, Inc. v. Hatton Brothers, Inc.*, 570 F. Supp. 747 (S.D. Fla. 1983)..............16

*Allen v. Holiday Universal,* Civ. No. 05-5726, 2008 WL 746613
(E.D. Pa. March 18, 2008)...........................................................................................6

*Allen v. International Truck and Engine Corp.*, 358 F.3d 469 (7th Cir. 2004)................9

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)................................................8

*American Telegraph & Telegraph v. Fraiser*, 545 So.2d 405 (Fla. Dist. Ct. App. 1989)   ..........16

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994)..............................................6, 7, 8, 9, 10

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006)  ...........................................5, 7, 8

*Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. 156 (S.D. W. Va. 1996).................................18

*Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179 (E.D. Pa. 2007)...........................18

*Califano v. Yamasaki*, 442 U.S. 682 (1979).......................................................................4

*Camden County Board of Chosen Freeholders v. Beretta*, 273 F.3d 536 (3d Cir. 2001).............10

*Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (6th Cir. 1993)................18

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004).............................................................5

 *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 373 (D. Del. 1990).............................7

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).........................................................5

*International Brotherhood of Boilermakers v. Kelly*, 815 F.2d 912 (3d Cir. 1987)......................11

*Kamke v. Clark*, 67 N.W.2d 841 (Wis. 1955)...................................................................15

*Kerrigan v. Philadelphia Board of Election*,
No. 07-687, 2008 WL 706688 (E.D. Pa. March 13, 2008)..............................................5

*Lusardi v. Xerox Corp.*, 975 F.2d 964 (3d Cir. 1992)......................................................14

*Manchester v. National Gypsum Co.*, 637 F. Supp. 646 (D.R.I. 1986)...........................................10

*Midland Empire Packing Co. v. Yale Oil Corp.*, 169 P.2d 732 (Mont. 1946)................................16

*Montana Pole & Treating Plant v. I.F. Laucks and Co.*,
775 F. Supp. 1339  (D. Mont. 1991) ...............................................................................10, 16

*New York v. Solvent Chemical Co.*, 880 F. Supp. 139 (W.D. N.Y. 1995).....................................15

*Northridge Co. v. W.R. Grace & Co.*, 556 N.W.2d 345 (Wis. Ct. App. 1996).............................15

*Parks Hiway Enterprises, L.L.C. v. CEM Leasing, Inc.*, 995 P.2d 657 (Alaska 2000)..................10

*Pennsylvania Pub. Util. Co. v. General Waterworks Corp.*,
300 A. 2d 280 (Pa. Commw. Ct. 1973) ...........................................................................16

*Phoenix Marine Enterprises, Inc. v. One (1) Hylas, 46' Convertible Sportfisherman Hull N,*
681 F.Supp. 1523 (S.D. Fla.), a*ff'd,* 846 F.2d 753 (11th Cir. 1988)................................16

*Piambino v. Bailey*, 757 F.2d 1112 (11ᵗʰ Cir. 1985)...................................................................15

*Piambino v. Bestline Products, Inc.*, 645 F. Supp. 1210 (S.D. Fla. 1986)....................................16

*Powers v. Lycoming Engines*, 245 F.R.D. 226 (E.D. Pa. 2007)................................................18, 19

*S.E.C. v. Bilzerian*, 112 F. Supp. 2d 12 (D.C. Cir. 2000).............................................................16

*In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986)........................................................4

*Slapikas v. First American Title Ins. Co.,* Civ. No. 06-00084, 2008 WL 793919
(W.D. Pa. March 24, 2008)................................................................................................8

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001)..........................................................................6

*Turner v. Murphy Oil U.S.A., Inc.*, 234 F.R.D. 597 (E.D. La. 2006)............................................19

*Vana v. Grain Belt Supply Co.*, 18 N.W.2d 669 (Neb. 1945)........................................................16

*Wachtel ex rel. Jesse v. Guardian Life Insurance Co. of America*, 453 F.3d 179 (3d Cir. 2006).......5

*Wilmington Firefighters Local 1590 v. Wilmington*, 824 F.2d 262 (3d Cir.1987).........................14

## **MISCELLANEOUS**

5 Alba Conte & Herbert Newberg, Newberg on Class Actions § 17:17 (4th ed., Database updated June 2007).............................................................................................................1

Federal Rule of Civil Procedure 23........................................................................in passim

Restatement (Second) of Torts §§ 324A, 373, 389, 840A.........................................................11

Michael Stocker, 'Ought' and 'Can', 49 Australasian Journal of Philosophy 303 (No. 3, December 1971) ............................................................................................................15

COME NOW Plaintiffs, through counsel of record, and respectfully file this their Plaintiffs' Brief in Support of Motion for Class Certification:

## PROCEDURAL HISTORY

In 2000, the district court certified this case as a Rule 23(b)(3) class action with property damage, medical monitoring, personal injury, and punitive damages subclasses. *Josephat v. St. Croix Alumina, LLC,* 2000 WL 1679502 (D. V.I. August 7, 2000), Doc. 187, 188.  The Third Circuit denied Defendants' request for interlocutory appeal (*see* Doc. 224 (11/06/00)).  In 2006, the district court adopted the Magistrate Judge's recommendation that the class continue to be certified for liability purposes only and proceed to a liability-only trial (Doc. 949 (4/24/06)).  In 2007, after scrutinizing how the case could be tried under his second certification decision, the Court changed its mind regarding the 2006 decision and revisited certification in the interests of trial efficiency and workability (Doc. 1181, p.1 (12/11/07)).  This third Order states that there is no benefit to post-trial decertification, that the property damage and personal injury subclasses should be reinstated, that a punitive damages multiplier could be adjudicated on a class-wide basis, and that the demand for injunctive relief to protect Plaintiffs against future harm should be considered for Rule 23(b)(2) certification (Doc. 1181, pp. 1-3).   Plaintiffs are re-moving for class certification, as a formality, to request that the 2007 Order supercede the 2006 Order, which should be vacated.

## FACTUAL BACKGROUND

On September 21, 1998, bauxite and the alumina-refining waste-product, "red dust" or "red mud", from Defendants' alumina refinery inundated nearby neighborhoods on the island of St. Croix, when Hurricane Georges struck the island.[1]  Plaintiffs filed the instant case against Defendants Alcoa

---

[1] *See* Ex. 1, Bates No. DPNR 000706, Notice of Violation, *Dept. of Planning and Nat. Resources v. St. Croix Alumina*, LLC, Action No. APC-001-9 (describing government investigation of numerous complaints that red mud had contaminated neighborhoods on September 21, 1998, and citing St. Croix Alumina for violating environmental laws); *see also* Plaintiffs' Response in Opposition to Defendants' Joint Motion to Decertify the Class of Plaintiffs § II (filed April 16, 2008).

(Aluminum Company of America); St. Croix Alumina, a wholly-owned subsidiary of Alcoa; and Glencore, Ltd.  At the time of the hurricane, Alcoa was the owner and St. Croix Alumina was the operator of the St. Croix Alumina Refinery, where bauxite ore was refined into alumina.  Glencore is the former bauxite supplier and owner of a prior operator, VIALCO.

Plaintiffs include residents and property owners on St. Croix, whose persons and/or property were harmed by exposure to the red dust/red mud and bauxite from the refinery when those toxic substances were blown into their neighborhoods on St. Croix by Hurricane Georges.  Bauxite was stored in a makeshift structure that was open to the elements and inadequate for containment purposes. The red mud waste was dumped in huge open piles as high as 120 feet above grade on the refinery property, across the street from Plaintiffs' neighborhoods.[2]  In ruling on Glencore's summary judgment motion, the Court found that, "Material Safety Data Sheets ... indicated that bauxite is dangerous if inhaled.  The evidence also demonstrates that the aluminum plant was in a hurricane zone and the possibility of the red mud piles blowing into the surrounding neighborhoods posed a significant danger to the property owners." Mem. Op., Doc. 1125, 13.

Numerous hurricanes and tropical storms had struck St. Croix prior to Hurricane Georges.[3] Furthermore, residents had complained to Defendants about the red dust being blown into their neighborhoods prior to the hurricane, and these complaints resulted in a public hearing on this issue on August 25, 1994.  As a result of this hearing, the Department of Planning and Natural Resources conducted a field inspection on September 2, 1994, which found:

---

[2] *See* Ex. 2 (photographs of the red mud); Ex. 3, Complaint, *DPNR v. St. Croix Alumina,* Civ. No. 730/06, filed in the Superior Court of the Virgin Islands, December 1, 2006, at 2-3 ¶¶ 5-12 (describing refinery operations that created toxic red mud waste that was piled on the property).

[3] Hurricanes and tropical storms on St. Croix include: Betsy (1956), Edith (1959), Claudette (1979), Frederick (1979), Gert (1981), Klaus (1984), Hugo (1989), Marilyn (1995), Bertha (1996), Georges (1998).

> It was apparent that dust is ubiquitous on the site. The buildings and ground, especially to the west of the ship channel is covered with a fine layer of dust and stained red. During a site inspection of the red mud storage areas it was clear that while leaves were not red, the branches of vegetation in the area was stained red. Although dust was not apparent in the air, a drizzle during the inspection deposited red mud on the white shirts, faces and arms of staff indicating its presence in the air.

Ex. 4, Staff Recommendation, Major CZM Permit No. CZX-25-94L, p. 4, exhibit 17 to Dep. Wagh.

In addition, as early as 1989, Glencore's subsidiary VIALCO determined that the bauxite storage building should be totally enclosed for environmental reasons at an estimated cost of $3,000,000. Ex. 5, Prusak Dep., Feb. 22, 2002, at exhibit 4, G00167. This never happened.

One day after Hurricane Georges, inspectors from the Department of Planning and Natural Resources responded to numerous complaints of red mud contamination and observed entire homes discolored by a reddish substance. Ex. 1, 1-2 ¶¶ 2-3. On the next day, inspectors visited the refinery and found "that St. Croix Alumina took no identifiable precautionary measures to secure the stockpiled bauxite, in preparation for the then impending hurricane" and cited Defendant for violating environmental protection laws. *Id.* at 2 ¶ 9, 4-5.

In deposition testimony in this case, the environmental manager of St. Croix Alumina admitted that St. Croix Alumina took no steps to secure the residue from being blown in the event of a hurricane and that he did not take into account the safety or protection of the residents that lived around the facility in considering how to store bauxite or its waste residue. Ex. 6, Black Dep., 119:21-120:1, 179:11-17, April 24, 2002. The plant manager testified that he knew of no precautions taken by St. Croix Alumina to protect any of the neighbors. Ex. 7, Pedersen Dep., 68:1-10, April 25, 2002. An Alcoa consultant testified that he would not have located the disposal site at the same place on the refinery that St. Croix Alumina placed it.[4] He admitted Alcoa knew hurricanes were a strong

---

[4] The Alcoa consultant testified as follows:

3

possibility, yet no steps were taken to prevent residue from becoming airborne. Ex. 8 at 146:10-14, 189:3-11.  He further admitted that, as stated in the MSDS sheets, exposure to these materials causes upper respiratory tract problems and other negative health effects. *Id.* at 227:7-11, 229:5-11, 230:3-4, 258:8-20.

As a result of Defendants' negligent failure to contain the bauxite and red mud, Plaintiffs who were in the class neighborhoods at the time of the hurricane suffered multiple personal injuries that were primarily various breathing problems, throat irritations, eye problems, and skin rashes and irritations.  The neighborhoods also sustained a 30% decrease in real property value as a result of the stigma attached to the well-publicized bauxite and red mud hazardous waste catastrophe.[5]

## STANDARD

Plaintiffs re-move for class certification in an abundance of caution in order to formalize Rule 23(b)(2) certification of the injunctive relief request and to formally request re-certification of the personal injury and property damage subclasses.

This Court enjoys wide discretion in deciding to certify a class.  *In re School Asbestos Litig.,* 789 F.2d 996, 1011 (3d Cir. 1986); *see also Califano v. Yamasaki,* 442 U.S. 682, 703 (1979)

---

Q. ... If you were going to be building a plant afresh in St. Croix, assuming there wasn't one there, why would it be important to look at the neighboring present and planned land uses in considering the bauxite disposal site?

A.  I think everywhere where Alcoa has a presence, we try to be a good neighbor, so you would consider those kinds of things prior to construction of a facility.
....
Q.  So you would not have located the bauxite disposal site at the same place that St. Croix Alumina put it, would you?

A.  No.

Ex. 8, Norton Dep., 185:10-21, 205:19-23, Feb. 25, 2002.

[5] *See* Plaintiffs' Resp. in Opp. to Def. Jt. Mot. to Decertify § II (filed April 16, 2008), which marshals proof that the personal injury and property damage claims are cohesive and similar.

4

(recognizing district court discretion under Rule 23 to certify a class).  It is not necessary for a plaintiff to establish the merits of his case at the certification stage.  *Chiang v. Veneman,* 385 F.3d 256, 262 (3d Cir. 2004) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974)).  Indeed, the class certification inquiry cannot evolve into a "preliminary inquiry into the merits." *Eisen,* 417 U.S. at 177. In the limited circumstance in which class certification questions become enmeshed in the factual and legal issues comprising the plaintiffs' cause of action, courts may delve beyond the pleadings in determining whether certification requirements are met.  *Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir. 2006) (cit. om.).  When doubt exists, the court should err in favor of allowing the case to proceed as a class action.  *Kerrigan v. Philadelphia Bd. of Election,* No. 07-687, 2008 WL 706688, *1 (E.D. Pa. March 13, 2008) (cit. om.).  Class certification orders should include a clear and complete summary of the class claims, issues, and defenses.  *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of America,* 453 F.3d 179, 185 (3d Cir. 2006).

## ARGUMENT

A class action may be certified if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).  In addition, at least one of the Rule 23(b) criteria must be satisfied.  FED. R. CIV. P. 23(b).  A class may be certified pursuant to Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class." FED. R. CIV. P. 23(b)(2).  A class may be certified pursuant to Rule 23(b)(3) if "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

5

## I.      RULE 23(a)'S PREREQUISITES ARE SATISFIED.

### A.      Numerosity.

The parties and Court historically have agreed that the numerosity element is satisfied.  The Third Circuit typically approves classes numbering 40 or more.  *Allen v. Holiday Universal,* Civ. Action No. 05-5726, 2008 WL 746613, *8  (E.D. Pa. March 18, 2008) (citing *Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir. 2001)).  Census data shows *at least* 3,700 residents of the Harvey, Clifton Hill, Profit, Barren Spot, and La Reine communities (Ex. 9, Henry Report, p.3 at Map 1 Study area, Selected 2000 Census Data By Census Block Group). The numerosity element is clearly met.

### B.      Commonality.

Commonality is satisfied if at least one question of law or fact is common to the class. FED.R.CIV.P. 23(a)(2); *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994).  In recent briefing, Defendants conceded that common issues exist in this case (Def. Jt. Mot., Doc. No. 1248, p. 4 ("Defendants do not dispute that there are a handful of issues common to all class members.")).

Common issues of law and fact are:

1    whether red mud is toxic and the extent of that toxicity;
2.    whether bauxite is toxic and the extent of that toxicity;
3.    Defendants' knowledge that red mud could be dispersed into properties surrounding the alumina facility;
4.    Defendants' knowledge that bauxite could be dispersed into properties surrounding the alumina facility;
5.    Defendants' knowledge of the dangers of red mud;
6.    Defendants' knowledge of the dangers of bauxite;
7.    whether Defendants' method of handling and storing the red mud was appropriate in light of the existing and foreseeable circumstances;
8.    whether Defendants' method of handling and storing the bauxite was appropriate in light of the existing and foreseeable circumstances;
9.    whether Defendants implemented, or failed to implement, any safety plans, equipment, procedures, or structures to attempt to protect surrounding properties from materials stored at the alumina facility;
10.   whether Defendants were negligent in failing to prevent Plaintiffs from coming into contact with air, water, and soil contaminated with red mud and bauxite;
11.   whether Defendants breached a duty to the neighborhood class;
12.   the scope of the duty that Defendants owed to neighborhood owners and residents;

6

13.    to the extent Defendants can pursue a conjunctivitis defense, the extent to which the red mud and bauxite were factors in causing the conjunctivitis outbreak;

14.    to the extent Defendants can pursue a conjunctivitis defense, the extent to which the conjunctivitis was chemical as opposed to viral;

15.    Defendants' alleged "Act of God" defense (to the extent it exists, if at all);

16.    whether Defendants were negligent in failing to abate the contamination and mitigate damages;

17.    whether Defendants were negligent in failing to adequately warn Plaintiffs and the St. Croix community of the potential for contamination;

18.    whether Defendants are strictly liable for failing to sufficiently store and contain substances hazardous to human health;

19.    whether Defendants' failure to sufficiently store and contain the red mud and bauxite constitutes a public nuisance;

20.    whether Defendants' failure to sufficiently store and contain the red mud and bauxite constitutes a private nuisance;

21.    whether Defendants' acts and/or omissions constitute negligence per se based on their violations of federal, state, and municipal law;

22.    whether Defendants engaged in outrageous conduct for purposes of intentional infliction of emotional distress;

23.    whether Defendants engaged in negligent conduct causing emotional distress;

24.    the propriety of injunctive relief;

25.    whether Defendants are grossly negligent in that their acts and/or omissions constitute reckless and conscious indifference to the rights and welfare of Plaintiffs; and,

26.    the mathematic relationship between punitive and compensatory damages (or, punitive damages multiplier).

## C.    Typicality.

The typicality query is "'whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class.'" *Beck,* 457 F.3d at 295-96 (quoting *Baby Neal,* at 55).  "'[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.'" *Beck,* at 296 (quoting *Baby Neal,* at 58 (further cit. om.)).  The typicality inquiry focuses on Defendants' behavior, not on Plaintiffs.  *Josephat,* 2000 WL 1679502, * 5 (citing *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 373 (D. Del. 1990)).  "If Defendants' course of conduct gives rise to all of the class members' claims, and if Defendants have not taken any action unique to the named Plaintiff, then the representative's

claim is typical." *Id.*

Plaintiffs here satisfy the requirements of Rule 23(a)(3) because the claims of the class representatives are typical of the claims of the class as a whole.  The claims rely on the identical course of conduct and the laws of a sole jurisdiction.  The class shares the same types of injuries and damages.  *See* Plaintiffs' Response in Opposition to Defendants' Joint Motion to Decertify the Class of Plaintiffs § II (filed April 16, 2008).

### D.    Adequacy.

Class representatives must "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997). It "'assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class.'"  *Beck,* 457 F.3d at 296 (quoting *Baby Neal,* 43 F.3d at 55).  Adequacy is, in most cases, presumed in the absence of contrary evidence by the party opposing the class.  *Slapikas v. First American Title Ins. Co.,* No. 06-00084, 2008 WL 793919, *11 (W.D. Pa. March 24, 2008) (cit. om.).

The named plaintiffs have been actively involved in this case, have subjected themselves to deposition and examination, and were injured by red mud and bauxite following Hurricane Georges.[6]

_____

[6] *See* Doc. No. 148 at Exhibit D (affidavits of Josephat Henry, Kay Williams, and Sylvia Browne filed in support of original certification motion ); Ex. 10 hereto (affidavits of Sonia Cirilo, Maud Drew, Eyahie Malaykhan, George Rodriquez, Mercedes Rosa, Raquel Tavarez); Ex 11 (deposition excerpts of the other class representatives).  In addition, Plaintiffs previously have filed expert reports and deposition testimony proving that the class representatives have all sustained similar injuries due to their exposure to red mud and bauxite blown from the refinery property on September 21, 1998.  Doc. 866 at exhibit 5, An Analysis of the Impact of "Red Mud" Emissions from the Saint Croix Alumina Facility Caused by Hurricane Georges (9/22/03); exhibit 6, excerpts from the Deposition of Clayton Bock, Vol. I (5/3/05) and deposition ex. 1, Expert Report, at PEX 00033-34; exhibit 7, excerpts from the Deposition of Clayton Bock, Vol. II (5/4/05); exhibit 8, excerpts from the Deposition of Nachman Brautbar, Vol. III (10/7/04); exhibit 9, excerpts from the Deposition of

Defendants have not disputed the qualifications of Plaintiffs' Class Counsel.[7]

## II.     RULE 23(b)'S PREREQUISITES ARE SATISFIED.

### A.     Plaintiffs' Demand for Injunctive Relief Should Be Certified Pursuant to Rule 23(b)(2).

In the most recent certification Order, the Court stated that, "the question of whether the demand for [injunctive] relief to protect Plaintiffs against future harm from red dust or red mud should be certified pursuant to Rule 23(b)(2) has not been explored." Order, Doc. 1181, 3.  Although Rule 23(b)(2) certification of a claim for injunctive relief is not required to maintain a class action, Plaintiffs hereby move for Rule 23(b)(2) certification.[8]

A class may be certified pursuant to Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class." FED. R. CIV. P. 23(b)(2).  "The need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about."  *Allen v. Int'l Truck and Engine Corp.,* 358 F.3d 469, 471 (7th Cir. 2004) (paren. om.).  What is important in this context is that the relief sought by the named plaintiffs benefits the entire class. *Baby Neal,* 43 F.3d at 59.  Contrary to Defendants' argument (Doc. 1242, 40-41), the existence of individual issues does not prevent Rule 23(b)(2) certification where, as here, the class is injured by

---

Nachman Brautbar, Vol. IV (12/14/04); exhibit 12, Expert Report of Nachman Brautbar, M.D., F.A.C.P.; exhibit 14, excerpts from the Deposition of Nachman Brautbar, Vol. II (10/6/04); exhibit 15, excerpts from the Deposition of Nachman Brautbar, Vol. VI (12/16/04); exhibit 16, excerpts from the Deposition of Nachman Brautbar, Vol. V (12/15/04); exhibit 17, excerpts from the Deposition of Wilbert Williams (4/22/04); exhibit 18, Rebuttal Expert Report of Robert J. Buynak; exhibit 19, Rebuttal Report of Dr. Richard A. Lemen.

In addition, Plaintiffs' Response in Opposition to Defendants' Joint Motion to Decertify (filed April 16, 2008) includes additional expert reports at exhibit 4, Tarr Supp. Report; exhibit 5, Bock Supp. Report; exhibit 7, Brautbar Supp. Report; exhibit 22, Kilpatrick Supp. Report.

[7] As a formality, individual and firm biographies are submitted at Exs. 12-13.

[8] While Rule 23(b)(2) certification may be mandatory, plaintiffs are not seeking mandatory certification, as the class has received notice and an opportunity to opt out.

the same course of conduct. "Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Baby Neal,* 43 F.3d at 58 (cit. om.); *id.* at 59 ("Certainly, the plaintiffs will have different stories to tell."). Differences among plaintiffs do not prohibit certification if the plaintiffs' legal claims are based on a common factual predicate. *Id.* Because the nuisance in this case arises from the same course of conduct in mishandling and improperly storing toxic hazardous waste and raw materials, class certification is appropriate.

In March 2008 briefing, Defendants objected to Rule 23(b)(2) certification on the grounds that the injunctive relief is allegedly moot because Defendants sold the property to another company after this litigation was filed. Defendants have made this claim since at least 2005 (Doc. 838, 11 n.4), yet the 2006 and 2007 court decisions declined to strike Plaintiffs' request for injunctive relief. Judge Finch tacitly rejected Defendants' argument when, in his December 2007 Order, he suggested that Plaintiffs move for Rule 23(b)(2) certification.

Contrary to Defendants' argument (Def. Br., Doc. 1242, 38), the Court's August 10, 2007 memorandum opinion does not assist them on this issue. In 2007, the Court found that supplying bauxite does not give rise to a nuisance claim, and cited cases that refused to extend the law of nuisance to vendors.[9] Prior *owners*, however, are liable in nuisance, as the Court found in this same

---

[9] *Manchester v. Nat'l Gypsum Co.,* 637 F. Supp. 646, 656 (D.R.I. 1986) (defendants were sellers and manufacturers and the property was owned by *the plaintiff*); *Montana Pole & Treating Plant v. I.F. Laucks and Co.,* 775 F. Supp. 1339, 1348 n.10 (D. Mont. 1991) (explaining that "defendants, as suppliers of penta, lacked *any* ownership interest in the treating facility," and parenthetically stating that a "nuisance claim may not be maintained against defendants who merely manufacture a product which, subsequent to its sale, allegedly causes damage to property" (emp. supp.; cit. om.)); *Parks Hiway Enters., L.L.C. v. CEM Leasing, Inc.,* 995 P.2d 657, 666 (Alaska 2000) (refusing to apply nuisance theory to fuel distributors (cit. om.)).

Defendants similarly misplace reliance on *Camden County Bd. of Chosen Freeholders v. Beretta,* 273 F.3d 536, 540 (3d Cir. 2001) (cited at Def. Br., Doc. 1242, 39). *Camden* explains that nuisance law is inapplicable to product liability claims. These cases, then, do not speak to the issue

decision:

> Glencore also argues that VIALCO cannot be held liable for Plaintiffs' injuries because VIALCO sold the property in 1995, three years before Hurricane Georges hit the island in 1998....  However, as Plaintiffs correctly point out, liability based on a nuisance claim can be maintained against a defendant even if the defendant sold the property.

Mem. Op., Doc. 1125, 11.  The Court quoted Restatement (Second) of Torts §§ 373, 840A, then found that, "Both of these sections establish that a seller of land can still be held liable for a nuisance on the premises even after the land has been sold until the purchaser has discovered the condition and has had a reasonable opportunity to abate it."  Mem. Op., Doc. 1125, 12 (also citing Restatement (2d) of Torts § 373 cmt. c (further cit. om.)).  Further, while Glencore's actions as a bauxite supplier did not give rise to liability in nuisance, a reasonable jury could find Glencore liable to plaintiffs pursuant to Restatement (2d) of Torts § 389 for negligently supplying an unreasonably dangerous good, and/or pursuant to Restatement (2d) of Torts § 324A for gratuitously performing inspections of the refinery.  Doc. 1125, 26-28, 30-33.

After losing the argument that the 1995 sale absolved VIALCO of liability, Defendants now advance a weaker theory.  Defendants claim that, after the Court ruled in 2000 that the case could proceed as a class action, the Defendants *unilaterally* eliminated a claim in the class complaint by simply selling the property.  As stated in the very case law Defendants invoke, mootness is an intensely factual inquiry.[10]  Yet, Defendants have failed to provide a scintilla of evidence to support their argument that "for almost six years" they have been without a "'degree of control'" over the site (Def. Br., Doc. 1242, 38-39 (cit. om.)).  Plaintiffs have no duty to rebut the wholly unsubstantiated claims of Defendants, yet Plaintiffs herewith file an administrative order and three complaints against

---

of whether a defendant in a nuisance suit can escape its legal obligations to abate the nuisance by selling the property.

[10] *International Brotherhood of Boilermakers v. Kelly,* 815 F.2d 912, 915 (3d Cir. 1987) (cit. om.) (cited at Def. Br., 1242, 38).

one or more of the Defendants that flatly contradict their representations to the Court on this issue.[11]

Under the terms of the 2002 purchase contract, title passed to Renaissance Group, but St. Croix Alumina, LLC agreed to retain responsibilities and obligations that survived the closing.  Ex. 14, 2 ¶ 9, 4, ¶¶ 13-14.  Specifically, St. Croix Alumina represented that it would clean up and regrade the red mud disposal area to satisfy the Department of Planning and Natural Resources (DPNR), which had discovered that runoff from drainage was polluting Island waters.  *Id.* at 3 ¶¶ 10-12. According to the DPNR, "Red mud contains significant amounts of caustic liquid and heavy metals" and "tons of red mud ... continue to flow across the property and threaten the mud flats, mangroves, wetlands, and Caribbean Sea." Ex.3, 2 ¶ 10, 4 ¶ 20; Ex. 15, 3 ¶ 13, 6 ¶ 32.  Contrary to Defendants' representation to the Court that they had no degree of control over the site since the sale to Renaissance Group in 2002, Defendant St. Croix Alumina LLC obtained a permit "to undertake drainage improvements" in 2003, well after the sale.  Ex. 3, 5 ¶ 28, and exhibit A (a copy of the permit naming St. Croix Alumina, LLC as "permittee").  Also in 2003, the DPNR entered an Administrative Order against St. Croix Alumina and Renaissance Group holding them both responsible for solving the imminent and substantial water pollution threat caused by the condition of the red mud. Ex. 16, pp. 4-5; *see also* Ex. 14, 17 ¶18 (St. Croix Alumina obtained a Consent Order from DPNR in 2003).

Thus for "several years" after the 2002 sale, St. Croix Alumina and DPNR interacted regarding the red mud water pollution problem. Ex. 15, 6 ¶ 35.  In May 2006, St. Croix Alumina met with the

---

[11] Ex. 14, Am. Complaint, *St. Croix Renaissance Group, LLP v. St. Croix Alumina,* Civ. No. 764/2003, in the Territorial Court of the Virgin Islands, April 20, 2004; Ex. 3, Complaint, *DPNR v. St. Croix Alumina,* Civ. No. 730/06, filed in the Superior Court of the Virgin Islands, December 1, 2006; Ex. 15, Complaint, *DPNR v. Virgin Islands Alumina Co.,* Civ. No. 2006/772, filed in the Superior Court of the Virgin Islands, December 21, 2006; Ex. 16, Administrative Order, *DPNR v. St. Croix Alumina,* No. C-03-002, Gov't of the Virgin Islands before the DPNR, Division of Environmental Protection, April 29, 2003.

DPNR about the drainage work.  Ex. 3, 8 ¶ 45.  In December of 2006, DPNR sued St. Croix Alumina twice, alleging in both Complaints that St. Croix Alumina is responsible for the red mud.  Ex. 3; Ex. 15.  The first DPNR Complaint names St. Croix Alumina as the sole defendant and attaches a picture of victimized ducks.  Ex. 3, 9 ¶ 47 ("red-mud stained water fowl have been observed swimming in the polluted ponds.").  A later Complaint states that "releases of red mud and high pH liquid from the red mud piles" have polluted "United States Virgin Island waters, including the drainage canals, wetlands, mangroves, mud flats, and Caribbean Sea."  Ex. 15, 11 ¶ 61.  While the second DPNR Complaint also names the new owner, Renaissance Group, as another defendant, the Complaint specifically states that Renaissance has no duty to vegetate the red mud piles because St. Croix Alumina had not completed the work it was required to undertake under the terms of a Consent Agreement.  Ex. 15, 7 ¶ 39.  As of December 21, 2006 (the date of the second Complaint), the DPNR faulted St. Croix Alumina for failing "to properly maintain and operate the red mud piles[.]" Ex. 15, 11 ¶ 63.  Clearly, St. Croix Alumina did not lose control of the red mud piles in 2002, as stated to the Court in Defendants' Brief, Doc. 1242, 38-39.

In the Complaints, St. Croix Alumina is repeatedly accused, by both the government and the Renaissance Group, of untrue statements and intentional misconduct related to the sale of the property and the status of the red mud piles.[12]   These untruths included telling the Renaissance Group that

_____

[12] Ex. 14, 5 ¶ 17 (St. Croix Alumina, with the knowledge of Alcoa, failed to report to DPNR as required in administrative orders and "misrepresented to DPNR the extent of the resulting problems"); *id.* at ¶ 19 ("When questioned about this matter, the defendants stated the work was being done with the knowledge and consent of DPNR, which in fact was untrue."); *id.* at 7 ¶ 24 (identifying "misrepresentations made by the defendants"); *id.* at 8 ¶ 35 (identifying "conduct intended to deceive," "concealment activities," and "misrepresentations regarding the work being done"); *id.* at 9-10 ¶ 42 ("The foregoing conduct constitutes fraud and deceit, done with the express intent of concealing the problems created by the defendant's activities at the red mud disposal area as well as concealing the defendants' efforts to improperly shift the responsibility for the releases of red mud from the defendants to Renaissance."); *id.* at 10 ¶ 45 ("The conduct of the defendants in withholding critical information from the plaintiffs as well as various governmental agencies was willful, wanton and

"they [St. Croix Alumina and Alcoa] were doing work to the red mud site as authorized by a governmental permit, when in fact the work being done was in violation of said permit." Ex. 14, 9 ¶ 36. "When asked [by Renaissance] to produce the permit, defendants [St. Croix Alumina and Alcoa] alleged they could not locate copies when in fact the defendants were deliberately withholding this permit." *Id.* at ¶ 37. This 1994 permit (which the Renaissance Group finally found in storage, *id.* at ¶ 38), had required that the red mud piles be capped with vegetation, but this was not done. Ex. 15, 4 ¶ 16, 12 ¶ 70.

In sum, the Renaissance Group a) sued St. Croix Alumina and Alcoa for their dishonesty in hiding the red mud drainage problem before the sale, b) took the position that St. Croix Alumina and Alcoa have continuing post-sale obligations with regard to the red mud, and c) was itself finally sued by the DPNR, which also alleged that St. Croix Alumina and Alcoa are responsible for the red mud. The Renaissance Group surely will welcome with open arms an order of this Court that Defendants fund a program to abate the red mud. The Court has the power to oversee a fund for the benefit of the class.[13] The mootness cases cited by Defendants do not support the conclusion that injunctive relief would be moot under these facts.[14]

Further, putting the factual inaccuracies of Defendants' argument aside, the law does not

---

outrageous."); Ex. 3, 6 ¶¶ 32-34 (St. Croix Alumina affirmed in the Permit that it was providing true information but "much of the factual information and data provided in connection with Defendant's Permit Application proved to be inaccurate."); *id.* at 9 ¶ 53 (St. Croix Alumina "intentionally and knowingly violated its Permit").

[13] *Accord* 5 Newberg on Class Actions § 17:17 (4th ed. Database updated June 2007) ("In the mass tort context involving exposure to toxic agents, Rule 23(b)(2) has been used as a vehicle to require a defendant to establish a medical monitoring program for those exposed.") (cit. om.).

[14] In *Wilmington Firefighters Local 1590 v. Wilmington,* 824 F.2d 262, 265 (3d Cir.1987) (cited at Def. Br. 1242, 38), the only record that had been made in the district court related to a "1984 promotion eligibility list," which had expired by contractual agreement. Therefore, the only issue before the appellate court was moot. In *Lusardi v. Xerox Corp.,* 975 F.2d 964, 973-74 (3d Cir. 1992) (cited at Def. Br., Doc. 1242, 39), the action was moot because the plaintiff and defendant s*ettled* it.

allow them to evade liability by selling the property.  "The fact that the defendant cannot enter to abate the nuisance does not excuse his liability, for it is his own wrong which has involved him in trouble."  *Northridge Co. v. W.R. Grace & Co.,* 556 N.W.2d 345, 351 (Wis. Ct. App. 1996) (quoting *Kamke v. Clark,* 67 N.W.2d 841, 843 (Wis. 1955)).[15]  Defendants' behavior is a textbook example of "culpable inability"; if a party causes its own inability then the inability is no excuse.[16]

For example, in *Piambino v. Bailey,* 757 F.2d 1112 (11th Cir. 1985), erstwhile "Lead Counsel" unsuccessfully resisted a court order to return fees paid pursuant to a settlement.  Lead Counsel claimed inability to comply.[17]  Nonetheless, the *Piambino* court explicitly rejected the argument that mandating repayment would work an injustice, stating that these parties had taken "a calculated risk" by withdrawing the funds when an appeal was pending.  *Id.* at 1141.  Contempt proceedings followed in the district court, which stated that, "'Inability to comply with a court order may be a defense to a charge of contempt ... but not if the defendant created his own inability'....  To the extent that [Lead

---

[15] *See also New York v. Solvent Chemical Co.,* 880 F. Supp. 139, 144 (W.D. N.Y. 1995) ("one who creates a public nuisance cannot avoid liability by selling the property on which the nuisance was created") (cit om.) (applying New York law); *Kamke, supra.* ("While the appellant cannot be compelled to go upon the premises of the defendants Clark and abate the nuisance, a warrant can be issued to the sheriff under the provisions of [state law] which would empower that officer to so enter upon such premises and abate the nuisance, a proportional part of the expense of which would be chargeable against appellant.").

[16] As a classic hypothetical in moral philosophy:

Suppose that Gray promises to meet Brown in two hours and is thus morally obligated to do so; and suppose further that after making the promise he decides not to keep it and to prevent pangs of conscience from deflecting his will, he boards a plane which he knows will be airborne for three hours....
[I]t seems clear to me that given these circumstances, he does act wrongly and blameworthily.

Michael Stocker, 'Ought' and 'Can', 49 Australasian Journal of Philosophy 303, 314 (No. 3, December 1971) (fn. om.).

[17] 757 F.2d at 1137 ("Lead Counsel and the settling defendants have spent the monies they have received and, we have been told, they cannot pay them back.").

Counsel] are presently unable to make complete restitution ... that inability is of their own making."
*Piambino v. Bestline Products, Inc.,* 645 F. Supp. 1210, 1215 (S.D. Fla. 1986) (quoting *Air America, Inc. v. Hatton Bros., Inc.,* 570 F. Supp. 747, 750 (S.D. Fla. 1983) (further cit. om.)).

In *Air America,* a party defended its failure to comply with a court order that it turn over possession of an aircraft by arguing that the aircraft had been sold prior to the court's order. 570 F. Supp. at 748. The court rejected the inability defense as unproven, and also stated that, "'Inability to comply with a court order may be a defense to a charge of contempt, ... but not if the defendant created his own inability.'" 570 F. Supp. at 750 (cit. om.).[18] Defendants' actions in unloading the property on an unsuspecting buyer do not constitute a legal defense.[19]

In addition to trying to raise its own misconduct as a defense, Defendants contend that the injunction is "beyond the scope" of the class definition (Def. Br., Doc. 1242, 38). This argument

---

[18] S*ee also Phoenix Marine Enterprises, Inc. v. One (1) Hylas 46' Convertible Sportfisherman Hull No. 1,* 681 F. Supp. 1523, 1530 (S.D. Fla.) (the companies claiming inability had, "Not only ... failed to carry their burden to show an inability to comply, additionally, it is clear to the Court that their asserted inability to comply is self-created.... In a similar action, *Air America,* ... [t]he Plaintiff Air America asserted at the contempt hearing that it was unable to turn over the aircraft because it had sold it prior to the court's order. The court held that Air America's inability to turn over the aircraft was caused by its own actions."), a*ff'd,* 846 F.2d 753 (11th Cir. 1988) (table); *S.E.C. v. Bilzerian,* 112 F. Supp. 2d 12, 28 (D.C. Cir. 2000) ("Bilzerian has not established an inability defense, as he admittedly created his alleged inability himself.").

[19] Defendants' authorities are distinguishable and unconvincing. The plaintiffs' request that the court order defendants to operate public utilities in *Pennsylvania Pub. Util. Co. v. General Waterworks Corp.* failed because the utilities were then possessed by Receivers that were "operating the plants under orders of the United States District Court," which had exclusive bankruptcy jurisdiction. 300 A. 2d 280, 283 (Pa. Commw. Ct. 1973). In *Vana v. Grain Belt Supply Co.,* 18 N.W.2d 669, 673 (Neb. 1945), the plaintiff was not entitled to injunctive relief because he had previously granted defendant a contractual right to operate the feed lot at issue. In *American Tel. & Tel. v. Fraiser,* 545 So.2d 405, 407 (Fla. Dist. Ct. App. 1989), "appellees no longer owned or controlled the property when the complaint was filed," and particular Jacksonville ordinances and the laws of intestacy complicated the case. In *Midland Empire Packing Co. v. Yale Oil Corp.,* 169 P.2d 732, 735 (Mont. 1946), the court analyzed Montana's misjoinder rules, which diverge from the laws applicable here. The two *Midland* defendants could not be joined because the only harm was caused by the manner of the refinery operations, not the refinery per se.

erroneously conflates the class definition with the class complaint.  A definition identifies *who* is in the class, and the class complaint identifies *what* the class is requesting (*accord* FED.R.CIV.P. 8 (general rules of pleading), FED.R.CIV.P. 23).  Confusing these two things, Defendants argue that the injunctive relief pled in the complaint is "beyond the scope" of the class definition.  The definition requires residence, work, or property ownership in the class neighborhoods as of September 21, 1998, and the definition ends with the words "damages and/or injuries as a result of exposure during and after Hurricane Georges to red dust and red mud blown during Hurricane Georges."  This language defines which people are in the class, but not what claims they are advancing.  Defendants do not deny that the class, which suffered injury in 1998, has standing to enjoin future injury from the same unabated source.  Defendants cannot deny that the class has standing; there is, then, no legal premise to support the theory that the injunction is "beyond the scope" of the class.

**B.      Rule 23(b)(3)'s Requisites are Satisfied and Allow Certification of the Case as a Whole.**

**1.      Common issues predominate.**

Rule 23(b)(3) provides that a class action may be maintained if the Court finds that "questions of law or fact common to the members of the class predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Defendants' denial that common issues predominate is the central point of the decertification motion filed at Doc. 1248, and Plaintiffs have separately responded in opposition briefing filed April 16, 2008.  This response is incorporated herein by reference.

**2.      The efficiencies of class resolution are superior to thousands of individual cases.**

Rule 23(b)(3) requires that the Court find that a class action is superior to other available litigation methods for the fair and efficient adjudication of the controversy.  FED. R. CIV. P. 23(b)(3).

Factors for assessment are:

*Material advancement of the litigation.* This factor strongly weighs in favor of class certification. The litigation is materially advanced where, as here, "[l]itigating the proposed common issues ... will require examination of the same witnesses and the production of generic documents that affect each class member. The cost of defending the action as well as the cost of prosecuting the claims will be substantially reduced by litigating common issues in one proceeding and in one forum." *Powers v. Lycoming Engines,* 245 F.R.D. 226, 238 (E.D. Pa. 2007). "'Significant economies may be achieved by relieving potential class members of the need to prove over and over' the common issues[.]" *Black v. Rhone-Poulenc, Inc.,* 173 F.R.D. 156, 166 (S.D. W. Va. 1996) (quoting *Cent. Wesleyan Colleve v. W.R.Grace & Co.,* 6 F.3d 177, 185 (4th Cir. 1993) (paren. om.)). In certifying a class seeking damages from accidental toxic gas emissions, the *Black* court explained the practicality of trying common issues once:

> Resolution of the common issues is what, practically speaking, will send a predictive message to both sides about the ultimate course of the litigation. For instance, if the jury in a common issues trial found Defendant (1) acted recklessly; (2) engaged in outrageous conduct; and (3) behaved in a fashion justifying punitive damages, one can imagine readily the impact such findings would have on the amicable resolution of the more fluid damages issues. On the other hand, a jury finding largely exonerating Defendant on the liability issues would sound the death knell for Plaintiffs' case.

*Black,* 173 F.R.D. at 164-65.

*Class members' interest in individually controlling their lawsuit.* The class members are united in seeking class treatment and have shown virtually no interest in individual litigation, as shown by the fact that only four or five class members chose to opt out after receiving notice.

*Extent of existing litigation.* This portion of Rule 23(b)(3) queries whether there is so much preexisting litigation as to render a class action unproductive. *Blain v. Smithkline Beecham Corp.,* 240 F.R.D. 179, 192 (E.D. Pa. 2007) (parenthetically citing *Cent. Wesleyan Coll. v. W.R. Grace &*

18

*Co.,* 143 F.R.D. 628, 640 (D. S.C. 1992), *aff'd* 6 F.3d 177 (4ᵗʰ Cir. 1993)).  The instant case has been litigated for approximately nine years as the sole class action arising from this toxic red mud and dust calamity.  Thus, this factor weighs in favor of certification.

*Manageability of proposed class and choice-of-law impediments.*  In  examining  the manageability of the proposed class, two factors for consideration are the existence of choice-of-law conflicts in a putative nationwide class and the manageability of the class for trial.  *Powers,* 245 F.R.D. at 239 (cit. om.).   First, the instant litigation relies on the law of a sole jurisdiction, which is an important factor in favor of certification.  *Compare Turner v. Murphy Oil U.S.A., Inc.,* 234 F.R.D. 597, 606 (E.D. La. 2006) ("It is important that the same substantive law will apply to all Plaintiffs' claims").

Second, the relevant manageability analysis is whether the class action format is superior to individual cases.  *Turner,* 234 F.R.D. at 610.  While Defendants continue to quarrel with trial plan manageability, these complaints suffer a fatal omission: Defendants cannot credibly claim that the *alternative* is better.  The Defendants' laments as to the depth and complexity of this case fail to advance the decertification ball because the alternative – individually litigating the claims of thousands of class members – is far worse in terms of draining judicial resources.[20]

### C.   The Property Damages Subclass and Personal Injury Subclass Should Be Reinstated.

This Court's most recent certification Order explains why the Property and Personal Injury Damages Subclasses Should be Reinstated:

> Decertifying the subclasses may not be the most expedient way to proceed.  The property damages subclass would be beneficial if the jury were to adopt a statistical formula for determining property damages that could then be applied on an individualized basis. Establishing a property damages subclass naturally produces a personal injury subclass.

---

[20] *See also* Plaintiffs' Rep. to Def. Jt. Mot. to Decertify (filed April 16, 2008), at § III.

However, dividing damages into property and personal injury subclasses provides an added benefit.  A jury may determine a different punitive damages multiplier to be appropriate for a property damage claim than for a personal injury damage claim.

Order, Doc. 1181, 2; *see also* FED. R. CIV. P. 23(c)(4)(B) ("a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly").  These subclasses are suitable for certification because they sustained the same types of injuries and damages caused by the same course of operative facts and wrongful conduct.[21]

## CONCLUSION

For the foregoing reasons, Plaintiffs move for certification of all class claims pursuant to Rule 23(b)(3) and for certification of Plaintiffs' claims for injunctive relief pursuant to Rule 23(b)(2).  Plaintiffs further request certification of the Property Damages Subclass and the Personal Injury Damages Subclass pursuant to Rule 23(c)(4)(B).

Dated: April 16, 2008                    Respectfully submitted,

                                         ROHN & CAMERON, LLC
                                         1101 King Street
                                         Christiansted, St. Croix
                                         U.S. Virgin Islands  00820-4933
                                         (340) 778-8855 / (340) 773-2954 (FAX)

                                         By:___s/__*Lee J. Rohn*_____(dr)
                                              LEE J. ROHN

---

[21] *See* Plaintiffs' Response to Defendants' Joint Motion to Decertify the Class of Plaintiffs (filed in April 16, 2008), at § II.

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. CROIX

| | |
|---|---|
| JOSEPHAT HENRY resident of Harvey, KAY WILLIAMS resident of Harvey, SYLVIA BROWNE resident of Clifton Hill, MAUDE DREW resident of Estate Barren Spot, MARTHA ACOSTA resident of Estate Profit, WILHELMINA GLASGOW as an individual and mother and next friend of SAMANTHA VIERA, a minor, both residents of Estate Profit, MERCEDES ROSA resident of Estate Profit, GEORGE RODRIGUEZ as an individual and as father and next friend of AMADO and GEORGE E. RODRIGUEZ, Minors, all residents of Estate Profit, SONYA CIRILO resident of Estate Profit, RAQUEL TAVAREZ, resident of Estate Profit, NEFTALI CAMACHO, as an individual and as father and next friend of ANGEL JAVIER CAMACHO, a minor, both residents of Estate Profit, EYAJIE MALAYKHAN resident of Estate Profit, KELSHALL CHEDDIE resident of Estate Profit and other persons too numerous to mention, A CLASS ACTION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ST. CROIX ALUMINA, LLC, ALCOA INC., and GLENCORE, LTD, f/k/a CLARENDON, LTD., | ) ) ) |
| Defendants. | ) ) |

CIVIL NO. 1999/0036

### [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO CERTIFY CLASS

AND NOW, this ____ day of _____, 2008, upon consideration of Plaintiffs' Motion for Class Certification, the Defendants' response thereto, the Plaintiffs' reply, and the record and prior briefing incorporated by reference, it is hereby ORDERED that the Motion is GRANTED.

IT IS FURTHER ORDERED that this action shall be maintained as a class action in accordance with Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure pursuant to the

following findings:

1.  The Class continues to be defined as: All individuals who, as of September 21, 1998 [the date of Hurricane Georges], resided, worked, and/or owned property located in the following six communities adjacent to and downwind from the St. Croix Alumina Refinery Plant – the projects of Harvey and Clifton Hill and the estates of Barren Spot, Profit, Clifton Hill and La Reine – who, due to Defendants' conduct with regard to the containment and storage of red dust containing bauxite and red mud, suffered damages and/or injuries as a result of exposure during and after Hurricane Georges to red dust and red mud blown during Hurricane Georges.

2.  The Class, as defined in paragraph 1 of this Order, is so numerous that joinder of all members is impractical.

3.  There are questions of law and fact common to the Class, namely:

1       whether red mud is toxic and the extent of that toxicity;
2.      whether bauxite is toxic and the extent of that toxicity;
3.      Defendants' knowledge that red mud could be dispersed into properties surrounding the alumina facility;
4.      Defendants' knowledge that bauxite could be dispersed into properties surrounding the alumina facility;
5.      Defendants' knowledge of the dangers of red mud;
6.      Defendants' knowledge of the dangers of bauxite;
7.      whether Defendants' method of handling and storing the red mud was appropriate in light of the existing and foreseeable circumstances;
8.      whether Defendants' method of handling and storing the bauxite was appropriate in light of the existing and foreseeable circumstances;
9.      whether Defendants implemented, or failed to implement, any safety plans, equipment, procedures, or structures to attempt to protect surrounding properties from materials stored at the alumina facility;
10.     whether Defendants were negligent in failing to prevent Plaintiffs from coming into contact with air, water, and soil contaminated with red mud and bauxite;
11.     whether Defendants breached a duty to the neighborhood class;
12.     the scope of the duty that Defendants owed to neighborhood owners and residents;
13.     to the extent Defendants can pursue a conjunctivitis defense, the extent to which the red mud and bauxite were factors in causing the conjunctivitis outbreak;
14.     to the extent Defendants can pursue a conjunctivitis defense, the extent to which the conjunctivitis was chemical as opposed to viral;

2

15.    Defendants' alleged "Act of God" defense (to the extent it exists, if at all);

16.    whether Defendants were negligent in failing to abate the contamination and mitigate damages;

17.    whether Defendants were negligent in failing to adequately warn Plaintiffs and the St. Croix community of the potential for contamination;

18.    whether Defendants are strictly liable for failing to sufficiently store and contain substances hazardous to human health;

19.    whether Defendants' failure to sufficiently store and contain the red mud and bauxite constitutes a public nuisance;

20.    whether Defendants' failure to sufficiently store and contain the red mud and bauxite constitutes a private nuisance;

21.    whether Defendants' acts and/or omissions constitute negligence per se based on their violations of federal, state, and municipal law;

22.    whether Defendants engaged in outrageous conduct for purposes of intentional infliction of emotional distress;

23.    whether Defendants engaged in negligent conduct causing emotional distress;

24.    the propriety of injunctive relief;

25.    whether Defendants are grossly negligent in that their acts and/or omissions constitute reckless and conscious indifference to the rights and welfare of Plaintiffs; and,

26.    the mathematic relationship between punitive and compensatory damages (or, punitive damages multiplier).

4. The claims of the class representatives are typical of the Class.

5. The class representative plaintiffs will fairly and adequately protect the interests of the Class.

6. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

7. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

8. A property damages subclass would be expedient because the jury may adopt a statistical formula for determining property damages as well as a punitive damages multiplier appropriate to the property damages claims.  Questions of law and fact common to the Property Damage Subclass are:

1.    Whether the subclass members have incurred damage to their property as a result of the red mud and bauxite permeating their property; and

2.    the percent diminution in value of real property.

3

9. A personal injury subclass would be expedient because the jury may adopt a punitive damages multiplier appropriate to the personal injury claims. The personal injury subclass shares the common question of whether the red mud and bauxite generally cause skin irritation, eye irritation, and respiratory problems.

10. Plaintiffs' demand for injunctive relief to protect the class against future harm from red mud or red dust should be certified pursuant to Rule 23(b)(2). The class is cohesive and the injunctive relief is premised on the same course of conduct perpetrated by Defendants.

11. Plaintiffs have presented a trial plan (Docket No. 800) describing the issues likely to be presented at trial and demonstrating that those issues are susceptible of class-wide proof.

ACCORDINGLY, IT IS HEREBY FURTHER ORDERED that the Class as defined in paragraph 1 of this Order is hereby CERTIFIED; and that the Subclasses defined in paragraphs 8 and 9 of this Order are hereby CERTIFIED; and it is further

ORDERED that Plaintiffs Josephat Henry, Sylvia Browne, Kay Williams, Maud Drew, Martha Acosta, Wilhemina Glasgow, Samantha Viera, Mercedes Rosa, George Rodriguez (personally, and as representative of minors George E. Rodriquez and Amado Rodriquez), Sonya Cirilo, Raquel Tavarez, Neftali Camacho (personally, and as representative of minor Angel Javier Camacho), Eyaji Malaykhan, and Kelshall Cheddie are certified as Class Representatives of the Class; and it is further

ORDERED that Plaintiffs Sylvia Browne, Maud Drew, Martha Acosta, Wilhemina Glasgow, Neftali Camacho, and Eyajie Malaykhan are certified as Representatives of the Property Damage Subclass; and it is further

ORDERED that Plaintiffs Josephat Henry, Sylvia Browne, Kay Williams, Maud Drew, Martha Acosta, Wilhemina Glasgow, Samantha Viera, Mercedes Rosa, George Rodriguez (personally, and as representative of minors George E. Rodriquez and Amado Rodriquez), Sonya Cirilo, Raquel

4

Tavarez, Neftali Camacho (personally, and as representative of minor Angel Javier Camacho), Eyaji Malaykhan, and Kelshall Cheddie are certified as Representatives of the Personal Injury Subclass; and it is further

ORDERED that Laura Baughman and Scott Summy of Baron & Budd, P.C.; Lee J. Rohn of the Law Offices of Lee J. Rohn; and, Gordon C. Rhea of Richardson, Patrick, Westbrook & Brickman, L.L.C. shall serve as Class Counsel.

_____

Bartle, J.

<u>CERTIFICATE OF SERVICE</u>

**THIS IS TO CERTIFY** that on April 16, 2008 I electronically filed the foregoing Plaintiffs' Motion for Class Certification, accompanying brief in support, and proposed order with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Bernard C. Pattie, Esquire
Law Office of Bernard C. Pattie PC
1244 Queen Cross Street, Suite 5
St. Croix, VI 00820-4932
Attorney for St. Croix Alumina LLC and Alcoa Inc.

Derek M. Hodge, Esquire
MacKay & Hodge
19A-20 Kongens Gade
P.O. Box 303678
St. Thomas, VI 00802
Attorney for Glencore, Ltd.

Gordon Rhea, Esquire
Richardson, Patrick Westbrook & Brickman, LLC
1037 Chuck Dawley Blvd. Bldg A
Mt. Pleasant, SC 29464
Attorney for Plaintiffs

Laura Baughman, Esquire
Baron & Budd, P.C.
3102 Oak Lawn Ave.
Dallas, TX 75219-4281
Attorney for Palintiffs

Lori E. Jarvis, Esquire
Hunton & Williams
River Front Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Attorney for St. Croix Alumina LLC and Alcoa Inc.

Rene' P. Tatro, Esquire
Tatro Tekosky Sadwick LLP
333 S. Grand Avenue, Suite 4270
Los Angeles, CA 90017
Attorney for Glencore, Ltd.

BY:  s/ *Lee J. Rohn*            (dr)