# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. CROIX

JOSEPHAT HENRY resident of Harvey, KAY WILLIAMS resident of Harvey, SYLVIA BROWNE resident of Clifton Hill, MAUDE DREW resident of Estate Barren Spot, MARTHA ACOSTA resident of Estate Profit, WILHELMINA GLASGOW as in individual and mother and next of friend of SAMANTHA VIERA, a minor, both residents of Estate Profit, MERCEDES ROSA resident of Estate Profit, GEORGE RODRIGUEZ as an individual and as father and next friend of AMANDO and GEORGE E. RODRIGUEZ, minors, all residents of Estate Profit, SONYA CIRILO resident of Estate Profit, RAQUEL TAVAREZ, resident of Estate Profit, NEFTALI CAMACHO, as an individual and as father and next friend of ANGEL JAVIER CAMACHO a minor, both residents of Estate Profit, EYAJIE MALAYKHAN resident of Estate Profit, CHEDDIE KELSHALL resident of Estate Profit and other persons too numerous to mention, A CLASS ACTION,

     Plaintiff,

  v.

ST. CROIX ALUMINA, LLC, ALCOA INC., and GLENCORE, LTD., f/k/a CLARENDON, LTD.,

     Defendant.

CIVIL NO.  1999/0036

**ACTION FOR DAMAGES**

<u>JURY TRIAL DEMANDED</u>

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 1**

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF

The Class Plaintiffs, by and through their undersigned Counsel, hereby submit their Statement of Material Facts in Support of their Response to Defendants Alcoa, Inc. and St. Croix Alumina, LLC's Motion for Summary Judgment on Plaintiffs' Class Claim for Injunctive Relief ("Alcoa's Motion").[1]   Plaintiffs submit this statement of material facts addressing the facts upon which the Defendants have relied (using the corresponding serial numbering) and identifying any and all other material facts, pursuant to LRCi 56.1(b). All documents designated "Exh. __" are authenticated by the Affirmation of Plaintiffs' Counsel, and the Affirmation and referenced documents were electronically filed on July 22, 2009 as Document No. 1320.

---

[1]   Defendant Glencore Ltd. ("Glencore") joined Alcoa's Motion for Summary Judgment on Plaintiffs' Class Claim for Injunctive Relief and incorporated it by reference into Glencore Ltd.'s Motion for Summary Judgment on Class Claims for Injunctive Relief and Memorandum of Points and Authorities in Support Thereof ("Glencore MSJ").  *See* Doc. No. 1311, at p. 3.  Both Motions were filed on May 15, 2009.  A third Motion was filed by Defendants jointly on May 22, 2009.  To avoid confusion, the Motions filed on May 15, 2009 will be designated "Alcoa's Motion" and "Glencore's Motion" respectively, and the Motion filed on May 22, 2009 will be cited as "Defendants' Joint Motion" or "the Joint Motion".

Plaintiffs hereby and herein incorporate by reference Plaintiffs' Opposition to Glencore Ltd.'s Motion for Summary Judgment on Class Claim for Injunctive Relief, Plaintiffs' Statement of Facts in Opposition to Glencore Ltd.'s Motion for Summary Judgment on Class Claim for Injunctive Relief, Plaintiffs' Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment Based on Plaintiffs' Lack of Necessary Evidence, and Plaintiffs' Opposition to Glencore's Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment.

## I.   PLAINTIFFS' STATEMENT REGARDING MOVANTS' FACTS

### A.    THE PARTIES AND THE HISTORY OF THE FACILITY

1.    Defendants' Statement of Facts: "In the mid-1960s an entity then known as Harvey Aluminum, Inc. ("Harvey Aluminum") constructed and began operation of an alumina refinery on St. Croix."

Plaintiffs' Statement of Facts: Plaintiffs agree that the facts in this paragraph are undisputed.

2.    Defendants' Statement of Facts: "Harvey Aluminum and its successor in interest Martin Marietta operated the facility until 1985. . . In 1989, Martin Marietta sold the facility to the Virgin Islands Alumina Company ("Vialco")."

Plaintiffs' Statement of Facts:  Plaintiffs dispute the facts in this paragraph because the Acquisition Agreement shows that Glencore was the "ultimate parent" of Vialco and the ultimate owner of the Refinery.[2]  Other aspects of the Acquisition Agreement demonstrate Glencore's ownership and/or control of the Refinery.  For example, the term "Affiliates" clearly encompasses Glencore, making the "due diligence" sections of the Acquisition Agreement equally applicable to Glencore.

Additionally, a 1989 report from Ormet Corporation issued to Glencore f/k/a Clarendon identified major local concerns about the operations of the Refinery, including the ability of the bauxite storage building to withstand storm conditions and the potential "air pollution problem" posed by bauxite residue.[3]  When the Virgin Islands Department of Planning and

---

[2] See Acquisition Agreement, Exh.78.

[3] St. Croix Alumina Refinery Report to Clarendon, Ltd. (Bates Nos. G00207-68), attached as Exh 50.

Natural Resources ("DPNR") assessed fees against SCA in 1996 for two months of air

emissions in 1995 under its permit, Glencore, not Vialco, promptly paid those fees.[4]

Glencore's 30(b)(6) representative, Robert Prusak, testified that he was not "sure but I

think that a Glencore company had to guarantee Vialco's indemnity obligation to Alcoa,"

which is memorialized in the Acquisition Agreement.[5]  By the terms of that agreement, the

indemnity obligation lasted until July 24, 2001.[6]

3.  Defendants' Statement of Facts: "In 1995, Vialco sold the facility to SCA, an

indirect, partially-owned subsidiary of Alcoa . . . SCA operated the facility from 1998 to

2001."

Plaintiffs' Statement of Facts:  Plaintiffs dispute that Vialco sold the facility to SCA in

1995. Plaintiffs incorporate herein their statement of facts in paragraph 3, above,

and rely on the following statement filed by Century Aluminum Company with the

SEC:

> In April 1995, **pursuant to a restructuring within Glencore
> International AG and its subsidiaries**, (hereinafter, "Glencore
> International," "Glencore" or the "Glencore Group", respectively),
> **Ravenswood acquired Virgin Islands Alumina Company
> ("Vialco")** and Berkeley (which was previously a direct wholly-
> owned subsidiary of Century) **and Ravenswood became a
> wholly-owned subsidiary of Century**.  **The restructuring was
> accounted for as a transfer of interests among companies
> under the common control of Glencore International** and, as a
> result, the assets and liabilities of Ravenswood have been

---

[4] See, Copies of receipt, check, and cancelled envelope (all bearing the name "Glencore, Ltd.", produced
and identified by SCA as documents copied from DPNR), corresponding letter and invoice from DPNR files,
Exh. 81.

[5] Prusak Dep. 114, Feb. 22, 2002, attached as Exh. 49; Exh 78 at 14-17.

[6] Exh 78 at 17.

> accounted for at historical cost. In July 1995, the Vialco Alumina Facility was sold to a subsidiary of Alcoa L.L.C. Accordingly, the Consolidated Financial Statements of the Company do not include the historical results of Vialco.[7]

Moreover, Century "retained liability for environmental conditions existing at the time of the sale only to the extent such conditions require remedial action, or give rise to claims, under laws in effect at the time of sale."[8] Plaintiffs dispute that SCA is "an indirect, partially-owned subsidiary of Alcoa" and that "SCA operated the facility from 1998 to 2001" as unsupported legal conclusions, not facts. It is an undisputed finding of this Court that "Defendant St. Croix Alumina, LLC, and Defendant Alcoa, Inc., owned and operated the subject alumina processing facility" and Defendants have admitted that SCA is an "Alcoa-controlled entity."[9]

4.    <u>Defendants' Statement of Facts:</u> "While the facility was in operation, bauxite, a naturally occurring ore rich in aluminum oxide from which alumina is extracted via the Bayer process, was stored in a large, A-frame steel structure."

---

[7]  Exh. 80 Notes to Century Aluminum Co · 10-K · For 12/31/96, On 3/27/97, Document 1 of 6, at p. 2. *See also id.*, at p. 7 ("Pursuant to the contract for sale of the Vialco facility to St. Croix Alumina, L.L.C. ("St. Croix Alumina"), a subsidiary of Alcoa Alumina and Chemicals L.L.C., the Company has retained liability for environmental conditions existing at the time of the sale only to the extent such conditions require remedial action, or give rise to claims, under laws in effect at the time of sale. The Company will not have liability if remediation is required or claims are made due to changes in law after the time of sale. The Company has agreed to indemnify St. Croix Alumina against claims arising from environmental conditions for which the Company has retained liability. The indemnity is capped at $18 million, and any claims under the indemnity must be brought by July 24, 2001.")

[8]  *Id.*, at p. 7. Glencore's retained liabilities are more fully explored in Plaintiffs' Opposition to Glencore's Motion for Summary Judgment, which Plaintiffs herein incorporate by reference.

[9]  Doc. No. 943 (3/29/06 Mag. Judge Prop. Find. & Recomm.), at p. 4, Finding A. 2, adopted by Order of 4/24/06, Doc. No. 949, at p. 1 (specifically noting that no party objected to the Magistrate's findings); Alcoa 30(b)6) Dep. (Norton), 333, Feb. 25, 2002, authenticated by the Affirmation of Counsel as Exh 48.

Plaintiffs' Statement of Facts: Plaintiffs agree that the facts in this paragraph are undisputed.

5.    Defendants' Statement of Facts:   "A by-product of the Bayer process is bauxite residue, also known as 'red mud.' . . . The red mud was disposed of on-site. . . . Beginning in the 1970s (during Martin Marietta's ownership and operation of the facility), the 'dry-stacking' method of bauxite residue disposal was used at the St. Croix facility."

Plaintiffs' Statement of Facts: Plaintiffs agree that the facts in this paragraph are undisputed.  However, the height of the red mud piles increased steadily over time after Glencore took over the Refinery.[10]

6.    Defendants' Statement of Facts: At the St. Croix facility, the red mud was mixed with seawater and deposited in cells, where it would dry to a firm, clay soil consistency. . . . The dry-stacking method was used throughout all periods of operation of the facility through 2001. . . . The dry-stack bauxite residue disposal area is commonly referred to as the 'red mud pile.'"

Plaintiffs' Statement of Facts:   Plaintiffs agree in part with the facts in this paragraph.  Plaintiffs dispute that the red mud "would dry to a firm, clay soil consistency."  Further, the red mud "cells" were actually open piles as high as 120 feet above grade on 55 acres of refinery property.[11]  For years, these uncovered

---

[10] *See* Henry Aff. ¶ 5, attached as Exh 1; Acosta Aff. ¶ 2, attached as  11; Rosa Aff. ¶ ¶ 3-4, attached as Exh 28; Camacho Aff. ¶ 2, attached as  23.

[11]  *See* Black Dep.169:13-170:2, Apr. 25, 2002, attached as Exh 32; F. Williams Dep. 99:8-14, June 17, 2005, attached as Exh 47.  In contrast, the bauxite storage shed was 87 feet high.  Exh 32 at 110:3-11; *see also* Exh 31 at p. 7 ("Much of the current bauxite residue disposal area is uncovered and contains several steep, unvegetated slopes.") and p. 67 ("Since the hurricane, the facility has adopted the policy of covering piles of material with plastic in case of predicted high winds or storms."); *see also* Doc. No. 1125 at 27

piles often emitted fugitive dust when winds blew across the Refinery or on the

frequent occasions when SCA ran bulldozers over them.[12]  In the 1990's, Residents

complained with frequency about red mud being blown into their neighborhoods.[13]

St. Croix Alumina itself acknowledged that a major community concern was fugitive

emissions from red mud dusting.[14]  In September 1994, a DPNR field inspection

found evidence of dust emissions from the red mud piles.[15]  There have also been

numerous reports of water causing the erosion (i.e., movement) of red mud during

storm events less severe than the hurricane.[16]  On June 18, 2002, DPNR issued an

Administrative Order, based on the finding that "due to the reworking of the red mud

---

("Further, it is undisputed that the red mud was also stored in large mud piles outside of the facility in an open, obvious, and uncovered condition.").

[12]  See O'Neale Dep. 55:14-21, Jan. 25, 2002, attached as Exh 46 (admitting that the red mud piles were regularly re-worked by bulldozers); Exh 47 at 154:24-157:25; 162:3-163:7; 162: 3-163: 7; 166:1-13; 168: 3-169: 25; 171:3-172:3; 173:3-15; 22:3-24; 247:5-21; 262:9-263:12. (admitting dust is emitted from the red mud piles and emissions can be caused by winds or mechanical manipulations, like bulldozing; see also Henry Aff. ¶¶ 5-7, attached as Exh 2; Williams Aff. ¶¶ 4-5, attached as Exh 3; Acosta Aff. ¶ 2, attached as Exh 11; Rosa Aff. ¶¶ 4-5, attached as Exh 28; Tavarez Aff. ¶ 3, attached as Exh 21; Glasgow Aff. ¶ 3, attached as Exh 13; Malaykhan Aff. ¶¶ 4-5, attached as Exh 25; Rodriguez Aff. ¶¶ 3-4, attached as Exh 17; Camacho Aff. ¶ 2, attached as Exh 23 (testifying that dust escaped the red mud piles before Hurricane Georges).

[13]  See, e.g., Staff Recommendation, Major CZM Permit No. CZX-25-94L Expansion of Red Mud Storage Area (9/6/94) at Klepp 0853-0854, attached as Exh 65 (noting that residents complained in Aug. & Sept. 1994 about red dust from the alumina refinery contaminating their cisterns and homes and causing skin rashes and asthma); "Site Assessment for the Vialco Facility St. Croix, U.S. Virgin Islands," dated Nov. 1995, Prepared for Alcoa by Geraghty & Miller, Inc., and produced in discovery by Defendant Alcoa as "AI000835-AI0001726" ("Geraghty & Miller Report"), attached as Exh 44 (neighbors complained about dust from red mud from 1993 to 1995 and these complaints were unresolved).

[14]  Exh. 69 (St. Croix Alumina, LLC's Residue Disposal Facilities Master Plan (June 2000)) at F(III) (reporting erosion from weather conditions less severe than hurricanes).

[15]  See Exh 65 at Klepp 0853 (reporting that a site inspection of the red mud storage areas revealed that branches of vegetation in the area was stained red, and  a drizzle during the inspection deposited red mud on the white shirts, faces and arms of staff indicating its presence in the air).

[16]  E.g., Exh 44 at 6-3 (noting that storm water control measures to mitigate erosion from the red mud disposal areas seem inadequate.)

piles by St.. Croix Alumina. LLC. (SCA) over the past few months, and due to

subsequent heavy rains during the latter part of March 2002, red mud particulate

(red mud) and red mud laden storm water flowed out of the red mud storage areas

on the SCA facility . . ."[17]

## B.    EVENTS DURING HURRICANE GEORGES

7.    Defendants' Statement of Facts:   "On September 21, 1998, Hurricane Georges

struck St. Croix."

Plaintiffs' Statement of Facts: Plaintiffs agree that the facts in this paragraph are

undisputed. Additionally, the storm struck during the dark early morning of

September 21, 1998. The meteorological data shows that winds got up to

approximately 70 miles per hour and the storm lasted until approximately 3:00 a.m.

on September 22, 1998.[18]

8.    Defendants' Statement of Facts:   "Plaintiffs in the instant litigation claim that 'red

dust' was blown from the alumina refinery into the surrounding neighborhoods during

Hurricane Georges."

Plaintiffs' Statement of Facts:  Plaintiffs dispute the facts in this paragraph.  Plaintiffs

have not merely "claimed" that red dust was blown from the Refinery into their

neighborhoods during Hurricane Georges, Plaintiffs have substantially

demonstrated that red dust from the Refinery infiltrated their neighborhoods, and as

---

[17]  Exh. 82 (6/18/02 Order), at p. 1.

[18] See Excerpts of weather data collected at the St. Croix Alumina Refinery during Hurricane Georges and
produced by Defendant SCA in discovery bearing Bates Nos. SCX007394, SCX007548-55, attached as Exh
77.

mixed with rain water "rained like blood" into their homes. Refinery workers reported

seeing the winds shift and blow huge amounts of bauxite out of holes in the roof of

the storage shed towards the nearby neighborhoods, and some Plaintiffs saw red

dust swirling about Plaintiffs' properties during the storm.[19] After the storm, SCA

admitted that Hurricane Georges carried red dust from the bauxite shed and the red

mud piles at the Refinery to the adjoining properties.[20]   Further, Paragraph 24 of

Plaintiffs' Third Amended Complaint is not limited to red dust.  Paragraph 24 states

that the substances that were blown from the alumina refinery included, without

limitation, "bauxite, 'Red Dust', coal dust and other particulates . . ."  Plaintiffs also

allege that "defendants failed to promptly clean up the substances but left it to blow

about the island . . ." and that "[w]hen defendants ALCOA and St. Croix Alumina

finally began to attempt to clean up the substances, they did so in a negligent

matter." [21]

---

[19]  Memo from Tyrone Benjamin, Environmental Specialist 11 of the DPNR, to Austin Moorehead, Director of
the DPNR, (Oct. 5, 1998), attached as Exh 71 (indicating that two SCA employees admitted that they saw
the winds change direction and blow bauxite towards the neighborhoods);  *see also* Rodriguez Dep. 35:17-
37:23, June 26, 2003, attached as Exh 18 (stating that during the storm, he looked out the windows and saw
the red dust come over from the Refinery and coat the homes in the area.); Cirilo Dep. 47:11-48:24, June 27,
2003, attached as Exh 20 (testifying that she looked outside during the storm, and she saw red dust flying
around).

[20]  *See* Exh 71 (DPNR received reports from two SCA employees who observed bauxite escaping its storage
building and blowing toward the neighborhoods); *see also* Exh 2 at ¶¶ 12-13; Exh 3 at ¶¶ 13-14; Exh 6 at ¶¶
9, 17; Exh 9 at ¶ 5; Exh 11 at ¶ 8; Exh 13 at ¶¶ 6-7; Exh 17 at ¶ 10; Exh 23 at ¶ 7; Exh 25 at ¶ 9; and Exh 28
at ¶ 12 (testifying to admissions by SCA and/or Alcoa that the dust in their neighborhood came from the red
mud piles at the Refinery).

[21]  *See* Third Amended Complaint at ¶¶ 24, 28.

## C.    SCA'S SALE OF THE FACILITY

9.    <u>Defendants' Statement of Facts</u>: "In 2002, SCA sold the facility to a consortium that, following the sale, would immediately assign its interests to St. Croix Renaissance Group, L.L.L.P. ("SCRG"). . . . SCRG is not in the alumina or aluminum business. . . . The facility has not been operated as an alumina refinery since prior to SCA's sale of the facility in 2002."

> <u>Plaintiffs' Statement of Facts:</u> Plaintiffs do not dispute that the property was sold in 2002 and that it was not operated as an alumina refinery after the sale.  Plaintiffs dispute the remainder of this paragraph as not supported by admissible evidence and dispute that it was not Alcoa who sold the property and actually received the proceeds of the sale.

10.    <u>Defendants' Statement of Facts</u>: "Prior to the 2002 sale of the alumina refinery property, the parties to the agreement engaged in an extensive due diligence process."

> <u>Plaintiffs' Statement of Facts:</u>    Defendants' cite in support of this statement is unclear as neither page 13 nor paragraph 13 is evidence of any "process".  The paragraphs on page 13 speak to "Representations and Warranties" including the representation that SCA made available a Due Diligence Assessment it had conducted.  Paragraph 13 is entitled "Casualty or Condemnation".[22]

11.    <u>Defendants' Statement of Facts</u>: "Under the terms of the Purchase and Sale Agreement entered into on March 22, 2002, SCRG's predecessors in interest expressly assumed liability arising from the red mud pile", citing Exhibit C. "at 9 ('Except for the

---

[22]  DF Exh. C, at pp. 13, 21.

Seller's Retained Liabilities, Purchaser shall also indemnify, defend and hold harmless

Seller and the Seller Indemnitees from any and all Damages arising out of or related to: . .

. (iv) claims regarding the discharge, disposal or release of bauxite, bauxite residue or red

mud.')."

   Plaintiffs' Statement of Facts:   Plaintiffs dispute this interpretation of Exhibit C and

the document speaks for itself.   The following paragraphs represent the agreement

of the parties and, because they contradict Defendants' representations here and in

their brief, are admissions by a party opponent pursuant to Fed. R. Evid. 801 (d) (2).

Paragraphs 6.2 and 6.2 (d) state that SCA's "Retained Liabilities" include "**[a]ll**

**liability arising out of any alleged failure to secure materials on the Property,**

**including but not limited to bauxite, "red dust' and red mud . . . which liability**

**may be found or determined pursuant to that certain class action lawsuit filed**

**against Seller [SCA], Alcoa and Glencore, Ltd. f/k/a Clarendon, Ltd. in the**

**District Court of the Virgin Islands, Division of St. Croix, under Case Number**

**Civil No. 0036/99 (the 'Class action Lawsuit')** . . ."[23]   Paragraph 26 is an

admission that SCA has retained the right of "reasonable access to the site in

connection with Seller's completion of the matters described in . . . Section 6.2(d)."[24]

Paragraph 6.8 states that "[t]he parties hereto acknowledge that . . . the Seller's

responsibilities under . . . Section 6.2(d) will extend for such time after the Closing

---

[23]   *See* DF Exh C, at pp. 6, 8 (emphasis supplied).

[24]   *Id.*, at p. 25.

until the legal and administrative actions described herein have been concluded."[25]

Paragraph 26 concludes: "Finally, in connection with any action or other proceeding arising from or related to Seller's ownership and/or operation of the site, Purchaser shall provide such reasonable access to the site, to its former employees (if any) and to the Pre-Closing Records as Seller may reasonably request, from time to time, at such reasonable times and places as Purchaser designates, but at Seller's expense."[26]

12.   Defendants' Statement of Facts: "In Spring 2002, due to heavy rains red mud was released from the red mud pile into a ditch on the alumina refinery property's western border, and some of that red mud migrated to the mangrove and beach area. . . . This release did not involve any airborne dispersion caused by wind."

Plaintiffs' Statement of Facts:   Plaintiffs agree that the referenced Spring 2002 discharge of pollutants into the waters of the Virgin Islands did not involve any airborne dispersion.  Plaintiffs dispute the remainder of the statement with regard to the cause of the discharge, its constituents, and its extent as lacking in foundation and conclusory.  On June 18, 2002, DPNR issued an Administrative Order based on the finding that "due to the reworking of the red mud piles by St.. Croix Alumina. LLC. (SCA) over the past few months, and due to subsequent heavy rains during the latter part of March 2002, red mud particulate (red mud) and red mud laden

---

[25]  *Id.*, at p. 11.

[26]  *Id.*, at p. 26.

storm water flowed out of the red mud storage areas on the SCA facility . . ."[27]
Further, the pleadings proffered by Defendants state that "[a]s early as February
2002, contractors working for SCA began filling in the red mud cells in order to
lower the profile of the piles", the contractors also removed a portion of the
southwest berm at the red mud piles", and the actions of Defendants "altered the
flow patterns of rainfall run-off on the red mud piles" and "precipitated the onset of
severe erosion and runoff of red mud."[28]

13.   Defendants' Statement of Facts: "After that release the parties to the Purchase
and Sale Agreement amended the Agreement."

Plaintiffs' Statement of Facts:   Plaintiffs dispute this statement as unsupported by
admissible evidence.  Plaintiffs further dispute that the Exhibit post-dates the Spring
2002 discharge as Defendants say in Statement 17 that the 2002 release was in
April and the agreement is dated March 22, 2002.[29]   As to the remainder of the
statement, Plaintiffs agree that the document speaks for itself.

14.   Defendants' Statement of Facts:  "As part of the Amendment the parties clarified
that responsibility for any remediation of the bauxite residue disposal area would remain
with the purchasers: 'The Purchaser shall be responsible for all liability associated with
contouring or vegetation of the bauxite residue disposal areas or other work in the bauxite
residue disposal areas.''

---

[27]  Exh. 82 (6/18/02 Order), at p. 1

[28]  DF Exh F, at ¶¶ 23, 24, 27.

[29]  DF Exh. C, at pp.30-32.

Plaintiffs' Statement of Facts:  The document speaks for itself and Plaintiffs dispute

that the limitation of responsibility described in Exhibit D applies to "any

remediation" anywhere on the entire refinery site as by its terms Exhibit D amends

only Section 6.2 (e) of Exhibit C and, further, is specifically limited to "contouring or

vegetation" done "in connection with the Red Mud Release."[30]   The "Red Mud

Release" is defined as "that certain release of red mud into the wetlands and the

sea on or about March and April 2002, as described in the Assessment of the

Extent of the Red Mud Spill and Impact Assessment prepared by Bioimpact, Inc,

dated April 20, 2002 for the Seller."[31]   By its terms, the Alleged Amendment has no

effect on SCA's Retained Liabilities with regard to the claims at issue in this suit,

defined in Section 6.2 (d) of Exhibit C.[32]

15.   Defendants' Statement of Facts:   "The Amendment further provided that SCA

would retain liability for the clean-up of the red mud released into the wetlands in Spring

2002."

Plaintiffs' Statement of Facts:  Plaintiffs do not dispute the facts in this statement.

## D. DPNR ACTIONS AND DPNR'S INVOLVEMENT IN SITE CLOSURE AND/OR REMEDIATION

16.   Defendants' Statement of Facts:   "In May 2005, the Virgin Islands Department of

Planning and Natural Resources   ("DPNR") filed an action against Century Alumina

---

[30]  DF Exh C, at p. 8; DF Exh D, at pp. 1, 2.

[31] Defendants' Exh D, at p. 1.

[32]  Defendants' Exh D, at p. 2 ("Except as expressly amended hereby, the terms and conditions of the Purchase Agreement shall remain in full force and effect.")

Company; Vialco; SCA; Lockheed Martin Corporation; Alcoa World Alumina, LLC; HOVENSA, LLC; Hess Oil Virgin Islands Corporation; and SCRG, bringing claims under the Comprehensive Environmental Response, Contamination, and Liability Act ("CERCLA"), the Virgin Islands Oil Spill Prevention and Pollution Control Act, the Territorial Water Pollution Control Act, and several common law theories, including public nuisance."

Plaintiffs' Statement of Facts:  Plaintiffs do not dispute Defendants' characterization of the document.

17.   Defendants' Statement of Facts:  "On December 1, 2006, DPNR filed an action against SCA in the Virgin Islands Superior Court seeking the imposition of civil penalties and an award of exemplary damages for SCA's alleged violation of a Coastal Zone Management ("CZM") permit in the course of its response to the April 2002 red mud release."

Plaintiffs' Statement of Facts:  Plaintiffs do not dispute Defendants' characterization of the document.

18.   Defendants' Statement of Facts:  "On December 21, 2006, DPNR filed an action against SCA, Vialco and SCRG, seeking civil penalties, exemplary damages, and injunctive relief in the form of a "cap, erosion control, and drainage control systems" for the alumina refinery site."

Plaintiffs' Statement of Facts:  Plaintiffs do not dispute Defendants' characterization of the document.

19.   Defendants' Statement of Facts:  "Some of the parties to the Second Enforcement Action have been involved in comprehensive discussions regarding the appropriate closure and/or remediation plan for the St. Croix alumina refinery site."

Plaintiffs' Statement of Facts:  Plaintiffs dispute this as it is a statement of opinion rather than fact unsupported by admissible evidence.  The supporting Declaration neither qualifies as an admissible lay opinion based on personal knowledge nor as the opinion of an expert.[33]  The Declarant has not been identified or admitted as an expert, and has provided no expert report, and the opinion has been proffered with no foundation.  In violation of Fed. R. Civ. P. 56 (e)(1), the allegedly "appropriate" plan referenced therein has not been produced and no details of its terms have been provided.  The "parties" allegedly "involved" are not identified and the particulars of the alleged "discussions" have not been provided.

20.   Defendants' Statement of Facts:  "All proposals put forward to date by the parties to those discussions would address both stormwater run-off and erosion issues and any potential for fugitive dust emissions from the dry-stack bauxite residue disposal area."

Plaintiffs' Statement of Facts:  Plaintiffs dispute this as a statement of opinion and not fact unsupported by admissible evidence.  The supporting Declaration neither qualifies as an admissible lay opinion based on personal knowledge nor as the opinion of an expert.[34]  The Declarant has not been identified or admitted as an expert, and has provided no expert report, and the opinion has been proffered with

---

[33]   See DF Exh. H; Plaintiffs' Mot. to Strike.

[34]   See DF Exh. H; Plaintiffs' Mot. to Strike, Doc. No.  ___.

no foundation.  In violation of Fed. R. Civ. P. 56 (e)(1), none of the referenced "proposals" have been produced and no details of their terms have been provided. The "parties" allegedly proffering the "proposals" are not identified and the particulars of the alleged "discussions" have not been provided.

II.     **PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

    A.     **DEFENDANTS' EARLY KNOWLEDGE OF DANGERS**

21.   In 1977, a report by Dames & Moore informed the owners and operators of the Refinery about the need to control drainage, erosion, and "dust problems" from the red mud piles and the manner in which to accomplish such control.[35]

22.   In 1987, an Alcoa research scientist named Sam Ward wrote "dust control, primarily using sprinkler irrigation, will be a high priority on an operating dry disposal area" due to a red mud pile's susceptibility to wind erosion.[36]  Ward also made recommendations for available methods of controlling dust from red mud piles.[37]

23.   A 1989 report from Ormet Corporation issued to Glencore (f/k/a Clarendon) identified major local concerns about the operations of the Refinery, including the ability of

---

[35]  Report by Dames & Moore to Martin Marietta Alumina (Oct. 5, 1977) (Bates Nos. SCA 000368-531.) ("Dames & Moore Report") at SCA 000451, 457, 432, attached as Exh 36; *see also* Supplemental Expert Report of Edward W. Kleppinger (Feb. 8, 2008) at 9-10, attached as Exh 74 (the Dames & Moore Report explained the need and means for reducing dust emissions from the red mud piles).

[36]  Ward, Sam C., *Reclaiming Bauxite Residue Disposal Areas in South-West Australia*, in Australia Mining Industry Council, Canberra, Mining Rehabilitation '87 at 63(Tom Farrell ed., 1987), attached as Exh 33.

[37]  *Id.* at 63-64.

the bauxite storage building to withstand storm conditions and the potential "air pollution problem" posed by bauxite residue.[38]

24.  In 1991, SCA was aware that residents living downwind of the Refinery had complained about fugitive dust.[39]

25.  A 1994 report prepared by the Virgin Islands government observed that dust was "ubiquitous" at the Refinery and that surrounding buildings, ground, and vegetation had been "stained red."[40]

26.  Glencore provided Vialco with Material Safety Data Sheets (MSDS) that verified that bauxite is dangerous if inhaled.[41]

27.  The Alcoa MSDS for red mud states that it can cause "severe irritation and burns [of eyes], especially when wet," "can cause severe irritation [of skin], especially when wet," and "can cause irritation of the upper respiratory tract."[42] It also advises against skin and eye exposure to red mud.[43]

---

[38]  St. Croix Alumina Refinery Report to Clarendon, Ltd. (Bates Nos. G00207-68), attached as Exh 50.

[39]  Exh 32 at 80: 12-20; *see also* Exh 73 at 2.

[40]  Exh 65 at 4.  This report was obtained from the files of DPNR is admissible pursuant to FRE 803 (7).

[41]  Doc. No. 1125 (Memo Op on Glencore SJ) at 23-24 ([T]he MSDS adequately put VIALCO and St. Croix Alumina on notice regarding the dangerous conditions of bauxite."); *see also* MSDS (Sept. 10, 1999) (AI000008-14), attached as Exh 54; MSDS (Nov. 13, 1985) (AI000656-658), attached as Exh 55; MSDS (Nov. 3, 1987) (AI000671-674), attached as Exh 56; MSDS (Nov. 1, 1990) (AI000687-689), attached as Exh 57; MSDS (Mar. 31, 1990) (AI000696-700), attached as Exh 58; MSDS (Oct. 31, 2000) (AI00001-07), attached as Exh 59..

[42]  Alcoa MSDS for Red Mud (Sept. 10, 1999) (AI000008-14), attached as Exh 54.

[43]  Exh 54 at AI000010-11.

28.   The MSDS for bauxite warns that it can cause mild irritation of the eyes, skin and upper respiratory tract.[44]

29.   Defendants' expert who performed medical examinations of four minor Plaintiffs testified that it is reasonable to rely on the bauxite and red mud MSDSs in determining which health conditions can be caused by exposure to red mud and bauxite.[45] She based this opinion on the training she received at Johns Hopkins School of Public Health, where she was taught about the utility, application, relevance and validity of MSDSs.  *Id.* at 231:2 - 20.

30.   Defendants' dermatology expert also testified that it is reasonable to rely on red mud and bauxite MSDSs to determine what the adverse health effects are from exposure to same.[46]

31.   The MSDS's provided by Glencore "adequately put VIALCO and St. Croix Alumina on notice regarding the dangerous conditions of bauxite."[47]

32.   Alcoa's 1995 Site Assessment Report informed Defendants that (1) nearby residents complained about dust from red mud between 1993 to 1995,[48] and (2) "[s]torm

---

[44]   Alcoa MSDS for bauxite dated Oct. 31, 2000 (Bates Nos. Al00001-07), attached as Exh 59.

[45]   Ex. 19, Mathew Dep. at 231:21 - 232:3, Apr. 25, 2005, attached as Exh 63.

[46]   Larsen Dep. at 84:10-85:7; 87:7-17, June 15, 2005, attached as Exh 60.

[47]   Doc. No. 1125 at 23-24.

[48]   "Site Assessment for the Vialco Facility St. Croix, U.S. Virgin Islands," (Nov. 1995) Prepared for Alcoa by Geraghty & Miller, Inc., (AI000835-AI0001726) ("Geraghty & Miller Report"), at Al000882 & Al000957, attached as Exh 44.

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 19**

water control measures to mitigate erosion from the Red Mud disposal areas seem inadequate." [49]

33.   In ruling on Glencore's 2003 Motion for Summary Judgment, this Court found that "[t]he evidence . . . demonstrates that the aluminum plant was in a hurricane zone and the possibility of the red mud piles blowing into the surrounding neighborhoods posed a significant danger to the property owners."[50]

34.   In the case captioned *St. Croix Renaissance Group, LLLP v. St. Croix Alumina, LLC, et al.*, Civil No. 2004/67, in the District Court of the Virgin Islands, Division of St. Croix (the "SCRG" case) Defendants SCA and Alcoa World Alumina, LLC ("AWA") rely upon the evidence cited by Plaintiffs, *supra*, to support their claim that Defendants adequately conveyed to Plaintiff St. Croix Renaissance Group LLLP ("Plaintiff SCRG") SCA's and AWA's considerable knowledge that **bauxite residue had escaped and would continue to escape the red mud piles**.[51]

35.   In 1995, Hurricane Marilyn damaged the roof of the bauxite storage shed.[52]

36.   During Hurricane Georges in 1998, the winds shifted and blew red dust across the Refinery and into the adjacent neighborhoods.[53]

---

[49]  *Id.* at 6-3 (AI0001362).

[50]  Doc. No. 1125 (Mem. Op.), at p. 13.

[51]  Exh 53 (St. Croix Alumina, LLC's and Alcoa World Alumina, LLC's Statement of Undisputed Facts, dated May 15, 2009 (Doc. No. 229) in *St. Croix Renaissance Group, LLLP, et al., v. St. Croix Alumina*, LLC, Civ. No. 2004/67 in the U.S. District Court of the Virgin Islands, Division of St. Croix. at ¶¶ 34-41 and documents cited therein.

[52]  Exh 32 at 101:18-21 & 103:20-22.

[53]  Memo from Tyrone Benjamin, Environmental Specialist 11 of the DPNR, to Austin Moorehead, Director of the DPNR, (Oct. 5, 1998), attached as Exh 71 (indicating that two SCA employees admitted that they saw

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 20**

37.   Red water, red dust, and red mud inundated the adjacent neighborhoods, and cisterns and homes on those properties.[54]

38.   The red dust, red water, and red mud "ran like blood" and stained the personal and real property in the adjacent neighborhoods.[55]

## B.   EVENTS FOLLOWING HURRICANE GEORGES

39.   Immediately after Hurricane Georges, multiple complaints about red dust resulted in an investigation by the DPNR, which found that red dust had in fact contaminated the neighborhoods and issued a Notice of Violation against St. Croix Alumina on October 21, 1998.[56]

---

the winds change direction and blow bauxite towards the neighborhoods);   *see also* Rodriguez Dep. 35:17-37:23, June 26, 2003, attached as Exh 18 (stating that during the storm, he looked out the windows and saw the red dust come over from the Refinery and coat the homes in the area.); Cirilo Dep. 47:11-48:24, June 27, 2003, attached as Exh 20 (testifying that she looked outside during the storm, and she saw red dust flying around).

[54]  Henry Dep. 34:18-35:18; 48:15-19; 71:1-77:24, Mar. 20, 2000, attached as Exh 1; Exh 2; Exh 3; Williams Dep. 11:22-25; 13:6-14:2; 24:20-25:11, 33:14-24; 35:20-36:2, Mar. 22, 2000, attached as Exh 4; Williams Dep. 103:15-25, Dec. 10, 2003, attached as Exh 5; Browne Aff., attached as Exh 6; Browne Dep., 25:13-31:8, Mar. 22, 2000, attached as Exh 7; Browne Dep., 60:23-64:18, Dec. 9, 2003, attached as Exh 8; Drew Aff., attached as Exh 9; Drew Dep., 31:4-32:1, Dec. 10, 2003, attached as Exh 10; Acosta Aff., attached as Exh 11; Acosta Dep., 26:20-27:18; 28:1-29:4, Oct. 15, 2002, attached as Exh 12; Glasgow Aff., attached as Exh 13; Glasgow Dep. 28:3-29:5; 33:2-21; 35:6-11; 58:16-64:10; 69:21-72:15, Oct. 16, 2001, attached as Exh 14; Viera Dep. 18:7-19:22, June 24, 2003, attached as Exh 16; Rodriguez Aff., attached as Exh 17; Rodriguez Dep. 35:17-37:23; 52:5-22; 69:16-71:8, June 26, 2003, attached as Exh 18; Cirilo Aff., attached as Exh 19; Cirilo Dep. 47:11-48:24; 61:24-62:10, attached as Exh 20; Tavarez Aff., attached as Exh 21; Tavarez Dep. 32:9-33:25, June 24, 2003, attached has Exh 22; Camacho Aff., attached as Exh 23; Camacho Dep. 22:12-29:3; 33:24-35:15, June 25, 2003, attached as Exh 24; Malaykhan Aff., attached as Exh 25; Malaykhan Dep. 20:3-18; 46:15-48:11, June 23, 2003, attached as Exh 26; Cheddie Dep. 18:22-21:2; 40:14-46:25; 49:2-51:3; 51:13-52:22; 53:4-56:7; 60:11-16; 94:8-97:8; 116:4-16; 141:8-142:21; 183:16-25; 188:11-190:3, June 23, 2003, attached as Exh 27; Rosa Aff., attached as Exh 28; Rosa Dep. 30:19-32:24; 33:5-34:23; 34:25-36:25, June 25, 2003, attached as Exh 29.

[55]  *See* Exhs 2, 3, 6, 9, 11, 13, 17, 19, 21, 23, 25, and 28.

[56]  Exh 40 at II(2).

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 21**

40.   DPNR reported that it had received multiple telephone complaints from residents of the neighborhoods adjacent to the St. Croix Alumina refinery, including the neighborhoods of Harvey and Clifton Hill, that a substance described as "red mud" contaminated their properties during the hurricane, including their cisterns, which supplied their drinking water, their cooking water, and their bath water.[57]

41.   As early as the day after Hurricane Georges, DPNR staff investigated and found that a red substance contaminated numerous properties.[58]   DPNR also noted that water taken from residential cisterns was discolored.[59]

42.   DPNR then found two holes in the roof of the bauxite storage structure and confirmed the pollution of the neighborhoods from reports from SCA employees who admitted they witnessed bauxite escaping from those holes and blowing towards the adjoining neighborhoods.[60]

43.   In 1998, DPNR determined that SCA's actions with respect to bauxite had violated numerous statutes (including 12 V.I.R.& R. § 204-20(d) & (e); 12 V.I.R.& R. § 204-25(a)(2) & (3), 12 V.I.R.& R. § 204-25(c), 12 V.I.R.& R. § 204-27(a)), that bauxite is an air contaminant, and that it was released in such quantity and of such characteristics and duration that it has, and is likely to be injurious to the public welfare, to the health of human, plant or animal life, and to property, and which is unduly interfering with the

---

[57]  *Id.*

[58]  *Id.* at II(3).

[59]  *Id.* at II(4).

[60]  *Id.* at II(7), (8); *see also* Exh 71.

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 22**

enjoyment of life and property of the residents and public institutions adjacent to and in relative proximity to the Refinery.[61]

## C.   EARLY PROCEDURAL HISTORY OF THIS SUIT

44.   The instant suit was commenced in the Territorial Court in February 1999 and removed to District Court in March 1999.[62].

45.   By Order entered August 7, 2000, the following class of Plaintiffs was certified:

> all individuals who, as of September 21,1998 [the date of Hurricane Georges], resided, worked, and/or owned property located in communities adjacent to and downwind from the St. Croix Alumina Refinery Plant, including, but not limited to, the projects of Harvey and Clifton Hill, as well as the estates of Barron Spot, Profit, Clifton Hill and La Reine, who have suffered damages and/or injuries as a result of Defendants' [conduct] with regard to the containment and storage of red dust containing bauxite and red mud. [63]

46.   The definition of the class was clarified on January 26, 2001:

> All individuals who, as of September 21, 1998 [the date of Hurricane Georges], resided, worked, and/or owned property located in the following six communities adjacent to and downwind from the St. Croix Alumina Refinery Plant--the projects of Harvey and Clifton Hill and the estates of Barren Spot, Profit, Clifton Hill and La Reine--who, due to Defendants' conduct with regard to the containment and storage of red dust containing bauxite and red mud, suffered damages and/or injuries as a result of exposure during and after Hurricane Georges to red dust and red mud blown during Hurricane Georges.[64]

---

[61]   Exh 40 at IV(2), (3).

[62]   Doc. No. 943 (Magistrate's 3/29/06 Rprt. & Recomm), at p. 4, Finding 1.

[63]   Doc. No. 187 (8/7/00 Memo Op.), at pp. 2, 4.  *See also* Doc. No. 188 (8/7/00 Order).

[64]   Doc. No. 249 (1/26/01 Order), at  pp. 1, 2.

47.  Plaintiffs' original expert reports were due and produced on Sept. 30, 2003, pursuant to an "Amended Scheduling Order" dated Aug. 26, 2003.[65]

### D.    TRANSFER OF OWNERSHIP, BUT NOT OF THE LIABILITIES TO BE DETERMINED IN THIS SUIT

48.  The Alcoa Defendants allege that they sold the alumina refinery site in March 2002.[66]

49.  Defendants' Exhibit C contradicts Defendants' factual statement that the buyers "expressly assumed liability arising from the red mud pile".[67]  Paragraphs 6.2 and 6.2 (d) define Seller's "Retained Liabilities" to include "**[a]ll liability arising out of any alleged failure to secure materials on the Property, including but not limited to bauxite, 'red dust' and red mud** and the alleged spreading of bauxite, 'red dust' and red mud into the surrounding neighborhood, when said materials were allegedly blown off the Property on or about September 21, 1998 when the island of St. Croix was struck by hurricane Georges, **which liability may be found or determined pursuant to that certain class action lawsuit filed against Seller [SCA], Alcoa and Glencore, Ltd. f/k/a Clarendon, Ltd. in the District Court of the Virgin Islands, Division of St. Croix, under Case Number Civil No. 0036/99 (the 'Class action Lawsuit')** . . ."[68]

---

[65]  Doc. No. 508 (8/23/03 Amend. Sched, Order), at pp. 1, 2.

[66]  Memo in Supp. Alcoa-only Mot. for SJ at pp. 3, 4, *citing* DF Exh. C.

[67]  Memo in Supp. Alcoa-only Mot. for SJ, at pp. 3, 4, *citing* Exh. C.  To the extent that it is an admission by a party opponent, the Exh is admissible pursuant to Fed. R. Evid. 801 (d) (2).

[68]  Defendants' Exh C, at pp. 6, 8 (emphasis supplied).

50.    Paragraph 26 of Defendants' Exhibit C is an admission that SCA has retained the right of "reasonable access to the site in connection with Seller's completion of the matters described in . . . Section 6.2(d)."[69]

51.    Paragraph 6.8 states that "[t]he parties hereto acknowledge that . . . the Seller's responsibilities under . . . Section 6.2(d) will extend for such time after the Closing **until the legal and administrative actions described herein have been concluded**."[70]

52.    Paragraph 26 concludes: "Finally, in connection with any action or other proceeding arising from or related to Seller's ownership and/or operation of the site, Purchaser shall provide such reasonable access to the site, to its former employees (if any) and to the Pre-Closing Records as Seller may reasonably request, from time to time, at such reasonable times and places as Purchaser designates, but at Seller's expense."[71]

## E.    SCA HAS ADMITTED TO DPNR THAT IT IS LIABLE FOR CONTAINING THE RED MUD PILES

53.    On May 3, 2002, two months after the sale, SCA "delivered to DPNR-DEP [Division of Environmental Protection] a report authored by Bioimpact, Inc. titled Assessment of the Extent of the Red Mud Spill and Impact Assessment at the St. Croix Alumina, L.L.C. Facility (the 'Bioimpact Report')."[72]

54.    "[B]ased upon the findings and recommendations contained in the Bioimpact Report and DPNR·DEP's subsequent investigations of the conditions described in the

---

[69]  *Id.*, at p. 25.

[70]  *Id.*, at p. 11 (emphasis supplied).

[71]  *Id.*, at p. 26.

[72]  Exh. 83 (1/22/03 Consent Order and Stip. of Dismissal with Prej.), at p. 1.

Bioimpact Report, DPNR-DEP issued an Administrative Order dated June 18, 2002 to
SCA."[73]

55.   The June 18, 2002 Order found that "due to the reworking of the red mud piles by
St.. Croix Alumina. LLC. (SCA) over the past few months, and due to subsequent heavy
rains during the latter part of March 2002, red mud particulate (red mud) and red mud
laden storm water flowed out of the red mud storage areas on the SCA facility . . .".  The
Order was received by Eric Black on behalf of SCA on June 19, 2002, three months after
the alleged sale.[74]

56.   SCA answered the Administrative Order on June 24, 2002 and moved for various
forms of relief.[75]

57.   SCA continued to work on addressing the spill at its previously owned refinery,
and on January 22, 2003, entered into a Consent Order agreeing that it had continued to
work on the spill after June 18, 2002 and to submit a report prepared by Bioimpact "setting
forth observations conducted between the issuance of the June 18 Order and January,
2003, which documents any impacts of the red mud spill to the terrestrial, near-shore,
marine and benthic habitats along the areas described in the Bioimpact Report."[76]

58.   **SCA also agreed to** pay a civil penalty of twenty thousand dollars ($20,000.00),
to **"submit a coastal zone permit application** based upon the proposal developed by

---

[73]  Exh. 83 (1/22/03 Consent Order and Stip. of Dismissal with Prej.), at p. 1.

[74]  Exh. 82 (6/18/02 Order), at pp. 1, 7.

[75]  Exh. 83 (1/22/03 Consent Order and Stip. of Dismissal with Prej.), at p. 1.

[76]  Exh. 83 (1/22/03 Consent Order and Stip. of Dismissal with Prej), at p. 2.

Garver Engineers, LLC **for the redesign of the red mud sediment control system, which is designed to prevent or minimize <u>future releases</u> to the environment, if any, from the red mud piles located on the facility formerly owned by SCA** (the "Garver Proposal") . . .", and to use its "best efforts to obtain the permit."[77]

59.   SCA further agreed to commence work in the previously owned refinery within a week of obtaining the CZM permit and to pay for a DPNR monitor.[78]

60.   The Consent Order was signed by Eric W. Black on behalf of SCA on January 22, 2003.[79]

61.   On March 14, 2003, a year after the sale of the St. Croix alumina refinery site, SCA applied to the Government of the Virgin Islands for a Major Earth Change/Coastal Zone permit for "[d]rainage improvements: drainage ditch construction, rip-rap placement, levee construction, and culvert replacement and redirection" at their previously owned refinery.[80]

62.   SCA was identified as the applicant and developer and SCRG was identified as the owner of the property.[81]

63.   On November 5, 2003, 20 months after SCA sold but maintained control of the red mud piles and bauxite at the refinery, Major Coastal Zone Permit No. CZX-15-03 (L) was

---

[77]   Exh. 83 (1/22/03 Consent Order and Stipulation of Dismissal with Prejudice), at pp. 2, 3, ¶¶ 2, 3 (emphasis supplied).

[78]   Exh. 83 (1/22/03 Consent Order and Stipulation of Dismissal with Prejudice), at p. 3, ¶¶ 4, 5.

[79]   Exh. 83 (1/22/03 Consent Order and Stip. of Dismiss. with Prej.), at p. 4.

[80]   Exh. 84 (Executed Form L&WD 2 Permit Application), at pp. 1, 2, admissible pursuant to FRE 803 (8).

[81]   Exh. 84 (Executed Form L&WD 2 Permit Application), at pp. 1, 2.  *See also* attached Form L&WD-3, signed by Eric W. Black on behalf of SCA.

issued to SCA as the "Permittee" and permitted SCA to "undertake drainage improvements" that included "construction of a drainage ditch around the northeastern and eastern sides of the bauxite residual area, a levee around the southwestern portion of the bauxite residue area and installation of three (3), 36" culverts."[82]

64.   Per paragraph 2, "[t]he proposed drainage improvements are located at Plot NO.2, Estate Annerberg [sic] nad [sic] Shannon Grove, and Plot No.1, Estate Spanish Town, Christiansted, St. Croix, Virgin Islands."[83]

65.   The first condition of the permit was that the "**Permittee agrees to assume full and complete responsibility for all liability** to any person or persons, including employees, **as a result of <u>its control</u> of the area** described in paragraph 2 of this permit, and all improvements thereon (which area and improvements are herein after referred to as the 'premises') . . . **during the time the Permittee is <u>in control</u> of the premises** pursuant to this permit."[84]

66.   A special condition of the Permit is that SCRG does not become responsible for the permitted construction around the bauxite residue storage areas until after DPNR deems the construction complete.[85]

---

[82]   Exh. 85 (Major Coastal Zone Permit No. CZX-15-03 (L)), at p. 1, admissible pursuant to FRE 801 (8).

[83]   Exh. 85 (Major Coastal Zone Permit No. CZX-15-03 (L)), at p. 1, ¶ 2.

[84]   Exh. 85  (Major Coastal Zone Permit No. CZX-15-03 (L)), at p. 2 (emphasis supplied.)

[85]   Exh. 85 (Major Coastal Zone Permit No. CZX-15-03 (L)), at p. 4.

67.   Eric W. Black signed the permit on behalf of SCA, the Permittee, certifying that he was an agent of SCA "duly authorized and empowered to sign this permit on behalf of St. Croix Alumina LLC."[86]

### F.   LITIGATION OF THE CLAIMS OF THE CERTIFIED CLASS CONTINUED

68.   On motion of Defendants, the Scheduling Order setting expert deadlines in the original class action was amended by order of January 27, 2005 and the deadline for the designation of defense witnesses was moved to January 31, 2005.[87]

69.   The deadlines for the expert witnesses' reports in the prior class were staggered from January 31 through February 21, 2005 and the General Subject Matters to be covered by the reports were: "Boundaries of class neighborhoods," "Regulatory issues," "Economic issues," "Medical IMEs of adult named plaintiffs, Medical causation, risk, and medical monitoring," "Medical IMEs of minor named plaintiffs," "Psychological IMEs and emotional Condition/injury (existence, causation, severity, treatability, etc.)," "Epidemiology and its interplay with medical monitoring," "Psychometric testing (if Dr. Copernann is not dropped as an expert for Plaintiffs)," "Medical monitoring experts," "Risk and causation," "Cost of medical services," "Chrome six toxicology experts," "Silica toxicology," "Dermatology," "Nature and extent of exposure," and "Alleged real property damages."[88]

---

[86]  Exh. 85 (Major Coastal Zone Permit No. CZX-15-03 (L)), at pp. 5, 6.

[87] Doc. No. 729 (1/27/05 Order), at pp. 2, 3.

[88] Doc. No. 729 (1/27/05 Order), at pp. 3, 4, ¶ 2 (b).

70.  The January 2005 Order required that all discovery of expert witnesses regarding the prior class be completed on or before May 16, 2005.[89]

71.  On May 5, 2005, the Commissioner of DPNR, as the Virgin Islands Trustee of Natural Resources, filed suit to recover damages from, *inter alia*, Vialco, Century Aluminum Company, SCA and SCRG for violations of CERCLA, common law, and Territorial law "caused by the releases or threatened releases of hazardous substances, hazardous wastes, petroleum products, pollutants, contaminants and materials . . ." in the District Court of the Virgin Islands, Division of St. Croix, on May 5 (the "NRD case").[90]

72.  The schedule for depositions of experts was again amended on May 18, 2005 to extend the deadline to June 16, or if by agreement, to June 30, 2005.[91]

73.  On April 24, 2006, it was ordered that "the class in this case will continue to be identified as 'all individuals, who as of September 21, 1998 [the date of Hurricane Georges], resided, worked, and/or owned property located in communities adjacent to and downwind from St. Croix Alumina Refinery Plant, including, but not limited to, the projects of Harvey and Clifton Hill, as well as the estates of Barron Spot, Profit, Clifton Hill, and La Reine, who have suffered damages and/or injuries as a result of Defendants' [conduct] with regard to containment and storage of red dust containing bauxite and red mud' " but

---

[89]  Doc. No. 729 (1/27/05 Order), at p. 5, ¶ 3.

[90]  *See* DF Exh. G.

[91]  Doc. No. 802 (5/18/05 Order), at p. 2.

that "the class is certified for liability purposes only . . ." and would be decertified after a

"liability-only trial."[92]

74.   On the same date, Plaintiffs were ordered to "submit a revised trial plan."  (4/24/06

Order), at p. 2.

## G.   SCA CONTINUES TO EVADE ITS OBLIGATIONS UNDER ITS AGREEMENT WITH DPNR

75.   On August 10, 2006, the Commissioner of DPNR responded to correspondence

from counsel from SCA and stated unequivocally that as of that date, "[w]ith regard to the

Agreed Order, SCA has failed to comply with its obligations" and that "[a]s set forth in the

Agreed Order, until DPNR concludes that Garver's as-built system is effective **as a 'red**

**mud sediment control system, which . . . prevent[s] or minimize[s]  future releases**

**to the environment . . . from the red mud piles** . . .,' DPNR will not be able to share your

client's conclusion that it has complied with the Agreed Order."[93]

76.   DPNR reiterated that **"SCA was obligated to construct a 'red mud sediment**

**control system' to 'prevent or minimize future releases to the environment, if any,**

**from the red mud piles' in January 2003**" and emphasized that "it was an absolute

requirement."[94]

77.   On December 1, 2006, DPNR filed suit against SCA in the Superior Court of the

Virgin Islands, alleging that SCA had provided "false and inaccurate information" in

connection with its application for the CZM permit and seeking, *inter alia*, ten thousand

---

[92]  Doc. No. 949 (4/24/06 Order), at pp. 1, 2.

[93]  Exh. 86 (Ltr. dated 8/10/06), at pp. 2, 4 (emphasis supplied).

[94]  Exh. 86 (Ltr. dated 8/10/06), at pp. 4 (emphasis supplied).

dollars ($10,000) "per day for each day during which DEFENDANT intentionally and knowingly has continued to be in violation of the CZM Act and the Permit."[95]

78.  DPNR filed a second suit arising from additional violations by SCA and others of the federal and territorial law on December 31, 2006.[96]

## H.   NEW CLASS CERTIFIED IN THIS SUIT

79.  By Order dated December 11, 2007, this Court gave notice that it "intend[ed] to revisit its class certification and decertification decisions," commenting, *inter alia*, that "the question of whether the demand for injunction relief to protect Plaintiffs against future harm from red dust or red mud should be certified pursuant to Rule 23(b)(2) has not been explored," and scheduled oral argument to address the Court's comments and to address a trial plan.[97]

80.  On June 3, 2008, the Court certified a new class of plaintiffs under Rule 23(b)(2) but "only insofar as they seek cleanup, abatement or removal of the substances **currently present** on the refinery property":

> All persons **who currently reside, work,  and/or own property** in the projects of Harvey and Clifton Hill and the estates of Barren Spot, Profit, Clifton Hill, and La Reine who, because of the presence of bauxite and red mud on the St. Croix Alumina Refinery Plant property due to defendants' conduct, **could suffer personal injuries or property damage in the future** as a result of exposure to that bauxite and red mud.[98]

---

[95]  DF Exh. E (Compl. Civ. No. 2006/730) at ¶¶ 50, 51, and Request for Relief, p. 10.

[96]  DF Exh. F (Compl. in Civ. No. 2006/772).

[97]  Doc. No. 1181 (12/11/07 Order), at pp. 1, 3.

[98]  Doc. No. 1255 (6/3/08 Order), at p. 25.  *See also Henry v. St. Croix Alumina, et al.*, Civil Action No. 1999-0036, 2009 U.S. Dist. LEXIS 31352 *3 (D.V.I. Slip Op. April 13, 2009) (acknowledging certification of "new class" on June 3, 2008).

81.   In the case captioned *St. Croix Renaissance Group, LLLP, et al. v. St. Croix Alumina, LLC, et al.*, Civil No. 2004/67, in the District Court of the Virgin Islands Division of St. Croix (the "SCRG" case) SCA relies upon the evidence cited by Plaintiffs herein to support its claim that it adequately **warned** SCRG that bauxite residue **could** escape the red mud piles.[99]

82.   In the SCRG case, SCA and AWA have identified Kirk Joseph Gribben as "a trial preparation expert for purposes of Fed. R. Civ. P. 26(b)(4)" who "is a member of the litigation team for purposes of this case."[100]

83.   In the NRD case in the District Court of the Virgin Islands, SCA and AWA has just admitted that "**[t]he link between the release [of red mud in 2002] and the loss of resources is obvious** from the photographs contained in the Bioimpact report" of the event and that "**[it] is inconceivable that the Trustee, or those acting on his behalf, could look at those photographs and not see that link.**"[101]

84.   To date, no Rule 16 status conference on the newly-certified class in this case has been held and no scheduling orders issued.

---

[99]   Exh 53 (St. Croix Alumina, LLC ("SCA") and Alcoa World Alumina, LLC's Statement of Undisputed Facts (Doc. No. 229) in *St. Croix Renaissance Group, LLLP, et al., v. St. Croix Alumina*, LLC, No. 2004/67 in the U.S. District Court of the Virgin Islands, Division of St. Croix. at ¶¶ 34-41.

[100]   *See* Exh. 87 (St. Croix Alumina, L.L.C. and Alcoa World Alumina, L.L.C.'s Memorandum in Opposition to Motion to Compel Deposition of Kirk Gribben) (filed as Doc. No. 117 in the SCRG case) at 2.

[101]   Exh. 88 (7/15/09 Memo in Supp Mot for Part SJ) filed as Doc. No. 362 by SCA and Alcoa World Alumina, L.L.C. ("AWA") in the NRD case, Civ. No. 2005/0062, at 15.

<u>Henry v. St. Croix Alumina, LLC, et al.,</u> CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 33**

Dated:  July 23, 2009                               Respectfully Submitted:


BY:   s/Lee J. Rohn

LEE J. ROHN
ROHN & CARPENTER, LLC
1101 King Street
Christiansted, St. Croix
U.S. Virgin Islands 00820-4933
(340) 778-8855
(340) 773-2954 (FAX)

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 34**

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2009, a true and correct copy of the above and foregoing **Plaintiffs' Statement of Material Facts In Support of their Response to Defendants Alcoa, Inc. and St. Croix Alumina, LLC's Motion for Summary Judgment on Plaintiffs' Class Claims for Injunctive Relief** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Bernard C. Pattie, Esquire
Law Office of Bernard C. Pattie PC
1244 Queen Cross Street, Suite 5
St. Croix, VI 00820-4932
Attorney for St. Croix Alumina LLC and Alcoa Inc.

Derek M. Hodge, Esquire
MacKay & Hodge
19A-20 Kongens Gade
P.O. Box 303678
St. Thomas, VI  00802
Attorney for Glencore, Ltd.

Gordon Rhea, Esquire
Richardson, Patrick Westbrook & Brickman, LLC
1037 Chuck Dawley Blvd. Bldg A
Mt. Pleasant, SC 29464
Attorney for Plaintiffs

Laura Baughman, Esquire
Baron & Budd, P.C.
3102 Oak Lawn Ave.
Dallas, TX 75219-4281
Attorney for Plaintiffs

Lori E. Jarvis, Esquire
Hunton & Williams
River Front Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Attorney for St. Croix Alumina LLC and Alcoa Inc.

**Henry v. St. Croix Alumina, LLC, et al.,** CIVIL NO. 1999/0036
**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN RESPONSE TO ALCOA INC. AND ST. CROIX ALUMINA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLASS CLAIMS FOR INJUNCTIVE RELIEF**
**Page 35**

Renè P. Tatro, Esquire
Tatro Tekosky Sadwick LLP
333 S. Grand Avenue, Suite 4270
Los Angeles, CA 90017
Attorney for Glencore, Ltd.

BY:   s/*Lee J. Rohn*