**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| JOSEPHAT HENRY resident of Harvey, KAY WILLIAMS resident of Harvey, SYLVIA BROWNE resident of Clifton Hill, MAUDE DREW resident of Estate Barren Spot, MARTHA ACOSTA resident of Estate Profit, WILHELMINA GLASGOW as an individual and mother and next friend of SAMANTHA VIERA, a minor, both residents of Estate Profit, MERCEDES ROSA resident of Estate Profit, GEORGE RODRIGUEZ as an individual and as father and next friend of AMADO and GEORGE E. RODRIGUEZ, Minors, all residents of Estate Profit, SONYA CIRILO resident of Estate Profit, RAQUEL TAVAREZ, resident of Estate Profit, NEFTALI CAMACHO, as an individual and as father and next friend of ANGEL JAVIER CAMACHO, a minor, both residents of Estate Profit, EYAJIE MALAYKHAN resident of Estate Profit, CHEDDIE KELSHALL resident of Estate Profit and other persons too numerous to mention, A CLASS ACTION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 1999/0036 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ST. CROIX ALUMINA, LLC, ALCOA INC., and GLENCORE, LTD, f/k/a CLARENDON, LTD., | ) ) ) ) | |
| Defendants. | ) ) ) ) ) | |
| _____ | | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON PLAINTIFFS' LACK OF NECESSARY EVIDENCE**

## TABLE OF CONTENTS

Table of Authorities .......................................................................................................... iii

I.   Introduction .............................................................................................................. 1

II.   The Court Should Only Consider Facts and Inferences that
Favor Plaintiffs in Determining Whether Summary
Judgment is Proper ...................................................................................................2

III.   There are Genuine Issues of Material Fact Regarding the
Cause of Plaintiffs' Personal Injuries and Property Damages ........................................... 2

    A.   There are Material Facts Showing that Dust
From the Refinery Caused Plaintiffs' Injuries ....................................................... 2

        (1)   There are disputed material facts within
the jury's understanding showing that
Plaintiffs suffered from common injuries caused
by red dust from the refinery ......................................................................... 3

        (2)   Courts accept non-expert evidence on causation in cases involving
obvious injuries ............................................................................................. 7

    B.   There are Disputed Material Facts with Respect to the Cause of
Plaintiffs' Property Damages. ............................................................................. 11

IV.   Material Fact Issues Exist on the Breach of the Relevant Standard of Care for
Plaintiffs' Negligence and Nuisance Claims. ............................................................... 13

    A.   There are Material Facts Regarding the Standard of Care for the Negligence,
Negligent Abatement, and Negligent Infliction of Emotional Distress Claims. ........ 14

        (1)   Plaintiffs' Expert Testimony Establishes a Breach of the Standard
of Care. ........................................................................................................ 14

        (2)   Plaintiffs' Non-Expert Evidence Raises Material Fact Issues on the Standard
of Care. ........................................................................................................ 15

            (a)   A Jury Could Reasonably Conclude without Expert Testimony
That Defendants Knew, Before Hurricane Georges, that Red Dust
Could Escape the Refinery During a Storm. ............................................ 17

            (b)   A Jury Could Reasonably Conclude without Expert Testimony that
Red Dust is  Hazardous to Human Health. ............................................. 19

(c) A Reasonable Jury Could Find, Without Expert Testimony, that Defendants Did Nothing to Prepare the Bauxite Shed or Red Mud Piles for Hurricane Georges, Despite this Knowledge. ........................................... 19

(3) Defendants' legal duties also establish the standard of care ........................................... 20

B. Genuine Issues of Material Fact Exist Regarding Plaintiffs' Nuisance Claims. ............. 20

(1) There are Genuine Factual Disputes Regarding Plaintiffs' Private Nuisance Claims ........................................... 20

(2) Genuine Issues of Material Fact Exist Regarding Plaintiffs' Public Nuisance Claims ........................................... 23

V. Genuine Factual Issues Exist with Respect to Plaintiffs' Claims for Abnormally Dangerous Activities. ........................................... 24

A. Defendants are not Immune from Strict Liability Simply Because It is Generally Lawful to Operate an Alumina Refinery. ........................................... 24

B. The Relevant Factors Support Finding of Strict Liability. ........................................... 26

VI. Genuine Issues of Material Fact Exist with Regard to Plaintiffs' Nuisance Per Se Claims. ........................................... 29

VII. Genuine Issues of Material Fact Exist Regarding Plaintiffs' Intentional Infliction of Emotional Distress ("IIED") Claims. ........................................... 30

VIII. Genuine Issues of Material Fact Exist Regarding Plaintiffs' Claims for Negligent Infliction of Emotional Distress ("NIED"). ........................................... 31

IX. The Summary Judgment Evidence Supports Plaintiffs' Claims for Punitive Damages. ........................................... 32

X. Conclusion ........................................... 33

# TABLE OF AUTHORITIES

## CASES

*Allison v. Manetta*, 933 A.2d 1197 (Conn. 2007).........................................................15

*Anderson v. Farmland Industries, Inc.*, 136 F. Supp. 2d 1192 (D. Kan. 2001)............................26

*Banford v. Aldrich Chemical Company, Inc.*, No. 03-CV-8704, 05-CV-7221,
06-CV-4053, 2006 WL 4453926 (trial order) (Ohio Com. Pl. 9/22/06).......................................13

*Bowler v. Metropolitan Transit Authority of Harris County*, No. 01-06-0053-CV, 2007
WL 1299803 (Tex. App.—Hous. [1st Dist] May 3, 2007).................................................3

*Cain v. Rust Industrial Cleaning Services, Inc.*, 969 S.W.2d 464
(Tex. App. – Texarkana 1998)............................................................................15

*Carty v. Hess Oil Virgin Islands Corp.*, 78 F. Supp. 2d 417 (D.V.I. 1999)...................................2

*Certain Underwriters at Lloyd's London v. Bunker Hill View Guest House, Inc.*,
No. 2008-26, 2008-27, 2008 WL 5455401 (D.V.I. Dec. 31, 2008)...........................................2

*Chaveriat v. Williams Pipe Line Co.*, 1994 U.S. Dist. LEXIS 15082
(N.D. Ill. Oct. 18, 1994)..................................................................................26

*City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007) .....................25

*Continental Building Corp. v. Union Oil Corp.*, 504 N.E.2d 787 (Ill. App. 1st dist 1987)...........28

*Deluca by Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941 (3d Cir. 1990)...........................10

*District of Columbia v. Peters*, 527 A.2d 1269 (D.C. 1987) .........................................15

*Eddy v. Virgin Islands Water & Power Authority*, 369 F.3d 227 (3d Cir. 2004) ...................30, 31

*El v. Southeastern Pennsylvania Transportation Authority*, 479 F.3d 232 (3rd Cir. 2007) ...........3

*Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004)..................................................8

*Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp. 2d 1255 (W.D. Mo. 2001) ...............................28

*Florida East Coast Properties, Inc. v. Metropolitan Dade County*,
572 F.2d 1108 (5th Cir. 1978) ..........................................................................30

*Gannett Outdoor Co. of Texas v. Kubecza*, 710 S.W.2d 79 (Tex..................................................15

*Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419 (6th Cir. 2009)........................................4, 17

*Haase v. Gov't of Virgin Islands*, No. 2002-0110, 2008 WL 939024, 1, 1
(D.V.I. Apr. 4, 2008)........................................................................................................................2

*Hager v. Waste Technologies Industries*, No. 2000-CO-45, 2002 WL 1483913
(Ohio App. Jun. 27, 2002) .............................................................................................................12

*Heller v. Shaw Industries*, 167 F.3d 146 (3d Cir. 1999)................................................................10

*Henry et al., v. St. Croix Alumina, LLC, et al.*,
2008 U.S. Dist. LEXIS 43755 (D.V.I. June 3, 2008) .....................................................................3

*Heywood v. Cruzan*, 792 F.2d 367 (3d Cir. 1986)..................................................................31, 32

*HRD v. Lux Int'l Corp.*, *No. H-06-0730*, 2007 U.S. Dist. LEXIS 51688 (July 17, 2007).............16

*Hughes v. Lamay*, 89 Conn. App. 378 (2005) ................................................................................3

*International Islamic Community Of Masjid Baytulkhaliq, v. U.S*,
981 F. Supp. 352 (D.V.I. 1997) ....................................................................................................31

*Kemmerer v. State Farm Insurance Company*, No. 01-5445,
2004 U.S. Dist. LEXIS 2645 (E.D. Penn. Jan. 16, 2004) ............................................................10

*Kramer v. Angel's Path, LLC*, 882 N.E.2d 46 (Oh. App. (Erie) 2007) .........................................9

*Kramer v. Government of Virgin Islands*, 479 F.2d 350 (3rd Cir. 1973) ....................................29

*Lempert v. Singer*, 766 F. Supp. 1356 (D.V.I. 1991)..............................................................31, 32

*Mathes v. Century Alumina Co. et al.*, No. 2005/0062,
2008 U.S. Dist. LEXIS 90087 (D.V.I. Oct. 31, 2008).............................................................23, 28

*Mendez v. Hovensa*, No. 02-0169, 2008 WL 803115 (D.V.I. Mar. 24, 2008) ...............................2

*Morgan v. High Penn Oil Co.*, 77 S.E.2d 682 (N.C. 1953).........................................................29

*National Telephone Cooperative Associate v. Exxon Corp.*,
38 F. Supp. 2d 1 (D. D.C. 1998)....................................................................................................15

*O'Connor v. Boeing, No. CV97-1554 et al.*,
2005 U.S. Dist. LEXIS 46226 (C.D. Cal. Aug. 18, 2005)............................................................15

*In Re Paoli*, 916 F.2d 829 (3d Cir. 1990) ....................................................................................10

*In Re Paoli Railroad Yard PCB Litigation*,
2000 U.S. Dist. LEXIS, 12993 (E.D. Pa. Sept. 6, 2000) ...............................................7

*Priory v. Borough of Manasquan*, 120 A.2d 625
(Superior Court of New Jersey Appellate Division 1956).............................................2

*Sanders v Rosenberg*, No. 06-1406, 2008 U.S. Dist. LEXIS 29581 (D.N.J. Apr. 10, 2008) ........10

*Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1567 (N.D. Ga. 1995) ...........................................11

*Smith v. Carbide & Chemicals Corp.*, 507 F.3d 372 (6th Cir. 2005) ...........................................26

*Smith v. Elias*, No. 56/2003, 2007 WL 4209701 (V.I. Super. Oct. 11, 2007) ..............................31

*South Cambden v. Campbell*, 2006 U.S. Dist. LEXIS 45765 (D.N.J. Mar. 31, 2006) .................13

*St. Croix Renaissance Group, LLLP, et al. v. St. Croix Alumina, LLC, et al.*, No. 2004/67 ........18

*Stockdale v. Agrico Chemical Company*, 340 F. Supp. 244 (N.D. Iowa 1972)............................29

*Tabuteau v. London Guarantee & Accident Company, Ltd.*, 40 A.2d 396 (Penn. 1945) ..........8, 20

*In Re TMI General Public Utilities Corp.*, 67 F.3d 1103 (3d Cir. 1995) ....................................11

*Torres v. Bennett*, 13 V.I. 443 (V.I. 1977)..................................................................................22

*In re Tutu Wells Contamination Litigation*, 846 F. Supp. 1243 (D.V.I. 1993)............................24

*Wade-Greaux v. Whitehall Laboratories, Inc.*, 874 F. Supp. 1141 (D.V.I. 1994).......................11

*Wisnewski v. Johns-Manville*, 812 F.2d 81 (3d Cir. 1987).........................................................31

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) .......................................................................................................2

## MISCELLANEOUS

Restatement (Second) of Torts...........................................................................20, 21, 25

58 Am. Jur. 2d Nuisances § 13 ..........................................................................................29

## I.    Introduction

Defendants' Motion for Summary Judgment Based on Plaintiffs' Lack of Necessary Evidence ("Joint Motion") suffers from fatal flaws.[1] First, despite the questions of fact as to the composition of red dust, Defendants have ***admitted*** that it at least contained bauxite blown from the refinery and contaminating Plaintiffs' neighborhoods.[2] Thus, for the purposes of summary judgment, it is established that at least bauxite inundated Plaintiffs' homes and damaged personal property. Plaintiffs further claim that the red dust that inundated them also contained red mud, which remains a question of fact.[3] Second, Plaintiffs can overcome summary judgment on their claims for personal injuries and property damages without ***any*** expert testimony because the jury is capable of understanding that red dust (i.e., at a minimum, bauxite) can cause the common types of symptoms—skin rashes, eye irritations, coughing, and the like—that Plaintiffs suffered. The jury is also capable of determining, without expert testimony, whether the red dust from the refinery stained Plaintiffs' personal belongings, homes, and cisterns.  Third, the Joint Motion ignores the various admissions in its own pleadings in related litigation, the testimony of its own employees, and its own documents. These admissions, alone, create genuine issues of material fact on many of the claims for which Defendants now seek summary judgment. Therefore, this Court should deny Defendants' Joint Motion.

---

[1] Defendants Alcoa, Inc. ("Alcoa"), St. Croix Alumina, LLC ("SCA"), and Glencore Ltd. ("Glencore") filed their joint Mot. for Summ. J. Based on Plaintiffs' Lack of Necessary Evidence (Doc. No. 1313) on May 22, 2009.  For ease of reference, this motion will be referred to herein as the "Joint Motion."

[2] Plaintiffs incorporate by reference the following: (1) Pls.' Statement of Material Facts in Opp. to Defs.' Mot. for Summ. J. Based on Plaintiffs' Lack of Necessary Evidence; (2) the Decl. of Lee J. Rohn ("Rohn Decl.") in Supp. of Pls.' Resp. and Mem. in Opp. to Defs.' Mot. For Summ. J. Based on Plaintiffs' Lack of Necessary Evidence and Pls.' Mem. and Resp. to Alcoa, Inc. and St. Croix Alumina's Mot. for Summ. J. on Plaintiffs' Class Claims For Injunc. Relief (July 22, 2009), filed herewith.  All exhibits referenced herein are attached to the Rohn Decl.

[3] Henry Aff. ¶¶ 8-13, attached as Exhibit 2; K. Williams Aff. ¶¶ 7-14, attached as Exhibit 3; Browne Aff. ¶¶ 8-9, 17, attached as Exhibit 6; Drew Aff. ¶ 5, attached as Exhibit 9; Acosta Aff. ¶¶ 3-6, 8, attached as Exhibit 11; Glasgow Aff. ¶¶ 3-7, attached as Exhibit 13; Camacho Aff. ¶ 7, attached as Exhibit 23; Malaykhan Aff. ¶¶ 3-9, attached as Exhibit 25; Rosa Aff. ¶¶ 4-6, 12, attached as Exhibit 28; Rodriguez Dep. 35:17-37:23, June 26, 2003, attached as Exhibit 18; K. Williams Dep. 33:14-24; 58-16-59:2, Mar. 22, 2000,  attached as Exhibit 4; Camacho Dep. 145:21-148-12; 157:12-158:1, June 25, 2003, attached as Exhibit 24; Cheddie Dep. 40:14-46:25; 183:16-25; 188:11-190:3, June 23, 2003, attached as Exhibit 27.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
2

## II.    The Court Should Only Consider Facts and Inferences that Favor Plaintiffs in Determining Whether Summary Judgment is Proper.

"The standard for awarding summary judgment is well-worn: it is fitting when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"[4] The movant "has the initial burden of showing the absence of material fact in dispute, and the court must consider all evidence in the light most favorable to the non-moving party," giving the non-movant "the benefit of all reasonable inferences."[5]

## III.    There Are Genuine Issues of Material Fact Regarding the Cause of Plaintiffs' Personal Injuries and Property Damages.

Defendants argue that Plaintiffs' claims for personal injury and property losses must fail without expert testimony, but expert testimony is not required in this case. It is well-established that a plaintiff may prove causation by *either* direct or circumstantial evidence, which are equally forceful under the law.[6]

## A.    There are Material Facts Showing that Dust from the Refinery Caused Plaintiffs' Injuries.

Courts do not require expert testimony to establish causation in cases in which the injuries are so common that a jury or judge can easily understand them,[7] or where there are no other

---

[4] *El v. Southeastern Pennsylvania Transportation Authority*, 479 F.3d 232, 237 (3d Cir. 2007) (quoting Fed. R. Civ. P. 56(c)); *see also Haase v. Gov't of Virgin Islands*, No. 2002-0110, 2008 WL 939024, *1, *1 (D.V.I. Apr. 4, 2008) (using the exact same standard); *Mendez v. Hovensa*, No. 02-0169, 2008 WL  803115, *1, *1 (D.V.I. Mar. 24, 2008) (citing the same standard and reciting only those facts and inferences supporting nonmovant.)

[5] *Carty v. Hess Oil Virgin Islands Corp.*, 78 F. Supp. 2d 417, 421 (D.V.I. 1999); *Certain Underwriters at Lloyd's London v. Bunker Hill View Guest House, Inc.*, No. 2008-26, 2008-27, 2008 WL 5455401, *1, *1 (D.V.I. Dec. 31, 2008).

[6] *Newton v. Gov't of the Virgin Islands*, No. 2001/67, No. 103/1999, 2005 WL 4850303, *1, *4, n.8 (D.V.I. Sept. 19, 1995) (designated for publication) (quoting *Gov't of V.I. v. Bradshaw*, 569 F.2d 777, 779 (3d Cir. 1978) for the proposition that causation can be proven by either direct or circumstantial evidence).

[7] *See Hughes v. Lamay*, 89 Conn. App. 378, 381-82 (2005) ("[w]hen the causation issue involved goes beyond the field of ordinary knowledge and experience of judges and jurors, expert testimony is required. . . Expert testimony is not required, however, when the medical condition is obvious or common in everyday life. . . Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief." (citations and internal quotes omitted).)

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
**3**

likely alternative causes for the injuries.[8] Expert testimony is unnecessary in this case because Plaintiffs' injuries are understood by jurors, are readily traceable to the red dust from the refinery, and have no likely alternative cause.

**(1) There are disputed material facts within the jury's understanding showing that Plaintiffs suffered from common injuries caused by red dust from the Refinery.**

In this case, Plaintiffs' injuries are well within the typical jury's understanding. The St. Croix Alumina ("SCA") Refinery is located just south of several residential neighborhoods.[9] The refinery used red-colored ore called bauxite as a raw material and produced a red substance called "red mud" as a byproduct in the alumina refining process.[10] The bauxite was stored in a steel A-frame structure with plastic sheets on the sides, called the bauxite storage shed.[11] Only three years before Georges, Hurricane Marilyn had damaged the roof of the bauxite storage shed.[12]

Defendants stacked the red mud in open uncovered piles up to 120 feet high near the neighborhoods.[13] For years before Georges, the uncovered red mud piles often emitted fugitive dust when winds blew across the refinery or on the frequent occasions when SCA ran bulldozers

---

[8] *See Bowler v. Metro. Transit Authority of Harris County,* No. 01-06-0053-CV, 2007 WL 1299803 (Tex. App.—Hous. [1st Dist] May 3, 2007) (mem. op.) (concluding that medical testimony is not necessary when the record clearly identifies only one cause of the injuries).

[9] Arthur D. Little, *Environmental Due Diligence Assessment* (August 2001 ) at 27 ("Little Report"), attached as Exhibit 31; *see also* Notice of Violation, Order for Corrective Action, and Notice of Opportunity for Hearing (Oct. 21, 1998) (DPNR 000706-713), attached as Exhibit 40 (referencing neighborhoods adjacent to the refinery); *see also* EPA Memorandum, Oct. 26, 1998, at 1, attached as Exhibit 64 (there are residential communities just north of the refinery).

[10] *See* Exhibit 31 at 27; *see also Henry et al., v. St. Croix Alumina, LLC, et al.*, 2008 U.S. Dist. LEXIS 43755, *1, *4 (D.V.I. June 3, 2008) (explaining that Glencore supplied bauxite, a red-colored ore, to the refinery, which extracted the alumina and left a similarly-colored substance called red mud behind as its waste product).

[11] Pedersen Dep. 62:11-63:10, Apr. 25, 2002, attached as Exhibit 45 (the bauxite storage shed had plastic sheets on its sides to stop airflow); Black Dep. 110:3-11, Apr. 25, 2002, attached as Exhibit 32 (the bauxite storage shed was 87 feet high); Defs.' Statement of Undisputed Facts (Doc. No. 1314) ("Defs.' Statement of Facts") at ¶ 6.

[12] Exhibit 32 at 101:18-21 & 103:20-22.

[13] *See* Exhibit 32 at 169:13-170:2; F. Williams Dep. 99:8-14, June 17, 2005, attached as Exhibit 47; *see also* Exhibit 31 at 7 ("Much of the current bauxite residue disposal area is uncovered and contains several steep, unvegetated slopes.") and 67 ("Since the hurricane, the facility has adopted the policy of covering piles of material with plastic in case of predicted high winds or storms."); *see also* Mem. Op., Aug. 10, 2007 at 27 (Doc. No. 1125)  ("Further, it is undisputed that the red mud was also stored in large mud piles outside of the facility in an open, obvious, and uncovered condition.").

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
4

over them.[14] Prior to Georges, residents complained about red mud being blown into their neighborhoods.[15] In 1994, a DPNR field inspection found evidence of dust emissions from the red mud piles.[16] There had also been numerous reports of water causing the erosion of red mud during storm events less severe than the hurricane.[17] St. Croix Alumina itself admitted that a major community concern is fugitive emissions from red mud dusting.[18]

Defendants' own Material Safety Data Sheet ("MSDS") for red mud states that it can cause "severe irritation and burns [of eyes], especially when wet," "can cause severe irritation [of skin], especially when wet," and "can cause irritation of the upper respiratory tract."[19] It also

---

[14] *See* O'Neale Dep. 55:14-21, Jan. 25, 2002, attached as Exhibit 46 (admitting that the red mud piles were regularly re-worked by bulldozers); Exhibit 47 at 154:24-157:25; 162:3-163:7; 162: 3-163: 7; 166:1-13; 168: 3-169: 25; 171:3-172:3; 173:3-15; 22:3-24; 247:5-21; 262:9-263:12. (admitting dust is emitted from the red mud piles and emissions can be caused by winds or mechanical manipulations, like bulldozing); *see also* Exhibit 2 at ¶¶ 5-7; Exhibit 3 at ¶¶ 4-5; Exhibit 11 at ¶ 2; Exhibit 28 at ¶¶ 4-5; Exhibit 13 at ¶ 3; Exhibit 25 at ¶¶ 4-5; Exhibit 23 at ¶ 2 (testifying that dust escaped the red mud piles before Hurricane Georges when Defendants' used bulldozers or strong breezes blew).

[15] *See e.g.* Staff Recommendation, Major CZM Permit No. CZX-25-94L Expansion of Red Mud Storage Area (Sept. 6, 1994) at Klepp 0853-0854, attached as Exhibit 65 (noting that residents complained in Aug. & Sept. 1994 about red dust from the alumina refinery contaminating their cisterns and homes and causing skin rashes and asthma); "Site Assessment for the Vialco Facility St. Croix, U.S. Virgin Islands," dated Nov. 1995, Prepared for Alcoa by Geraghty & Miller, Inc., and produced in discovery by Defendant Alcoa as "AI000835-AI0001726" ("Geraghty & Miller Report"), attached as Exhibit 44 (neighbors complained about dust from red mud from 1993 to 1995 and these complaints were unresolved).

[16] *See* Exhibit 65 at Klepp 0853 (reporting that a site inspection of the red mud storage areas revealed that branches of vegetation in the area was stained red, and a drizzle during the inspection deposited red mud on the white shirts, faces and arms of staff indicating its presence in the air).

[17] *E.g.* Exhibit 44 at 6-3 (noting that storm water control measures to mitigate erosion from the red mud disposal areas seem inadequate).

[18] St. Croix Alumina, LLC's *Residue Disposal Facilities Master Plan* (June 2000) at F(III), attached as Exhibit 66 (reporting erosion of red mud from weather conditions less severe than hurricanes).

[19] Alcoa MSDS for Red Mud (Sept. 10, 1999) (AI000008-14), attached as Exhibit 54. Defendants' expert who performed medical examinations of four minor Plaintiffs testified that it is reasonable to rely on the bauxite and red mud MSDS's in determining which health conditions can be caused by exposure to red mud and bauxite. Mathew Dep. 231:21-232:3, Apr. 25, 2005, attached as Exhibit 63. She based this opinion on the training she received at Johns Hopkins School of Public Health, where she was taught about the utility, application, relevance and validity of MSDS's. *Id.* at 231:2-20. Defendants' expert also testified that it is reasonable to rely on red mud and bauxite MSDS's to determine what the adverse health effects are from exposure to same. Larsen Dep. at 84:10-85:7; 87:7-17, June 15, 2005, attached as Exhibit 60; *see also, Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419, 421-23 (6th Cir. 2009) (cited by Defendants and noting that plaintiffs don't have to prove with certainty that they were exposed to a particular chemical in a few pesticides because the law only requires proof by a preponderance of the evidence on negligence, and permitting a jury to base its finding of causation (without expert testimony) on information in MSDS sheets showing that the pesticides at issue could cause the same injuries the plaintiffs suffered).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
**5**

advises against skin and eye exposure to red mud.[20] Similarly, the MSDS for bauxite warns that it can cause irritation of the eyes, skin and upper respiratory tract.[21]

On September 21, 1998, Hurricane Georges hit the island of St. Croix. Weather data shows that the winds shifted direction and began blowing towards the neighborhoods.[22] Refinery workers employed by Defendants reported seeing the winds shift and blow huge amounts of bauxite out of holes in the roof of the storage shed towards the nearby neighborhoods, and some Plaintiffs saw red dust swirling about Plaintiffs' properties during the storm.[23] Plaintiffs observed and had contact with red water and red dust on their properties, in their cisterns, and inside their homes.[24] The red dust stained Plaintiffs' belongings and homes and got into their drinking and bathing water.[25]

After the hurricane, the Environmental Protection Agency ("EPA") Environmental Response Team Center collected cistern water samples from numerous properties on St. Croix, including

---

[20] Exhibit 54 at Al000010-11.
[21] Alcoa MSDS for bauxite dated Oct. 31, 2000 (Bates Nos. Al00001-07), attached as Exhibit 59.
[22] *See* Excerpts of Weather Data collected at the St. Croix Alumina Refinery during Hurricane Georges and produced by Defendant SCA in discovery bearing Bates Nos. SCX007394, SCX007548-55, attached as Exhibit 77.
[23] Defs.' Statement of Facts at ¶ 9 (Hurricane Georges struck on Sept. 21, 1998); Memo from Tyrone Benjamin, Environmental Specialist 11 of the DPNR, to Austin Moorehead, Director of the DPNR, (Oct. 5, 1998), attached as Exhibit 71 (indicating that two SCA employees admitted that they saw the winds change direction and blow bauxite towards the neighborhoods); *see also* Exhibit 18 at 35:17-37:23 (stating that during the storm, he looked out the windows and saw the red dust come over from the Refinery and coat the homes in the area.); Cirilo Dep. 47:11-48:24, June 27, 2003, attached as Exhibit 20 (testifying that she looked outside during the storm, and she saw red dust flying around); *see also* Defs.' Overview Br. (Doc. 1272) at 10 (admitting that bauxite escaped the shed); Joint Motion at 13, n. 5 (admitting that bauxite erupted from the shed during the hurricane).
[24] Henry Dep. 34:18-35:18; 48:15-19; 71:1-77:24, Mar. 20, 2000, attached as Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4 at 11:22-25; 13:6-14:2; 24:20-25:11, 33:14-24; 35:20-36:2; K. Williams Dep. 103:15-25, Dec. 10, 2003, attached as Exhibit 5; Exhibit 6; Browne Dep., 25:13-31:8, Mar. 22, 2000, attached as Exhibit 7; Browne Dep., 60:23-64:18, Dec. 9, 2003, attached as Exhibit 8; Exhibit 9; Drew Dep., 31:4-32:1, Dec. 10, 2003, attached as Exhibit 10; Exhibit 11; Acosta Dep., 26:20-27:18; 28:1-29:4, Oct. 15, 2002, attached as Exhibit 12; Exhibit 13; Glasgow Dep. 28:3-29:5; 33:2-21; 35:6-11; 58:16-64:10; 69:21-72:15, Oct. 16, 2001, attached as Exhibit 14; Viera Dep. 18:7-19:22, June 24, 2003, attached as Exhibit 16; Exhibit 18 at 35:17-37:23; 52:5-22; 69:16-71:8; Cirilo Aff., attached as Exhibit 19; Exhibit 20 at 47:11-48:24; 61:24-62:10; Tavarez Dep. 32:9-33:25, June 24, 2003, attached has Exhibit 22; Exhibit 23; Exhibit 24 at 22:12-29:3; 33:24-35:15; Exhibit 25; Malaykhan Dep. 20:3-18; 46:15-48:11, June 23, 2003, attached as Exhibit 26; Exhibit 27 at 18:22-21:2; 40:14-46:25; 49:2-51:3; 51:13-52:22; 53:4-56:7; 60:11-16; 94:8-97:8; 116:4-16; 141:8-142:21; 183:16-25; 188:11-190:3; Exhibit 28; Rosa Dep. 30:19-32:24; 33:5-34:23; 34:25-36:25, June 25, 2003, attached as Exhibit 29.
[25] *See* Exhibits 2, 3, 6, 9, 11, 13, 17, 19, 21, 23, 25, and 28.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
6

the homes of Plaintiffs Mercedes Rosa, Kelshall Cheddie, and Eyajie Malaykhan.[26]  The EPA

stated that certain cisterns may have been contaminated with bauxite based on the levels of

aluminum in the water.[27]  Defendants also ***admitted*** that Hurricane Georges carried ***red dust***

from the bauxite shed and the red mud piles at the refinery to the adjoining properties.[28]

Defendants voluntarily paid for some of the homes and cisterns affected by the red dust to be

cleaned,[29] but the cleaning crews' pressure-washing caused additional damage to Plaintiffs'

property, and did not completely remove the red dust.[30]  Others of Plaintiffs' homes were not

cleaned at all.[31]  Consequently, the red dust continued to blow around the neighborhood and

many Plaintiffs continued to use the contaminated cistern water for bathing and other needs for

days, and even weeks, after the storm.[32]

---

[26] Plaintiffs Cheddie and Malaykhan were married at the time. Defs.' Statement of Facts at ¶¶ 10-11; *see also* Mem. Op., Apr. 13, 2009 (Doc. No. 1304) at 4 ("The only direct evidence of the nature of that substance comes from post-hurricane testing conducted by the DPNR and EPA, which resulted in a finding that 'the red dust [deposited in the neighborhoods surrounding the refinery] is in fact bauxite.' Plaintiffs have proffered evidence that the agencies' test results also support a finding that some percentage of the deposited material may have been red mud.").

[27] EPA Memorandum at 1 (Apr. 13, 1999), attached as Exhibit 76.  But red mud also contains significant amounts of aluminum, so this result is equally consistent with the conclusion that red mud, or a combination of red mud and bauxite, contaminated the cisterns; *see* Exhibit 44 at 3-14 (noting that extremely elevated levels of aluminum in water is a signature of impacts to groundwater quality resulting from red mud disposal); *see also* Mem. Op., Apr. 13, 2009 (Doc. No. 1304) at 4 ("The only direct evidence of the nature of that substance comes from post-hurricane testing conducted by the DPNR and EPA, which resulted in a finding that 'the red dust [deposited in the neighborhoods surrounding the refinery] is in fact bauxite.' Plaintiffs have proffered evidence that the agencies' test results also support a finding that some percentage of the deposited material may have been red mud.").

[28] *See* Exhibit 71 (DPNR received reports from two SCA employees who observed bauxite escaping its storage building and blowing toward the neighborhoods); *see also* Exhibit 2 at ¶¶ 12-13; Exhibit 3 at ¶¶ 13-14; Exhibit 6 at ¶¶ 9, 17; Exhibit 9 at ¶ 5; Exhibit 11 at ¶ 8; Exhibit 13 at ¶¶ 6-7; Exhibit 23 at ¶ 7; Exhibit 25 at ¶ 9; and Exhibit 28 at ¶ 12 (testifying to admissions by SCA and/or Alcoa that the dust in their neighborhood came from the red mud piles at the Refinery).

[29] *See* SCA's Am. R. to Pls.' First Set of Interrog. at No. 13, p. 11, attached as Exhibit 30  ("St. Croix Alumina's insurer Liberty Mutual Insurance Company or its agents retained certain persons and entities to clean properties in the vicinity of St. Croix's premises following Hurricane Georges."); *see also* Exhibit 2 at ¶¶ 12-13; Exhibit 3 at ¶¶ 13-15; Exhibit 6 at ¶¶ 9, 12; Exhibit 9 at ¶ 5; Exhibit 11 at ¶ 8; Exhibit 13 at ¶¶ 7, 12; Exhibit 23 at ¶ 7; Exhibit 25 at ¶ 13, 14; and Exhibit 28 at ¶ 13 (testifying that Alcoa and/or SCA volunteered to pay for the clean-up and sent crews to the neighborhoods to pressure-wash the red stains off the homes and cisterns); *see also* Exhibit 31 at 67 ("Alcoa voluntarily physically cleaned impacted private homes and properties).

[30] Exhibit 2 at 49:15- 52:9; Exhibit 4 at 38:22-39:22; Exhibit 7 at 37:5- 42:23; Exhibit 12 at 64:8-65:9; Exhibit 14 at 47:14- 49:18, 50:1-51:6; Exhibit 20 at 81:6-82:23; Exhibit 27 at 51:13-52:22.

[31] Exhibit 10 at 39:9-40:7; Exhibit 9 at ¶ 7; Exhibit 11 at ¶ 9; Exhibit 23 at ¶ 7; Exhibit 28 at ¶ 13.

[32] *E.g.* Exhibit 2 at 49:15- 52:9; Exhibit 4 at 38:22-39:22; Exhibit 7 at 37:5- 42:23; Exhibit 12 at 64:8-65:9; Exhibit 14 at 47:14- 49:18, 50:1-51:6; Exhibit 20 at 81:6-82:23; Exhibit 27 at 51:13-52:22.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
7

Within one day to several months after Georges, Plaintiffs reported a number of similar symptoms including skin, eye, and respiratory tract irritations, headaches, and other common (but severe) maladies as a result of breathing in and touching the red dust and bathing in the contaminated cistern water.[33] They generally reported that the nature of these symptoms was more severe than what they normally experienced, and that they had not previously suffered from such problems during or after previous hurricanes. Plaintiffs also report severe emotional distress from their exposure to and fear of the red dust.[34]

It is common knowledge that dust can irritate the eyes, nose, throat, and skin. These everyday ailments are also familiar to the typical juror. Regardless of the composition of the red dust, and without any expert testimony, a reasonable jury could conclude from the evidence that (1) red dust containing bauxite and/or red mud blew into the neighborhoods during Hurricane Georges; (2) Plaintiffs were exposed to this red dust; and (3) the red dust caused and/or substantially contributed to Plaintiffs' personal injuries.[35]

**(2) Courts accept non-expert evidence on causation in cases involving obvious injuries.**

Although most toxic exposure cases involve injuries or disease processes that require specialized medical knowledge, cases with an "obvious causal relationship between the accident and the injury" do not required expert testimony.[36] "An obvious causal relationship exists when the injury is either an 'immediate and direct' or the 'natural and probable' result of the

---

[33] See Pls.' Statement of Material Facts in Opp. To Defs.' Mtn. for Summ. J. Based on Pls.' Lack of Necessary Evidence ("Pls.' Statement of Facts") at ¶¶ 36-51 and citations thereto, filed herewith.

[34] Id.

[35] In this case, although Defendants have suggested other possible causes (like other dirt or debris from the hurricane and an outbreak of conjunctivitis or "pinkeye") for some of the ailments Plaintiffs reported, none of Defendants' evidence or experts have pointed to any single factor that could have caused all of Plaintiffs' injuries and damages. None of the so-called alternatives can account for the fact that people who lived further away from the refinery did not experience the same problems as Plaintiffs, even though they also live in the region of the pinkeye outbreak and survived the hurricane. After examining Plaintiffs in this case, and/or preparing reports about their exposures, none of Defendants' experts have diagnosed any alternative proffered by Defendants as the actual cause of the Plaintiffs' symptoms. See, generally, Reports of Walter Larsen, collectively attached as 61 and Reports of Phillip Guzelian, collectively attached as Exhibit 62.

[36] In Re Paoli Railroad Yard PCB Litigation, 2000 U.S. Dist. LEXIS 12993 ,*6 (E.D. Pa. Sept. 6, 2000).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
8

complained of act. The injury and act must be so closely connected that a lay person could diagnose the causal connection."[37]

In *Ellis v. Gallatin Steel Co.*, fugitive dusts from two nearby plants caused various respiratory problems, headaches, sore throats and other ailments and interfered with the use and enjoyment of property.[38] The plaintiff's physical symptoms appeared within a month of the plants' openings and were worse than she had ever before experienced.[39] She identified both companies as the sources of the dust because their emissions were unique—one had red dust and the other had gray dust.[40] The *Ellis* court did not require the plaintiff to show that each type of dust caused her injuries: "The company offers no explanation . . . as to why Harsco's gray dust would interfere with Brashear's use and enjoyment of her property but Gallatin's red dust would not."[41] The *Ellis* defendants also complained that the plaintiff's expert failed to consider alternative sources that might have caused the dust, but the court found that the expert need not exclude all other possible causes of injury.[42]

This case involves injuries resulting from exposure to one or two types of red dust emitted from just one facility. Here, Plaintiffs have testified and the Defendants have admitted that the

---

[37] *Id.* at *6, n.8. In *Tabuteau v. London Guarantee & Accident Company, Ltd.*, 40 A.2d 396 (Penn. 1945) the plaintiff was injured while walking on a sidewalk and stepped on something that felt like a live electric wire. The court held that expert testimony is not necessary where an injury is so immediately and directly or naturally and probably the result of the accident that the connection between them does not solely depend on an expert. In this case, Plaintiffs experienced the type of symptoms commonly associated with dust exposure within a short time of their homes being coated in red dust from the nearby Refinery. The fact that so many Plaintiffs experienced similar maladies within the aftermath of the hurricane suggests that the injuries were immediately, directly, naturally, and probably the result of their exposure to the red dust.
[38] *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 466-67 (6th Cir. 2004).
[39] *Id.* at 466-67.
[40] *Id.* at 470. Although the plaintiff did offer expert testimony that the particulates on her property came from the two companies, the court characterized that testimony as "bolstering" evidence—suggesting that it was unnecessary for plaintiff's proof.
[41] *Id.*
[42] *Id.* at 470.

red dust came from the refinery.[43] Defendants have neither suggested nor proven any other possible source of **red dust** that could have impacted Plaintiffs during and after the storm. As in *Ellis*, Plaintiffs' ailments after the hurricane were also more severe than they had ever been before.  Also as in *Ellis*, the composition of the two red dusts is irrelevant since exposure to either dust could cause Plaintiffs' symptoms.[44] Thus, like in *Ellis,* the evidence demonstrates that there is, at a minimum, a genuine issue of material fact that the red dust came from Defendants' facility and interfered with Plaintiffs' use and enjoyment of their property, and destroyed or damaged Plaintiffs' personal property.

*Kramer v. Angel's Path, LLC* also illustrates the type of proof required in a case involving dust emissions from industrial sites.[45] In *Angel's Path,* residents alleged that construction of a nearby development emitted dust, dirt, and light that damaged and interfered with their enjoyment of their properties.[46] The homeowners contended that "their home was in the pathway of 'dirt and debris blown onto and into [their] home by the prevailing winds.'"[47] The plaintiffs in *Angel's Path*, like the Plaintiffs here,[48]  provided National Weather Service records showing the direction of the wind and reports by the local EPA office which concluded that the blown dust and dirt was of some concern to health and safety.[49] The *Angel Path* plaintiffs had no expert testimony and did not identify the chemical makeup of the dirt or debris. Nonetheless, the court rejected the defendants' summary judgment motion based on the plaintiffs' own testimony and

---

[43] *See supra* notes 3, 28, and 29 (Plaintiffs' testimony that the red dust came from the Refinery, that Defendants' admitted to them that the red dust came from the red mud piles, and that Defendants admitted that bauxite escaped during the hurricane); *see also* Defs.' Overview Br. (Doc. 1272) at 10 (admitting that bauxite escaped the shed); Joint Motion at 13, n. 5 (admitting that bauxite erupted from the shed during the hurricane)

[44] *See* Exhibits 54-59 (MSDS sheets identifying the health hazards of bauxite and red mud).

[45] *Kramer v. Angel's Path, LLC,*  882 N.E.2d 46 (Oh. App. (Erie) 2007).

[46] *Id.* at 50.

[47] *Id.* at 54.

[48] *See supra* note 22 (weather data confirming that the winds shifted towards Plaintiffs' properties.); *see supra* note 27 (showing that the EPA found contamination of Plaintiffs' cisterns); *see also* Exhibit 40 (finding public health concerns).

[49] *Id.* at 54.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
10

did not require them to eliminate every other possible source because, like the Plaintiffs here, the

*Angel Path* plaintiffs stated that it was obvious where the pollutants came from.

Unlike *Ellis* and *Angel Path*, Defendants' authorities involve advanced injuries and/or

illnesses resulting from more complex exposures, including radiation, adverse drug reactions,

mold toxicity, and invisible volatile organic compounds.[50] Defendants cite cases involving

radiation, which occurs naturally in the environment and requires specialized medical knowledge

to understand its effects.[51] Similarly, Defendants' pharmaceutical cases require expert testimony

on adverse medical reactions.[52] Defendants also cite cases arising from mold exposures, in which

there was ample evidence of possible alternative causes of mold growth.[53] However, in this case,

there is no likely or probable alternative source of red dust or cause of Plaintiffs' injuries; rather,

the red dust from the refinery is the obvious cause of Plaintiffs' injuries and damages.  *Heller v.*

*Shaw Industries,* 167 F.3d 146 (3d Cir. 1999) and *Satterfield v. J.M. Huber Corp*., 888 F. Supp.

1567 (N.D. Ga. 1995), which Defendants reference, arise from exposures to toxic substances that

were imperceptible to human senses and caused both personal injuries and property damages

through constant exposures over a period of time.  The fact that these toxins were insidious was

significant to the outcome of those cases.  Here, Plaintiffs were exposed to an obvious and

---

[50] Joint Motion at 7.
[51] *In Re TMI Gen. Pub. Utils. Corp.,* 67 F.3d 1103, 1118-19 (3d Cir. 1995) and *In Re Paoli,* 916 F.2d 829 (3d Cir. 1990) involved a nuclear power plant's alleged release of radiation. Unlike the radiation in these cases, there is no evidence here that itinerant red dust occurs naturally in the local environment.  Additionally, unlike dust, the medical affects of radiation exposure are not within the normal experience of the average juror. Therefore, the reasoning of the *In Re TMI* and *In Re Paoli* courts for requiring expert testimony does not apply to this case.
[52] *Wade-Greaux v. Whitehall Labs., Inc.,* 874 F. Supp. 1141, 1475 (D.V.I. 1994) and *Deluca by Deluca v. Merrell Dow Pharms., Inc*. 911 F.2d 941, 958 (3d Cir. 1990) are both products liability cases against pharmaceutical manufacturers involving very complex medical injuries. Both cases summarily assume that expert testimony is needed because of the nature of the injuries.
[53] *Sanders v Rosenberg*, No. 06-1406, 2008 U.S. Dist. Lexis 29581, *1 (D.N.J. Apr. 10, 2008) and *Kemmerer v. State Farm Insurance Company*, No. 01-5445, 2004 U.S. Dist. Lexis 2645 (E.D. Penn. Jan. 16, 2004) both involved mold exposures. The courts in these cases found that expert testimony was necessary to explain the development of mold and its numerous possible causes.  The red dust that invaded Plaintiffs' homes is unlike mold.  Mold is a common biological organism that grows under numerous and typical household environments.  The defendants in the mold cases provided ample evidence of legitimate and likely alternative causes for the growth of the mold.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
11

notorious contaminant (red dust) as the result of a single, traceable incident.  Thus, Defendants'

reliance on these cases is misplaced.

Neither the *Angel Path* nor the *Ellis* courts required the plaintiffs to offer expert testimony

on the dosage or composition of the alleged toxins or on possible alternate causes for which there

was no substantiating evidence. Like the exposures in both *Angel Path* and *Ellis*, in this case,

Plaintiffs' injuries and damages were obviously linked to the red dust, they arose within a short

time frame of exposure to red dust, and they were consistent with the injuries associated with red

dust.[54] More specifically, Plaintiffs' injuries in this case arose after exposure to large amounts of

red dust from a hurricane; the Defendants' MSDS sheets warned about the same injuries

Plaintiffs sustained; the Plaintiffs live within the path of Georges' winds; Defendants admitted

that their red dust invaded Plaintiffs' properties; and many Plaintiffs suffered similar injuries.

**B.      There are Disputed Material Facts With Respect to the Cause of Plaintiffs' Property
         Damages.**

Defendants forcefully argue that Plaintiffs' may not recover their property damages without

expert evidence linking the red dust from their facility to Plaintiffs' properties.  However, unlike

all of the cases Defendants' cite, expert testimony is unnecessary here because the pollutant in

this case has a calling card—its red color—and Defendants have admitted that red dust from

their facility contaminated Plaintiffs' homes. There is evidence raising a genuine issue of

material fact that red dust (regardless of whether it was bauxite or red mud) stained Plaintiffs'

real and personal property beyond any damage normally expected from a hurricane.  A jury does

not require expert testimony to understand that red dust stained walls, roofs, cisterns, clothes, and

---

[54] *See In Re Paoli Yard PCB Litigation*, 2000 U.S. Dist. LEXIS at *6.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
12

other personal belongings.   At a minimum, this evidence precludes summary judgment on

Plaintiffs' property claims.[55]

In *Hager v. Waste Technologies Industries*, cited by Defendants, the plaintiffs alleged that

imperceptible emissions from a hazardous waste facility contaminated the air, water, and land.[56]

The court held that the plaintiffs only assumed that those emissions came from the defendant's

facility.[57] *Hager*, like all cases involving imperceptible contaminants, is distinguishable because

Plaintiffs here have eyewitness testimony and the admissions of Defendants confirming that

bauxite and red mud left Defendants' facility and landed on Plaintiffs' properties during the

hurricane.[58]

In *South Cambden v. Campbell*, also cited by Defendants, the plaintiffs claimed a facility's

dust emissions were a nuisance.[59] Unlike this case, *Campbell* involved numerous facilities that

produced the same kinds of emissions, and the court found that the plaintiffs could not determine

which facility the emissions came from.[60] In this case, there are genuine issues of material fact

regarding the cause of Plaintiffs' property damages. Defendants have admitted red dust from

their refinery landed on Plaintiffs' homes.[61] Additionally, Plaintiffs testified that the red dust

---

[55] Defs.' Overview Br. (Doc. 1272) at 10 (admitting that bauxite escaped the shed); Joint Motion at 13, n. 5 (admitting that bauxite erupted from the shed during the hurricane).
[56] *Hager v. Waste Technologies Industries*, No. 2000-CO-45, 2002 WL 1483913, *1, *1 (Ohio App. Jun. 27, 2002); *see also Banford v. Aldrich Chemical Company, Inc.*, No. 03-CV-8704, 05-CV-7221, 06-CV-4053, 2006 WL 4453926, *4453926 (trial order) (Ohio Com. Pl. Sept. 22, 2006) (declining to extend *Hager*).
[57] *Hager*, 2002 WL 1483913, at *4, *6.
[58] *See* Defs.' Overview Br. (Doc. 1272) at 10 (admitting that bauxite escaped the shed); Joint Motion at 13, n. 5 (admitting that bauxite erupted from the shed during the hurricane); Exhibit 71 (DPNR received reports from two SCA employees who observed bauxite escaping its storage building and blowing toward the neighborhoods); *see also* Exhibit 2 at ¶¶ 12-13; Exhibit 3 at ¶¶ 13-14; Exhibit 6 at ¶¶ 9, 17; Exhibit 9 at ¶ 5; Exhibit 11 at ¶ 8; Exhibit 13 at ¶¶ 6-7; Exhibit 23 at ¶ 7; Exhibit 25 at ¶ 9; and Exhibit 28 at ¶ 12 (testifying to admissions by SCA and/or Alcoa that the dust in their neighborhood came from the red mud piles at the Refinery).
[59] *South Cambden v. Campbell*, No. 01-702 FLW, 2006 U.S. Dist. LEXIS 45765, *1 (D.N.J. Mar. 31, 2006).
[60] *Id.* at *6.
[61] *See supra* notes 3, 28, and 29 (Plaintiffs' testimony that the red dust came from the Refinery, that Defendants admitted to them that the red dust came from the red mud piles, and that Defendants admitted that bauxite escaped during the hurricane); *see also* Defs.' Overview Br. (Doc. 1272) at 10 (admitting that bauxite escaped the shed); Joint Motion at 13, n. 5 (admitting that bauxite erupted from the shed during the hurricane).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
13

from the refinery damaged their property.[62] Also, both the DPNR and the EPA confirmed that

red dust from the refinery contaminated the neighborhoods.[63]

Thus, there is evidence creating genuine issues of material fact that (1) bauxite, a red dust,

escaped from Defendants' refinery and contaminated Plaintiffs' neighborhoods;[64] (2) red dust

can cause Plaintiffs' injuries;[65] and (3) Plaintiffs' suffered the kinds of personal injuries and

property damage expected from exposure to red dust.[66]

### IV.      Material Fact Issues Exist on the Breach of the Relevant Standard of Care for Plaintiffs' Negligence and Nuisance Claims.

Defendants' argument that Plaintiffs may not maintain negligence or nuisance actions

without expert evidence establishing the relevant standard of care is flawed because: (1) the

Court never excluded Plaintiff's expert evidence establishing the standard of care and

Defendant's breach of that standard; (2) Plaintiffs' nuisance actions depend upon a proof of

negligence; and (3) Defendants violated a duty of care established by the law of the Virgin

Islands.

There is a genuine issue of material fact that red dust (regardless of whether it was bauxite or

red mud) irritated Plaintiffs' skin, eyes, and respiratory tracts and stained Plaintiffs' real and

---

[62] *See supra* note 23 (Plaintiffs' testimony that they saw the red dust from the Refinery flying about during the storm).

[63] *See supra* note 27 (showing that the EPA found contamination of Plaintiffs' cisterns); *see also* Exhibit 40 (finding public health concerns). In *Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1567, 1571 (N.D. Ga. 1995) the defendants identified numerous other potential sources of the plaintiff's injuries including various other facilities near the home, smoking, dust, and chicken houses on property and the plaintiffs' doctors testified that their exposure was consistent with those alternate sources. Although Defendants in this case have pointed to other possible sources that could have caused some of Plaintiffs' personal injuries, there is no evidence connecting those injuries to those causes. Also, in this case, there is no other possible explanation for the property damage in light of the circumstantial and direct evidence showing that red dust from the Refinery invaded Plaintiffs' homes.

[64] *See* Exhibit 76 (EPA Memo); *See* Exhibit 71 (DPNR received reports from two SCA employees who observed bauxite escaping its storage building and blowing toward the neighborhoods); *see also* Exhibit 2 at ¶¶ 12-13; Exhibit 3 at ¶¶ 13-14; Exhibit 6 at ¶¶ 9, 17; Exhibit 9 at ¶ 5; Exhibit 11 at ¶ 8; Exhibit 13 at ¶¶ 6-7; Exhibit 23 at ¶ 7; Exhibit 25 at ¶ 9; and Exhibit 28 at ¶ 12 (testifying to admissions by SCA and/or Alcoa that the dust in their neighborhood came from the red mud piles at the Refinery).

[65] *See* Exhibits 54-59 (MSDS sheets).

[66] *See* Pls.' Statement of Facts at ¶¶ 36-51 (testifying to damages).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
**14**

personal property beyond any damage normally expected from a hurricane.  A jury does not require expert testimony to understand that red dust caused Plaintiffs' physical symptoms and stained walls, roofs, cisterns, clothes, and other personal belongings.

### A. There are Material Facts Regarding the Standard of Care for the Negligence, Negligent Abatement, and Negligent Infliction of Emotional Distress Claims.

None of Defendants' cases support the position that expert testimony is ***always*** required to establish the standard of care in negligence actions, and the summary judgment evidence provides genuine issues of material fact on Plaintiffs' claims.

### (1) Plaintiffs' Expert Testimony Establishes a Breach of the Standard of Care.

Neither Defendants' motion to exclude Dr. Kleppinger nor the Court's order address Dr. Kleppinger's opinions that Defendants breached the relevant standard of care by failing to use available techniques to secure their bauxite and red mud to prevent transport during storms.[67] These opinions, unchallenged by the Defendants, support a finding that Defendants violated the relevant standard of care in failing to cover or otherwise secure the red mud piles and the bauxite storage shed before Hurricane Georges hit the island.

---

[67] *See* Defs.' *Daubert* Mtn. to Exclude the Reports, Opinions, and Testimony of Dr. Kleppinger (Dec. 12, 2008) (Doc. No. 1276) (not arguing at all that Dr. Kleppinger is not qualified to offer opinions regarding the standard of care or the breach of the standard, not attacking Dr. Kleppinger's methodology for determining that Defendants violated the standard of care, and not challenging the fit of Dr. Kleppinger's opinions on these issues); *see also* Mem. Op., Apr. 13, 2009 at 14-16 (excluding certain opinions offered by Kleppinger and not addressing or expressly excluding Kleppinger's opinions that there was a minimum standard of care in the industry and Defendants did not adhere to it); *see also* Expert Report of Edward W. Kleppinger (Apr. 10, 2003) at 2-13 (concluding that Defendants knew about the need to secure the dust from hurricane winds and failed to adhere to industry standards for doing so);  Supp'l Expert Report of Edward W. Kleppinger (Feb. 8, 2008) at 7, 9-10, & 12 (demonstrating that Defendants understood the need for and how to minimize dusting but chose not to); and Sec. Supp'l Expert Report Edward W. Kleppinger (Apr. 3, 2008) at 4 (concluding that documents authored by Alcoa employees explained how to minimize dusting), attached (respectively) as Exhibits 73-75.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
15

> **(2) Plaintiffs' Non-Expert Evidence Raises Material Factual Issues on the Standard of Care.**

Even Defendants' distinguishable authorities acknowledge that expert testimony is not necessary for acts within the realm of common knowledge and everyday experience;[68] instead, it is only needed if the subject is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average person.[69] Additional cases establish that familiar subjects do not require expert proof of a standard of care.[70]

The case law establishes that whether Defendants here should have taken some preventative measures to protect Plaintiffs from exposure to their bauxite and/or red mud is within the realm of knowledge of jurors. In *Gannett Outdoor Co. of Texas v. Kubecza*, not cited by Defendants, the plaintiff sued for damages caused when defendant's billboard fell on her home during Hurricane Alicia.[71] Without using any expert testimony, the plaintiff showed that: (1) the billboard was located on property adjacent to her home; (2) the defendant tracked the movement

---

[68] *See O'Connor v. Boeing*, No. CV97-1554 *et al.*, 2005 U.S. Dist. Lexis 46226, *1, *64-65 (C.D. Cal. Aug. 18, 2005) (acknowledging that not all cases require expert testimony, but holding that plaintiffs needed expert testimony on the standard of care for flushing rocket engines to prevent TCE contamination); *see also District of Columbia v. Peters*, 527 A.2d 1269 (D.C. 1987) (stating that expert testimony is only required when the case is so distinctly related to some science, profession, or occupation that it is outside the experience or knowledge of the average juror and holding that a plaintiff must present an expert witness on the standards for police training). In *National Telephone Cooperative Assoc. v. Exxon Corp.*, 38 F. Supp. 2d 1, 9-10 (D. D.C. 1998), the plaintiff sued a gasoline company for allowing gas to leak from underground storage tanks. The court concluded that expert testimony was necessary to explain certain scientific and technical information including how USTs operate, removal & installation of USTs, materials needed to prevent leaks, how frequent to test for leaks, and other similar subjects. In this case, however, although there is plenty of information available about both bauxite and red mud, that information is not relevant to the question of whether Defendants with knowledge of impending hurricanes should secure their raw materials and wastes properly to prevent them from migrating onto residential properties.

[69] *Cain v. Rust Industrial Cleaning Services, Inc.*, 969 S.W.2d 464, 468 (Tex. App.—Texarkana 1998). In *Cain*, cited by Defendants, a landowner contaminated soil with arsenic and hired a remediation company, which dug up arsenic-laden soil in a manner that allowed it to wash onto the plaintiff's property. It was important to the court that the plaintiff did not sue the landowner and that the property had previously been contaminated by the same toxic soil. Here, Plaintiffs sued the same defendants for the remediation as well as the initial contamination during the hurricane.

[70] *See Allison v. Manetta*, 933 A.2d 1197, 1207-08 (Conn. 2007) (citing examples where expert testimony is not required, including negligent boat operation; detrimental effects of marijuana; effect of operating gas station on traffic safety; injuries sustained on plaintiff's property caused by defendant's blasting; negligence in failing to erect porch railing; fence erected around blasting area insufficient to prevent injuries; obscenity of certain materials for minors; and difficulty of backing a vehicle out of a parking space).

[71] *Gannett Outdoor Co. of Texas v. Kubecza*, 710 S.W.2d 79, 83 (Tex. App. Houston [14th Dist.] 1986.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
16

of the hurricane and secured a number of other billboards; (3) witnesses testified that about six weeks before the hurricane struck, defendant received a report from an independent consultant recommending repairs to the sign; and (4) the defendant had not completed those repairs despite adequate time before the hurricane.[72] The court explained that the standard for ordinary care was simply what a reasonably prudent person would do in the same or similar circumstances.[73] In light of the defendant's total failure to prepare for the impending hurricane, the court found no need to require expert testimony on the standard of care and held that the evidence was sufficient to support negligence and gross negligence claims.[74] Similarly, In *HRD v. Lux Int'l Corp.*, cited by Defendants, the plaintiff criticized a company's hurricane preparation plan as inadequate because it did not include warning property owners that a hurricane was imminent.[75] Citing *Gannett,* the *HRD* court found that "Lux had a duty not to contribute through independent negligence to the expected effects of the hurricane." The *Gannett* defendants, like the Defendants in this case, took ***no steps*** to prepare for the hurricane. Taken together, these cases demonstrate that a jury does not require expert testimony to understand that a company must take ***some*** action to protect against the common effects of hurricanes.

As in *Gannett*, there is ample evidence (without the need for expert testimony) showing that a reasonably prudent company in Defendants' position would have secured the bauxite storage shed and the red mud piles before the arrival of Hurricane Georges. This evidence is set forth below.

---

[72] *Id.*

[73] *Id.* at 88.

[74] *Id.* at 90. *See also Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 421-23 (6th Cir. 2009) (In a case in which a pesticide company sprayed chemicals in a guest room and on personal belongings, the court held that a jury understands that it is unacceptable to fill a person's closed quarters with chemicals).

[75] No. H-06-0730, 2007 U.S. Dist. Lexis 51688, *1, *26-27 (July 17, 2007).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
17

> **(a)    A Jury Could Reasonably Conclude without Expert Testimony that Defendants Knew, Before Hurricane Georges, that Red Dust Could Escape the Refinery During a Storm.**

Years before Hurricane Georges hit St. Croix, Defendants understood that winds and rain from storms could carry large amounts of bauxite or red mud into adjoining neighborhoods.[76] In 1977, a report by Dames & Moore informed the owners and operators of the refinery about the need to control drainage, erosion, and "dust problems" from the red mud piles and the manner in which to accomplish such control.[77] In 1987, an Alcoa research scientist, Sam Ward, wrote that "dust control, primarily using sprinkler irrigation, will be a high priority on an operating dry disposal area" due to a red mud pile's susceptibility to wind erosion.[78] Ward also gave recommendations for available methods of controlling dust from red mud piles.[79] A 1989 report from Ormet Corporation issued to Glencore [then Clarendon] identified concerns about the ability of the bauxite storage building to withstand storm conditions and the potential "air pollution problem" posed by bauxite residue.[80] In 1991, SCA learned that residents living downwind of the refinery had complained about fugitive dust.[81] A 1994 government report observed that dust was "ubiquitous" at the refinery and that surrounding buildings, ground, and vegetation had been "stained red."[82] A 1995 Site Assessment Report informed Defendants that (1) nearby residents complained about dust from red mud between 1993 to 1995,[83] and (2) [s]torm water control measures to mitigate erosion from the Red Mud disposal areas seem

---

[76] Exhibit 45 at 66:3-11 (plant manager understood that the area was hurricane prone).

[77] Report by Dames & Moore to Martin Marietta Alumina (Oct. 5, 1977) (Bates Nos. SCA 000368-531.) ("Dames & Moore Report") at SCA 000451, 457, 432, attached as Exhibit 36; *see also* Exhibit 74 at 9-10, (the Dames & Moore Report explained the need and means for reducing dust emissions from the red mud piles).

[78] Ward, Sam C., *Reclaiming Bauxite Residue Disposal Areas in South-West Australia*, in Australia Mining Industry Council, Canberra, <u>Mining Rehabilitation '87</u> at 63(Tom Farrell ed., 1987), attached as Exhibit 33.

[79] *Id.* at 63-64.

[80] St. Croix Alumina Refinery Report to Clarendon, Ltd. (Bates Nos. G00207-68), attached as Exhibit 50.

[81] Exhibit 32 at 80: 12-20; *see also* Exhibit 73 at 2.

[82] Exhibit 65 at 4.

[83] Exhibit 44 Al000882 & Al000957.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
18

inadequate." [84] And, that same year, three years before Georges, Hurricane Marilyn damaged the roof of the bauxite storage shed.[85]

Indeed, Defendant SCA has admitted it is obvious that red mud could migrate off-site in recent filings in related litigation in this Court. *St. Croix Renaissance Group, LLLP, et al. v. St. Croix Alumina, LLC, et al.*, No. 2004/67, in the District Court of the Virgin Islands Division of St. Croix (the "SCRG" case) is a lawsuit involving SCA's sale of the facility in 2002. In these proceedings, Defendants' have insisted that there was no appreciable chance for dusty emissions from the red mud piles. However, in the SCRG case, SCA has taken the polar opposite position that it adequately **warned** SCRG that bauxite residue **could** escape the red mud piles. In the SCRG case, SCA relies upon the same evidence that Plaintiffs rely on in this matter and concludes: "The condition of the current red mud disposal area was open and obvious . . . .As a result . . . [SCRG] knew that 'there was a potential for bauxite residue migrating away from the bauxite disposal area.'" [86] In its Statement of Undisputed Facts in the SCRG case, SCA admits that:

- The 1995 Site Assessment Report showed that red mud had a pH in excess of 10 and that storm water control measures were inadequate to mitigate erosion from the red mud disposal areas. The pH of the groundwater near the old and current red mud piles were over 12.[87]
- The Little Report also acknowledged elevated pH levels in the groundwater beneath the red mud piles.[88]
- The Little Report noted the potential for erosion and migration of red mud from the current red mud disposal area.[89]
- SCA did grading work on the current red mud disposal area, which SCRG believed was poorly done and contributed to erosion in the area and the area "no longer reflected any containment" of the red mud in the disposal area.[90]

---

[84] *Id.* at 6-3 (AI0001362).
[85] Exhibit 32 at 101:18-21 & 103:20-22.
[86] *See* SCA's Statement of Undisputed Facts in the SCRG Case, attached as Exhibit 53, at ¶¶ 34-38, 43 (referencing the Little Report and the 1995 Assessment Report).
[87] *Id.* at ¶¶ 34, 43(f) (referring to the Geraghty & Miller Report, Exhibit 44, attached hereto)
[88] *Id.* at ¶ 44 (referring to the Little Report, Exhibit 31, attached hereto).
[89] *Id.* at ¶ 35.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
19

- "The condition of the current red mud disposal area was open and obvious. . . .As a result . . . [SCRG] knew that 'there was a potential for bauxite residue migrating away from the bauxite disposal area.'"[91]

These admissions, alone constitute genuine issues of material facts regarding the dangers associated with the red mud piles and bauxite, and Defendants' knowledge of those risks and the fact that the substances were likely to erode and migrate.

> (b)    **A Jury Could Reasonably Conclude without Expert Testimony that Red Dust is  Hazardous to Human Health.**

Defendants' own Material Safety Data Sheets (MSDS) state that bauxite and red mud are dangerous if inhaled.[92]  These MSDS's also state that exposure to bauxite and red mud causes eye, skin, and upper respiratory irritation, and they advise against exposure to these substances.[93] These admissions constitute genuine issues of material facts regarding the dangers associated with the red mud piles and bauxite, and Defendants' knowledge of those risks.

> (c)    **A Reasonable Jury Could Find, Without Expert Testimony, that Defendants Did Nothing to Prepare the Bauxite Shed or Red Mud Piles for Hurricane Georges, Despite this Knowledge.**

Defendants have **admitted** (and the DPNR confirmed) that SCA did nothing to secure the bauxite storage shed or the red mud piles in preparation for Hurricane Georges.[94]

---

[90] *Id.* at ¶ 36.

[91] *Id.* at ¶37-38.

[92] Mem. Op., Aug. 10, 1987 (Doc. No. 1125) at 23-24 ("[T]he MSDS adequately put VIALCO and St. Croix Alumina on notice regarding the dangerous conditions of bauxite."); *see also* MSDS (Sept. 10, 1999) (Al000008-14), attached as Exhibit 54; MSDS (Nov. 13, 1985) (Al000656-658), attached as Exhibit 55; MSDS (Nov. 3, 1987) (Al000671-674), attached as Exhibit 56; MSDS (Nov. 1, 1990) (Al000687-689), attached as Exhibit 57; MSDS (Mar. 31, 1990) (Al000696-700), attached as Exhibit 58; MSDS (Oct. 31, 2000) (Al00001-07), attached as Exhibit 59.

[93] *See* Exhibits 54-58 (Alcoa MSDS sheets indicating dangers of bauxite and red mud); *see supra* note 18.

[94] Exhibit 40 at II(9); Exhibit 32 at 119: 13-120: 1, 125: 4-7 (admitting that SCA took no steps to secure the bauxite shed before the hurricane); Exhibit 45 at 67:19-68:10 (admitting that no precautions were taken to secure red dust); *see also* Exhibit 73 at 5-9, 12-13 (despite knowledge of dangers posed by red dust, Defendants took none of the necessary precautions to protect nearby neighborhoods); Exhibit 71 (noting DPNR investigator's observation that Mr. Black reported to him that nothing was done to secure the bauxite storage shed because it was allegedly built to withstand hurricanes).

### (3) Defendants' legal duties also establish the standard of care.

The Restatement (Second) of Torts § 285 allows a court to determine the relevant standard of care by looking to laws, ordinances, and regulations.[95]   The Virgin Islands has set standards relating to the release of pollutants, and Defendants violated those standards here.

Shortly after Georges, complaints about red dust resulted in an investigation by the Virgin Islands Department of Planning and Natural Resources (DPNR). The DPNR found that red dust had contaminated neighborhoods, and it issued a Notice of Violation against St. Croix Alumina on October 21, 1998.[96] DPNR concluded that SCA's actions with respect to bauxite violated numerous statutes.[97] Thus, DPNR's Notice of Violation establishes the standard of care, that Defendants breached that standard, and that negligence per se is appropriate.   Additionally, Plaintiffs' physical injuries and property damages are within the realm of harms the local statutes are designed to protect—the kinds produced by airborne pollutants.

## B. Genuine Issues of Material Fact Exist Regarding Plaintiffs' Nuisance Claims.

Contrary to Defendants' claims, a plaintiff need not prove negligence to succeed on claims for public or private nuisance.   Moreover, Defendants' complete failure to weigh the relevant factors for public and private nuisances should preclude summary judgment.

### (1)  There are Genuine Factual Disputes on Plaintiffs' Private Nuisance Claims.

There a material fact issue, without any expert testimony, that red dust from the Refinery (regardless of whether it was bauxite or red mud) stained Plaintiffs' property and irritated their eyes, skin, and respiratory tract.   A plaintiff need not prove negligence to succeed on a private

---

[95] Comment (c) to the section explains that the court may, and in certain types of cases customarily will, adopt the requirements of the enactment. RESTATEMENT (SECOND) OF TORTS § 285, CMT. C. "The same is true of municipal ordinances and administrative regulations." *See Tabuteau v. London Guarantee & Accident Company, Ltd.*, 40 A.2d 396, 398 (Penn. 1945) (invoking § 285 to look to the law for the relevant standard of care).
[96] Exhibit 40 at II(2).
[97] Exhibit 40 at IV(2), (3).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
21

nuisance claim.[98]   Under Restatement (Second) Torts § 822, a private nuisance exists if (1) the invasion is substantial; (2) the actor's conduct is a legal cause of the invasion of another's interest in the private use and enjoyment of land;  and (3) the invasion is either: (a) intentional and unreasonable; or (b) unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.[99]

Section 825 defines intentional conduct: "An invasion of another's interest in the use and enjoyment of land is intentional when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct."  "[I]t is enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing such an invasion."[100]  Section 826 provides that "An intentional invasion of another's interest . . .is unreasonable . . unless the utility of the actor's conduct outweighs the gravity of the harm."[101]  Under § 827, the court must determine the gravity of harm by considering the extent of the harm involved; the character of harm; the social value of the type of use or enjoyment; the suitability of the particular use or enjoyment; and the burden on the person harmed of avoiding the harm.[102]  Section 828 outlines the factors for utility of the conduct, including the social value of the primary purpose of the conduct; the suitability of the conduct to character of locality; whether it is impracticable to prevent or avoid the invasion if the activity is maintained; and the suitability of the conduct to the character of the locality.[103]

Of all the factors for balancing the harm against the utility of the conduct, "the most significant factor" is the subject of § 830: "An intentional invasion of another's interest in the use

---

[98] *Torres v. Bennett,* 13 V.I. 443 (V.I. 1977).
[99] *Id.* at 454.
[100] *Id.* at 456.
[101] *Id.* at 457.
[102] *Id.*
[103] *Id.*

and enjoyment of land is unreasonable and the actor is liable when the harm is substantial and it would be practicable for the actor to avoid the harm in whole or in part, without undue hardship."[104] In *Torres v. Bennett*, the plaintiff sought damages and injunctive relief arising from the defendant's interference with the flow of surface waters over property.[105]  After evaluating the factors set out in the Restatement, the *Torres* court found that it would have been very simple for the defendant to avoid the nuisance and, absent that, the defendant's invasion was intentional as a result of its continuing nature.[106]

As in *Torres*, the evidence in this case satisfies the elements of a private nuisance claim based upon intentional conduct. First, regardless of whether the red dust was bauxite or red mud, Plaintiffs suffered a substantial invasion of their property by that red dust and the so-called "remediation."[107] Second, Defendants' failure to secure the bauxite and/or red mud was the legal cause of Plaintiffs' injuries.[108] Third, Defendants' invasion was intentional because they were substantially certain that Plaintiffs would suffer this harm if they failed to secure the bauxite and/or red mud.[109]  Because Defendants' conduct was "intentional," as that term is defined in the Restatement section at issue, it is automatically unreasonable unless the utility of the conduct outweighs the gravity of the harm. However, the fourth, and most significant factor, in that balancing test is that it would have been simple for Defendants to fix the bauxite storage unit and to properly secure the red mud so that it did not blow into the nearby neighborhoods.[110] The

---

[104] *Torres v. Bennett,* 13 V.I. at 457 (quoting the Rest. 2d Torts § 830).
[105] *Id.* at 445.
[106] *Id.*
[107] *See supra* notes 23-24 & 29-34 (describing the torrents of red water and substantial amounts of red dust that coated Plaintiffs' homes and properties, how the red dust precluded Plaintiffs from enjoying their homes for a considerable time after the hurricane, how Defendants' "cleaning" crews caused additional damage, how Plaintiffs suffered severe physical symptoms from exposure to the red dust, and how Plaintiffs suffered emotional distress).
[108] *See supra* Section III (describing evidence that Defendants proximately caused Plaintiffs' injuries).
[109] *See supra* Section IV(A)(2)(a)-(c) (notes 76-95) (showing Defendants' knowledge  that the risks would occur).
[110] *See* Exhibit 45 at 53:5-54:25 (admitting that Defendants had discussions with the government after Georges regarding options to prevent bauxite from escaping building and that they eventually tarped it);  *see also* Exhibit 73

gravity of the harm to the Plaintiffs is severe. They suffered personal injuries for days to months, were in fear of the red dust, were unable to bathe, clean or cook with clean water, lost many of their personal belongings, and absorbed significant expenses in trying to rehabilitate their homes. The only utility of Defendants' failure to secure its bauxite and red mud piles was that it saved Defendants money. Thus, the relevant factors and facts weigh in favor of finding a nuisance in this case, and summary judgment should be denied.

**(2)     Genuine Factual Issues of Material Fact Exist Regarding Plaintiffs' Public Nuisance Claims.**

*Mathes v. Century Alumina Co. et al.*, involving the same refinery at issue here,[111] defines a public nuisance as "'an unreasonable interference with a right common to the general public.'"[112]    The Restatement provides the factors to be considered for determining reasonableness in § 821B(2): (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.[113]

---

at 2-13 (concluding that Defendants knew about the need to secure the dust from hurricane winds and failed to adhere to industry standards for doing so); Exhibit 74 at 7, 9-10, & 12 (demonstrating that Defendants understood the need for and how to minimize dusting but chose not to); Exhibit 75 at 4 (concluding that documents authored by Alcoa employees explained how to minimize dusting); *see generally* Exhibit 33 ("Ward Report"), Exhibit 44 ("Geraghty & Miller Report"), and Exhibit 36 ("Dames & Moore Report) (identifying dust-reducing methods); Exhibit 46 at 52:1-25; 60:7-22, Jan. 25, 2002 (wetting down method worked after Georges and it would have been possible to wet or tarp before Georges); Prusak Dep. 11, Feb. 22, 2002, attached as Exhibit 49 (Defendants could have made bricks from the red mud rather than stacked it in piles).
[111] *Mathes v. Century Alumina Co. et al.*, No. 2005/0062, 2008 U.S. Dist. LEXIS 90087, *1,*9 (D.V.I. Oct. 31, 2008).
[112] *Id.* at *29 (quoting Restatement 2d Torts §821B(1)).
[113] *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007), cited by Defendants,  addressed the concept of causation in the context of a public nuisance: "where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases." *Id.* 347-48. Nothing in this opinion

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
24

There are genuine issues of material fact such that a Virgin Islands jury should decide if Defendants' acts and/or omissions constitute a public nuisance. First, Defendants knew there was a significant risk that their neighbors would suffer health hazards and property damage as a result of their failure to secure their bauxite and/or red mud.[114] Second, the DPNR concluded that SCA's actions with respect to bauxite violated relevant ordinances and regulations, were injurious to the public welfare, to the health of human, plant or animal life, and to property, and unreasonably interfered with the enjoyment of life and property of the residents located near the refinery.[115] Third, Plaintiffs' physical injuries, emotional distress, and property loss demonstrated an unreasonable interference that lasted well beyond the day of September 21, 1998.[116] And, finally, Plaintiffs have also offered evidence that the red dust at the refinery is still not contained.  Indeed, the SCRG case arose as a result of a release of red mud in 2002.[117]

### V.  Genuine Factual Issues Exist With Respect to Plaintiffs' Claims for Abnormally Dangerous Activities.

Regardless of Defendants' insistence otherwise, the law of this jurisdiction is not that every legal business is always immune from strict liability for abnormally dangerous activities ("ADA").  Once again, Defendants neglected their burden as movants to engage in the proper analysis for determining ADAs in this jurisdiction.

### A. Defendants are Not Immune From Strict Liability Simply Because It is Generally Lawful to Operate an Alumina Refinery.

*In re Tutu Wells Contamination Litigation*,[118] a case Defendants rely on, denies Defendants' argument that running a lawful business constitutes per se immunity from abnormally dangerous

---

suggests that a plaintiff must always make a prima facie case of negligence before it can recover under a theory of public nuisance.
[114] *See supra* notes 76-95 (evidence demonstrating Defendants' knowledge of the risk).
[115] Exhibit 40 at IV(2), (3).
[116] *See* Pls.' Statement of Facts at ¶¶ 36-51 (describing Plaintiffs' physical injuries, emotional distress, and property losses).
[117] *See generally* Exhibit 53.
[118] *In re Tutu Wells Contamination Litigation*, 846 F. Supp. 1243, 1268 (D.V.I. 1993).

activity ("ADA") claims. *In Re Tutu Wells* involved the operation of underground storage tanks of petroleum (a legal business) in residential areas and near public wells supplying fresh drinking water.[119] The plaintiffs were " . . . correct when they argue[d] that the question is whether this storage of gasoline and toxic waste [above an aquifer] involved an appreciable risk of causing serious harm that could not be eliminated, regardless of the degree of care Defendants undertook."[120] Likewise, storing raw bauxite in an unenclosed storage shed and stacking red mud in open piles directly across the street from a residential neighborhood involved an appreciable risk of serious harm to Plaintiffs.

Restatement (Second) of Torts ¶ 519(1) states: "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."[121] Section 520 lists the factors to be considered in determining whether an activity is abnormally dangerous: (a) existence of a high degree of risk of some harm to the person, land, or chattels of others; (b) likelihood that the harm will be great; (c) inability to eliminate the risk through reasonable care;[122] (d) extent to which the activity is not a common usage; (e) inappropriateness of the activity for its location; and (f) extent to which its value to the community is outweighed by its risks.

Courts will normally not find an ADA unless several factors are present, but it is not necessary to have *every* factor in every case, especially where some factors weigh heavily in

---

[119] *Id.* at 1266.

[120] *Id.* at 1268.

[121] Sub-part (1) adds that "[t]his strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." Defendants do not address this prong in their motion.

[122] Defendants cite *Chaveriat v. Williams Pipe Line Co.*, 1994 U.S. Dist. LEXIS 15082, at *18 (N.D. Ill. Oct. 18, 1994) and *Anderson v. Farmland Industries, Inc.*, 136 F. Supp. 2d 1192 (D. Kan. 2001) to argue that the most important factor is whether reasonable care will eliminate the harm. However, these cases apply the laws of other jurisdictions and are contrary to the stated position in *Tutu Wells* that no one factor is singularly important.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
26

favor of finding an ADA.[123]  Ultimately, the *Tutu Wells* court concluded that the defendant's conduct in that case was an abnormally dangerous activity in light of the precious nature of the Virgin Islands' natural resources and the particular degree of risk associated with placing an underground storage tank above an aquifer.

## B.  The Relevant Factors Support a Finding of Strict Liability.

There was a significant risk that failing to secure the bauxite and red mud near the residential areas would cause substantial bodily and property harm to Plaintiffs.

### Factors (a) and (b): Risk of Harm.

Factors (a) and (b) weigh in favor of finding an ADA here. There was a significant risk that failing to secure the bauxite and red mud near the residential areas would cause substantial bodily and property harm to Plaintiffs.  As the evidence in Section III, *supra*, demonstrates, Defendants had actual knowledge that those living near the refinery would almost certainly suffer serious physical injuries and property damage unless they secured the bauxite storage shed and red mud piles before Hurricane Georges.[124]  Defendants failed to act in spite of this knowledge, and Plaintiffs suffered serious harm as a result.  In addition to their physical injuries, which were severe and, often, repetitive, Plaintiffs endured significant emotional distress and lost considerable property to the red dust and the subsequent "clean up efforts."

There are three problems with Defendants' citation of *Smith* v. *Carbide & Chemicals Corporation* regarding these factors.[125]  First, *Smith* applies Kentucky law, which has a more conservative standard for ADA claims than the Third Circuit.  Second, a crucial aspect of the *Smith* decision was the fact that the contaminants at issue in that case were imperceptible. Third, the Sixth Circuit reversed and remanded the lower court's decision regarding the plaintiff's

---

[123] *In re Tutu Wells Contamination Litigation*, 846 F. Supp. at 1268.
[124] *See supra* notes 76-95.
[125] *Smith* v. *Carbide & Chems. Corp.*, 507 F.3d 372 (6th Cir. 2005).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
27

nuisance and abnormally dangerous activity claims. The Sixth Circuit concluded that there was a fact issue on whether plaintiffs suffered a real and appreciable invasion of their property interests, and that they did not have to show a health hazard to prevail on their nuisance or strict liability claims.[126] Thus, even if the red dust is not a health hazard (which Plaintiffs deny), summary judgment on Plaintiffs' ADA claims should be denied because the dust damaged Plaintiffs' personal and real property and prevented them from using and enjoying their homes.

### Factor c: Inability to eliminate the risk with reasonable care.

Defendants complain it is inconsistent for Plaintiffs to argue, in support of their negligence claims, that Defendants failed to properly secure bauxite and red mud via the many ways available to do so and to also argue, in support of their ADA claims, that the risk from Defendants' unsecured bauxite shed and unenclosed red mud piles could not have been eliminated with reasonable care.[127] However, *Tutu Wells* demonstrates that these arguments are not inconsistent.  In *Tutu Wells*, the defendant placed the underground gas tank above an aquifer, and the court in that case found that there is no way to place a gas tank above an aquifer safely. This was true even though it would have been possible for the defendant to relocate the underground storage tank further away from the aquifer.  Similarly, in this case, the evidence shows, and common sense dictates, that Defendants could not have safely left the bauxite and red mud uncovered and in the open near Plaintiffs' neighborhoods before Hurricane Georges.[128] The fact that Defendants could have easily enclosed the storage shed and covered the red mud piles (among many other options) is irrelevant to this inquiry, just as the fact that the defendant in *Tutu*

---

[126] *Id.* at 381-82.
[127] Joint Motion at 23.
[128]*See* Exhibit 73 at 2-13 (concluding that Defendants knew about the need to secure the dust from hurricane winds and failed to adhere to industry standards for doing so),  Exhibit 74 at 7, 9-10, & 12 (demonstrating that Defendants understood the need for and how to minimize dusting but chose not to), and Exhibit 75 at 4 (concluding that documents authored by Alcoa employees explained how to minimize dusting); *see also* Exhibit 36 (Dames & Moore Report) at SCA 000451, 457, 432 (identifying ways to minimize dust emissions for red dust); *see als*o Exhibit 33 (same).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
28

*Wells* could have moved the gas tank was irrelevant in that case. Nonetheless, the *Tutu Wells*

court stressed the importance of reviewing all the factors together, and no single factor

determines the outcome.[129]   Under *Tutu Wells*, then, factor c weighs in favor of finding an ADA.

### Factor (d): Common Usage.

This factor weighs against the Defendants in this case.  Storing bauxite and/or red mud across

the street from residential neighborhoods is certainly not a common usage—it only benefited

Defendants financially and is not a typical undertaking.

### Factor (e): Inappropriateness of the Activity for the Location.

This factor also weighs against Defendants in this case because the refinery borders

residential neighborhoods and abuts precious natural resources.[130]

### Factor (f): Extent to which the value to the community is outweighed by the risks.

In *Fletcher v. Conoco Pipe Line Company*, cited by Defendants, the law required the use of

an electric current to avoid the great risks posed by potential leaks in an underground gas

pipeline.[131]   In contrast, Defendants here are **prohibited** by law from allowing bauxite and/or red

mud to escape their premises and invade the neighboring homes.[132]   Local courts and the DPNR

have stressed the limited and fragile state of the area's natural resources.  Plaintiffs depend upon

clean water in the ground and in their cisterns to survive. Unlike the need for an electric current

to prevent the corrosion of underground gas pipelines in *Fletcher*, the only benefit of Defendants

---

[129] *In re Tutu Wells*, 846 F. Supp. at 1269-71.

[130] *See supra* note 9 (describing the proximity of the Refinery to the neighborhoods). Defendants cite *Continental Building Corp. v. Union Oil Corp.*, 504 N.E.2d 787 (Ill. App. 1st Dist. 1987), in which an envelope company complained that an oil company stored flammable liquid next to the envelope company's property. The Illinois court rejected the claim because the warehouse where the drums were stored was in an industrial area surrounded by factories and companies.  In this case, however, the Refinery's proximity to the neighborhoods and the location of the actual bauxite shed and red mud piles on the premises made Defendants' conduct inappropriate. As the court in *Mathes v. Century Alumina Co. et al.*, No. 2005/0062, 2008 U.S. Dist. LEXIS 90087, *1 (D.V.I. Oct. 31, 2008) explained, the natural resources of the Virgin Islands are particularly sensitive and precious.

[131] *Fletcher v. Conoco Pipe Line Co.*, 129 F. Supp. 2d 1255, 1258-59 (W.D. Mo. 2001).

[132] *See* Plaintiffs' Statement of Facts at ¶¶ 52-57 (setting out DPNR's findings that Defendants violated the law).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
29

placing open, uncovered red mud piles and an unenclosed bauxite shed near Plaintiffs'
neighborhoods was to save Defendants' money.  Thus, the risk of harm of Defendants' conduct
outweighs its utility.   At a minimum, there are genuine issues of material fact that preclude
summary judgment on this claim.

## VI.   Genuine Issues of Material Fact Exist With Regard to Plaintiffs' Nuisance Per Se Claims.

The DPNR has already concluded that Defendants' conduct regarding its bauxite violated
several statutes, ordinances and common-law duties.[133]  This fact, alone, precludes summary
judgment on Plaintiffs' nuisance per se claims because Defendants' violation of these laws
caused Plaintiffs to suffer the same kinds of harms those laws were designed to prevent—
physical injury and property damage caused by exposure to pollutants.[134]  Defendants' authorities
are not relevant to this case.  *Kramer v. Gov't of Virgin Islands* and *Priory v. Borough of
Manasquan* both involved attempts to stop a nuisance before it even existed, a factual scenario
not applicable to this case.[135]

The remaining cases cited by Defendants involved the natural effects of normal and proper
operations of each facility, and the courts in those cases held that a nuisance per se includes a
violation of law itself.[136]  In contrast, here the DPNR has already ruled that Defendants'
operation of its facility in a hurricane-prone area violated the law.  Thus, Defendants have not
met their burden to show their entitlement to summary judgment on this claim.

---

[133] *Id.*
[134] *Id.*
[135] *Kramer v. Gov't of Virgin Islands*, 479 F.2d 350 (3rd Cir. 1973); *Priory v. Borough of Manasquan*, 120 A.2d 625 (N.J. Super. Ct. App. Div. 1956).
[136] *See Stockdale v. Agrico Chem. Company*, 340 F. Supp. 244, 250-52 (N.D. Iowa 1972) (involving emissions from a nearby plant that interfered with his enjoyment of property, were injurious to human and animal health, damaged property, and reduced market value; *Morgan v. High Penn Oil Co*., 77 S.E.2d 682 (N.C. 1953) (arising from the operation of an oil refinery near homes); *Florida East Coast Properties, Inc. v. Metropolitan Dade County*, 572 F.2d 1108, 1112  (5th Cir. 1978) (citing 58 Am. Jur. 2d Nuisances § 13 and involving resident complaints that the county was building a jail and work release facility across from their homes).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
30

### VII.   Genuine Issues of Material Fact Exist Regarding Plaintiffs' Intentional Infliction of Emotional Distress ("IIED") Claims.

*Eddy v. Virgin Islands Water & Power Authority* sets out the relevant provisions of the Restatement for an IIED claim: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[137]

A defendant's conduct is intentional if the defendant (1) acts with the purpose or desire to inflict emotional distress or (2) acts knowing that distress is substantially certain to result.[138] A defendant acts "recklessly" where he "acts or intentionally fails to act (which it is his duty to the other to do) knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of [severe emotional distress] to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."[139]

Defendants rely on *Smith v. Elias* for the proposition that IIED will only stand where the conduct is atrocious,[140] however, *Elias* actually found sufficient evidence for an IIED claim and for punitive damages stemming from that action.   In *Elias*, a driver was in an accident while making a delivery for a merchant employer. The employer tried to make the driver perjure himself and deny he was in the course and scope of his employment. After the driver declined, the merchant removed his driving privileges, retaliated against him, screamed at him, and refused him any further promotions. The driver alleged that he suffered extreme emotional injury as

---

[137] *Eddy v. Virgin Islands Water & Power Auth.*, 369 F.3d 227, 231-32 (3d Cir. 2004) (quoting Rest. 2d Torts § 46). "[S]evere emotional distress" must not be unreasonable, exaggerated, or unjustified and may include mental anguish, fright, horror, grief, worry, and other emotional disturbances and the question is whether any reasonable person could be expected to endure it." *Id.* at 231-32 (citing § 46, cmt. j).
[138] *Id.* at 232.
[139] *Id.* (quoting § 46, cmt. i).
[140] *Smith v. Elias*, No. 56/2003, 2007 WL 4209701, *1 (V.I. Super. Oct. 11, 2007).

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
31

result.[141] Importantly, the court explained that an action based on IIED can be supported without expert medical testimony and may be based on common symptoms of stress that the ordinary person understands.[142]

Defendants here knowingly exposed Plaintiffs to a toxic, irritating, and destructive red dust that Defendants understood would cause Plaintiffs severe emotional distress that surpassed the normal stresses associated with hurricanes.[143] Plaintiffs' affidavits and deposition testimony describe the common symptoms of emotional distress that they suffered as a result of exposure to the red dust.[144] Under *Elias*, this evidence raises a genuine issue of material fact regarding Plaintiffs' claims for IIED, and expert testimony is not necessary to support Plaintiffs' claims.

### VIII.   Genuine Issues of Material Fact Exist Regarding Plaintiffs' Claims for Negligent Infliction of Emotion Distress ("NIED").

Virgin Islands law requires a plaintiff to prove two elements to sustain a claim for NIED. "First, the negligent conduct must have placed the plaintiff in danger of his or her own safety. Second, the plaintiff must have suffered some physical harm as a result of the emotional distress."[145] Defendants have admitted that red dust from their refinery contaminated Plaintiffs' neighborhoods, and that it can cause the same symptoms Plaintiffs suffered.[146] Plaintiffs'

---

[141] *Id.* at *1.

[142] *Id.* at *4-5. Defendants also cite *Wisnewski v. Johns-Manville,* 812 F.2d 81 (3d Cir. 1987) to show that Defendants' conduct must go beyond what is required for punitive damages, but Pennsylvania has a stricter standard for the IIED cause of action than the Virgin Islands. *Elias*, 2007 WL 4209701 at *5.

[143] *See supra* notes 76-95. *Lempert v. Singer,* 766 F. Supp. 1356, 1367 (D.V.I. 1991), also cited by Defendants, involved misrepresentations about the condition, boundaries, and encumbrances of a piece of real estate, which allegedly caused emotional distress; the court found that those misrepresentations did not rise to anything more than ordinary fraud, which was insufficient to support a claim for IIED.  In *Heywood v. Cruzan*, 792 F.2d 367 (3d Cir. 1986) (Virgin Islands), a dissatisfied purchaser of a car sued the dealership for rude and unprofessional behavior. Of course, these cases are distinguishable because of the nature of the conduct involved—in this case, Defendants knowingly placed Plaintiffs' health and homes at risk understanding that their conduct would add to the already stressful situation of a hurricane.

[144] *See supra* note 24; *see also* Pls.' Statement of Facts ¶¶ 36-51.

[145] *Int'l Islamic Cmty. Of Masjid Baytulkhaliq  v. U.S*, 981 F. Supp. 352, 369-70 (D.V.I. 1997) (finding that plaintiffs were unable to show that their safety was in danger or they suffered any physical harm from the emotional distress).

[146] *See e.g.* Exhibit 71 (DPNR memo indicating that two SCA employees admitted that they saw the winds change direction and blow bauxite towards the neighborhoods); Defs.' Overview Br. (Doc. 1272) at 10 (admitting that

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
**PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.**
**32**

affidavits and deposition testimony set out their physical injuries caused by their exposure to the red dust and the extreme emotional distress they endured during that trying time.[147] Defendants negligently failed to secure and needlessly exposed Plaintiffs to irritating red dust, even though Defendants understood such conduct would cause Plaintiffs severe personal injuries and property damage.[148] Thus, regardless of the composition of the red dust and without any expert testimony, under the relevant authorities, the summary judgment evidence raises a genuine issue of material fact regarding Plaintiffs' claims for NIED.

### IX.    The Summary Judgment Evidence Supports Plaintiffs' Claims for Punitive Damages.

To conclude their motion, Defendants cite several cases correctly indicating that punitive damage claims cannot stand on their own. However, Defendants then incorrectly presume that Plaintiffs have no evidence to support such damages.   The same evidence that supports Plaintiffs' claims for intentional conduct also supports punitive damages.   In particular, for years before Hurricane Georges, Defendants understood that (1) bauxite and red mud each separately posed serious hazards to safety and property; (2) the bauxite and red mud piles each independently emitted fugitive dusts; (3) those dusts had previously reached Plaintiffs'

---

bauxite escaped the shed); Joint Motion at 13, n. 5 (admitting that bauxite erupted from the shed during the hurricane); *see also* Exhibits 54-59 (MSDS sheets).

[147] *See supra* note 24; *see also* Pls.' Statement of Facts ¶¶ 36-51.

[148] *See e.g.* Exhibit 32 at 101:18-21 & 103:20-22 (Defendants knew the bauxite shed was susceptible to hurricane damage);  SCA's Statement of Undisputed Facts in the SCRG Case, Exhibit 53, at ¶¶ 34-38, 43 (admitting that certain documents warned them that bauxite and red mud were dusty and the need to control the dust); Pls.' Statement of Facts at ¶¶ 23-28 (MSDS sheets identifying physical injuries caused by bauxite and red mud); Exhibit 32 at 119: 13-120: 1, 125: 4-7 (admitting that SCA took no steps to secure the bauxite shed before the hurricane); Exhibit 45 at 67:19-68:10 (admitting that no precautions were taken to secure red dust); *see also* Exhibit 73 at 5-9, 12-13 (despite knowledge of dangers posed by red dust, Defendants took none of the necessary precautions to protect nearby neighborhoods); Exhibit 71 (noting DPNR investigator's observation that Mr. Black reported to him that nothing was done to secure the bauxite storage shed because it was built to withstand hurricanes). *Lempert v. Singer*, 766 F. Supp. 1356, 1367 (D.V.I. 1991) involved misrepresentations about the condition, boundaries, and encumbrances of a piece of real estate caused emotional distress; the court found that those misrepresentations did not rise to anything more than ordinary fraud, which was insufficient to support a claim for IIED.  In *Heywood v. Cruzan*, 792 F.2d 367 (3d Cir. 1986) (Virgin Islands), a dissatisfied purchaser of a car sued the dealership for rude and unprofessional behavior. Of course, these cases are distinguishable because of the nature of the conduct involved—Defendants knowingly placed Plaintiffs' health and homes at risk understanding that their conduct would add to the already stressful situation of a hurricane.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
33

properties; (4) there were available methods for protecting the Plaintiffs from itinerant dusts; and (5) the populations at risk lived closest to the refinery.[149] Nonetheless, Defendants did not take a single action before Hurricane Georges to reduce (much less eliminate) the dangers to Plaintiffs and, after the storm, they made matters worse by ineffectively remediating the red dust. Such conduct certainly rises to the level of gross indifference to the health, safety, and welfare of others.

## X.    Conclusion

Defendants use smoke and mirrors to try to distort the clear picture that a reasonable jury would see from the summary judgment evidence in this case.  But no parlor tricks can hide Defendants' glaring and repeated admissions in statements to Plaintiffs, written documents, corporate testimony, and pleadings in another case. Defendants knew that their neighbors would be bombarded by red dust from the bauxite storage shed and the red mud piles in the event of a hurricane, unless they took some action.  Despite this knowledge, Defendants chose to do nothing and sat by as Plaintiffs and their homes were contaminated by Defendants' raw materials and wastes. As a result of Defendants' total disregard for their health, safety, and welfare, Plaintiffs endured much more than the typical stress associated with hurricanes. Plaintiffs suffered the exact same physical symptoms described in Defendants' own documents, plus the extreme emotional distress associated with exposure to such large amounts of red dust and the unnecessary loss of real and personal property. Because a reasonable jury could easily draw such conclusions from the facts in the record, summary judgment is not appropriate in this case.

---

[149] *See supra* notes 76-95.

Henry, et al. v. St. Croix Alumina, LLC, et al., Civil No. 1999/0036
PLS.' MEM. IN OPP. TO DEFS.' MOT. FOR SUMM. J. BASED ON PLS.' LACK OF NEC. EVID.
34

Dated: July 24, 2009                    Respectfully Submitted:


BY:   /s/Lee J. Rohn
          LEE J. ROHN
          ROHN & CARPENTER, LLC
          1101 King Street
          Christiansted, St. Croix
          U.S. Virgin Islands 00820-4933
          (340) 778-8855
          (340) 773-2954 (FAX)



CERTIFICATE OF SERVICE


        I hereby certify that on July 24, 2009, a true and correct copy of the above and foregoing
**Plaintiffs' Memorandum In Opposition To Defendants' Motion For Summary Judgment
Based On Plaintiffs' Lack Of Necessary Evidence** was electronically filed with the Clerk of the
Court using the CM/ECF system, which will send a notification of such filing (NEF) to the
following:

Bernard C. Pattie, Esquire
Law Office of Bernard C. Pattie PC          Laura Baughman, Esquire
1244 Queen Cross Street, Suite 5            Baron & Budd, P.C.
St. Croix, VI 00820-4932                    3102 Oak Lawn Ave.
Attorney for St. Croix Alumina LLC and Alcoa   Dallas, TX 75219-4281
Inc.                                        Attorney for Plaintiffs

Derek M. Hodge, Esquire                     Lori E. Jarvis, Esquire
MacKay & Hodge                              Hunton & Williams
19A-20 Kongens Gade                         River Front Plaza, East Tower
P.O. Box 303678                             951 East Byrd Street
St. Thomas, VI  00802                       Richmond, VA 23219
Attorney for Glencore, Ltd.                 Attorney for St. Croix Alumina LLC and Alcoa
                                            Inc.

Gordon Rhea, Esquire
Richardson, Patrick Westbrook & Brickman,   Renè P. Tatro, Esquire
LLC                                         Tatro Tekosky Sadwick LLP
1037 Chuck Dawley Blvd. Bldg A              333 S. Grand Avenue, Suite 4270
Mt. Pleasant, SC 29464                      Los Angeles, CA 90017
Attorney for Plaintiffs                     Attorney for Glencore, Ltd.

                                            BY:   s/Lee J. Rohn          (sb)